FILED
MAY 23 2017
TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

**United States District Court For the Southern District of West Virginia**

Wei-ping Zeng, Ph.D.
3008 Fillmore Avenue
El Paso, TX 79930 (current temporary address)
Tel: 304 942-6668; Email: weipingzengny@gmail.com

3:17-cv-3008

Plaintiff,

v.

Marshall University
Attn: Joseph Shapiro, M.D.
Dean, Marshall University School of Medicine
1600 Medical Center Drive
Huntington, WV 25701

Defendant

**Title: Complaint and Demand of Jury Trial**

The plaintiff alleges that he was denied tenure because of discrimination based on race and national origin, and was retaliated against for opposing the unlawful discrimination by the defendant. Thus, the cause of action arises from defendant's alleged violations of Title VII of the Civil Rights Act of 1964, as amended, and Civil Rights Act of 1866.

**I. Jurisdiction and Venue**

1. The court has jurisdiction over this case as this case involves federal questions.

2. The court has jurisdiction over this case pursuant to 28 U.S.C. § 1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

3. The court has jurisdiction over this case pursuant to 28 U.S. C. §1343, which gives the district courts original jurisdiction of any civil action authorized by law to be commenced by any person.

4. The Court has supplemental jurisdiction over the plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), since the defendant is located in this district and the events giving rise to the claims occurred in this district.

**II. Procedure Requirement**

6. The plaintiff filed charges of discrimination based on race and national origin, and retaliation for opposing unlawful discrimination with Equal Employment Opportunity Commission (EEOC). On Feb 23, 2017 the EEOC notified the plaintiff the right to sue within 90 days. The plaintiff is filing the complaint within the 90 days of receipt of the EEOC notice.

7. The plaintiff also filed grievance with the West Virginia Public Employee Grievance Board (PEGB). The grievance has been heard by the chief administrative law judge, and is pending for decision.

**III. Parties**

8. The plaintiff Wei-ping Zeng, Ph.D. is a naturalized U.S. citizen, originally from China. Dr. Zeng was employed as an associate professor in the Department of Biochemistry and Microbiology, Marshall University School of Medicine from September 1, 2009 to June 30, 2016. Dr. Zeng applied for tenure in October 2015, and was denied tenure by Marshall University on April 30, 2016.

1

9. The defendant Marshall University is a higher education institution located in Huntington, West Virginia.

**IV. Applicable Laws**

Federal Laws

10. 42 USC §1981: Equal rights under the law
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

11. 42 USC §1981a: Damages in cases of intentional discrimination in employment
(a) Right of recovery -(1) Civil rights
In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 [42 U.S.C. 2000e–5, 2000e–16] against a respondent who engaged in unlawful intentional discrimination ....., the complaining party may recover compensatory and punitive damages as allowed in subsection (b), in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.
(b) Compensatory and punitive damages
(1) Determination of punitive damages
A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.
(2) Exclusions from compensatory damages
Compensatory damages awarded under this section shall not include back pay, interest on back pay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964 [42 U.S.C. 2000e–5(g)].
(3) Limitations (D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.
(c) Jury trial
If a complaining party seeks compensatory or punitive damages under this section-
(1) any party may demand a trial by jury; and
(2) the court shall not inform the jury of the limitations described in subsection (b)(3).

12. 42 USC §2000e–2. Unlawful employment practices
(a) Employer practices
It shall be an unlawful employment practice for an employer-
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
(m) Impermissible consideration of race, color, religion, sex, or national origin in employment practices
Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

13. 42 USC §2000e–3. Other unlawful employment practices
(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings
It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against

2

any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

      14. 42 USC §2000e–5. Enforcement provisions
(g) Injunctions; appropriate affirmative action; equitable relief; accrual of back pay; reduction of back pay; limitations on judicial orders
(1) If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

Comments

      15. The 1991 amendments to Civil Rights Act of 1964 permit Title VII cases to be tried by jury. 42 U.S.C. §1981a(c). The plaintiff may recover on a showing that the alleged discriminatory employment practice was based on an individual's race, color, religion, sex or national origin. 42 U.S.C. § 2000e-2(a)(1). The plaintiff may prevail by showing that the discrimination was "a motivating factor" in the employment decision even though other factors also motivated the decision. Washington v. Garrett, 10 F.3d 1421, 1433 n.15 (9th Cir.1993); see also Costa v.201Desert Palace, Inc., 299 F.3d 838, 853-59 (9th Cir.2002) (en banc), aff'd, 539 U.S. 90 (2003) ("Put simply, the plaintiff in any Title VII case may establish a violation through a preponderance of evidence (whether direct or circumstantial) that a protected characteristic played 'a motivating factor.'"); see also E.E.O.C. v. Abercrombie & Fitch Stores, Inc., 135 S. Ct. 2028, 2032 (2015) (explaining that phrase "because of" "typically imports, at a minimum, the traditional standard of but-for causation," but Title VII relaxes this standard "to prohibit even making a protected characteristic a 'motivating factor' in an employment decision"). In retaliation claims, however, the correct standard in determining causation is the "but-for" standard and not the "motivating factor" standard. Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517 (2013).

Reference

      16. Chapter 10. Civil rights – title VII- employment discrimination, harassment, retaliation. In: manual of model civil jury instructions for the district courts of the ninth circuit; by the ninth circuit jury instructions committee. (http://www3.ce9.uscourts.gov/jury-instructions/model-civil).

West Virginia State Laws

      17. West Virginia Code §6C-2-2(I) (1)"Grievance" means a claim by an employee alleging a violation, a misapplication or a misinterpretation of the statutes, policies, rules or written agreements applicable to the employee including:
(i) Any violation, misapplication or misinterpretation regarding compensation, hours, terms and conditions of employment, employment status or discrimination;
(ii) Any discriminatory or otherwise aggrieved application of unwritten policies or practices of his or her employer;
(iv) Any specifically identified incident of favoritism; or
(v) Any action, policy or practice constituting a substantial detriment to or interference with the effective job performance of the employee or the health and safety of the employee.

3

18. West Virginia Code §6C-1-3. Discriminatory and retaliatory actions against whistle-blowers (a) No employer may discharge, threaten or otherwise discriminate or retaliate against an employee by changing the employee's compensation, terms, conditions, location or privileges of employment because the employee, acting on his own volition, or a person acting on behalf of or under the direction of the employee, makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste.

Comments

19. Plaintiff has the burden of proving his grievance by a preponderance of the evidence. Howell v. W. Va. Dep't of Health & Human Res., Docket No. 89-DHS-72 (Nov. 29, 1990). See also Holly v. Logan County Bd. of Educ., Docket No. 96-23-174 (Apr. 30, 1997); Hanshaw v. McDowell County Bd. of Educ., Docket No. 33-88-130 (Aug. 19, 1988).

20. The preponderance standard generally requires proof that a reasonable person would accept as sufficient that a contested fact is more likely true than not. Leichliter v. W. Va. Dep't of Health & Human Res., Docket No. 92-HHR-486 (May 17, 1993).

21. The decisional subjective process by which promotion and tenure are awarded or denied is best left to the professional judgment of those presumed to possess a special competency in making the evaluation unless shown to be arbitrary and capricious or clearly wrong. Cohen v. W. Va. Univ., Docket No. BOR1-86-247-2 (July 7, 1987). See Siu v. Johnson, 748 F. 2d 238 (4th Cir. 1984). See also Carpenter v. Bd. of Trustees/W. Va. Univ., Docket No. 93-BOT-220 (Mar. 18, 1994).

22. Deference is granted to the subjective determination made by the official[s] administering the process. Harrison v. W. Va. Bd. of Directors/Bluefield State College, Docket No. 93-BOD-400 (Apr. 11, 1995); Gardner v. Bd. of Trustees/Marshall Univ., Docket No. 93-BOT-391 (Aug. 26, 1994). Thus, the review of an institution of higher learning promotion decision is "generally limited to an inquiry into whether the process by which such decisions are made conforms to applicable college policy or was otherwise arbitrary and capricious." Harrison, supra; Nelson v. Bd. of Trustees/W. Va. Univ., Docket No. 99-BOT-514 (June 22, 2001); Baroni v. Bd. of Directors/Fairmont State College, Docket No. 92-BOD-271 (Feb. 11, 1993).

23. Generally, an agency's action is arbitrary and capricious if it did not rely on factors that were intended to be considered, entirely ignored important aspects of the problem, explained its decision in a manner contrary to the evidence before it, or reached a decision that is so implausible that it cannot be ascribed to a difference of view. Bedford County Memorial Hosp. v. Health and Human Serv., 769 F.2d 1017 (4th Cir. 1985).

24. Arbitrary and capricious actions have been found to be closely related to ones that are unreasonable. State ex rel. Eads v. Duncil, 196 W. Va. 604, 474 S.E.2d 534 (1996). An action is recognized as arbitrary and capricious when "it is unreasonable, without consideration, and in disregard of facts and circumstances of the case." Eads, supra (citing Arlington Hosp. v. Schweiker, 547 F. Supp. 670 (E.D. Va. 1982).

25. The "clearly wrong" and the "arbitrary and capricious" standards of review are deferential ones which presume an agency's actions are valid as long as the decision is supported by substantial evidence or by a rational basis. Adkins v. W. Va. Dep't of Educ., 210 W. Va. 105, 556 S.E.2d 72 (2001) (citing In re Queen, 196 W. Va. 442, 473 S.E.2d 483 (1996)).

References

26. WV-PEGB decision, Sarah S. Knox v. West Virginia University, Docket No. 2014-1630-WVU, July 1, 2015.

27. WV-PEGB decision, Robert S. Gall v. West Liberty University, Docket No. 2011-1649-WLU, December 14, 2011.

28. WV-PEGB decision, Joseph L. Scarpaci v. West Liberty University, Docket No. 2013-2229-CONS, December 23, 2013.

**V. Factual Allegations**

A. Plaintiff's job performances were better than similarly situated employees

29. Dr. E. Koc, Dr. J. Denvir and the plaintiff were all employed as tenure-track faculty members in the Department of Biochemistry and Microbiology. Dr. Koc is Caucasian of Turkish national origin; Dr. Denvir is Caucasian of British national origin; the plaintiff is Asian of Chinese national origin. Dr. Koc was hired in 2011 as an associated professor, applied for tenure in October 2013, and was awarded tenure in 2014. Dr. Denvir was hired in 2011 as an assistant professor, applied for promotion and tenure in October 2014, and was promoted to associate professor and awarded tenure in 2015. The plaintiff was hired in 2009 as an associate. Professor, applied for tenure in October 2015, and was denied tenure in 2016.

30. Faculty's job responsiblities include teaching, research and services. Due to judge's order not to release specific information in the subpoena duces tecum of the grievance board hearing, the plaintiff could not provide specific information about Dr. Koc and Dr. Denvir. Nonetheless, to the plaintiff's knowledge Dr. Koc, Dr. J. Denvir and the plaintiff all had similar percentages of efforts for teaching, research and services.

Teaching

31. The medical school faculty's primary teaching responsibility is teaching medical students (medical teaching). Faculty also teaches graduate students (graduate teaching). Tenure applicants were evaluated whether they had achieved certain level of teaching proficiency in the academic year of their tenure application. Faculty's medical teaching was evaluated by medical student's evaluation score. There was no formal mechanism for graduate teaching evaluation.

32. In the one-year period immediately prior to the plaintiff's tenure application (2015 Spring semester and 2015 Fall semester), the plaintiff's overall medical teaching evaluation score was 4.449. To the plaintiff's knowledge, the plaintiff's score was better than those of Dr. Koc's and Dr. Denvir's in the academic years of their respective tenure application. The plaintiff's score was even better than the average score of 4.384 of a group of high-ranking departmental faculty who were former chair, sitting chair and university distinguished scholar and taught the same courses as the plaintiff.

33. The plaintiff continued to deliver excellent teaching performance in the spring semester of the 2015- 2016 academic year (2016 Spring semester) after he learned that the chair and dean did not recommend him for tenure. For the 2 courses he taught, he received averages of 4.640 and 4.557, both were better than the departmental averages of 4.635 and 4.464.

34. The plaintiff had taught 7 graduate courses, averaged at 20.83 hours per year. He had mentored 5 graduate students and medical resident. To the plaintiff's knowledge, these graduate teaching activities were much more than or at least comparable to those of Dr. Koc's or Dr. Denvir's.

Research

35. The ultimate measurement of research productivity is the quantity and quality of publications. Publications from a faculty member's own lab (faculty member as the first and/or corresponding author) and affiliated with Marshall University should receive primary consideration.

5

36. At the time of tenure application, the plaintiff had 6 first and/or corresponding author publications with Marshall affiliation. Dr. Koc had 3 first and/or corresponding author publications with Marshall affiliation. Dr. Denvir had 0 first and/or corresponding author publications with Marshall affiliation.

37. The quality of a publication is assessed by the impact factor of the journal in which the paper (pulbicaiton) is published. The accumulative impact factor of all the plaintiff's first and/or corresponding author publications was 26.4. Dr. Koc's was 7.915. Dr. Denvir had no first and/or corresponding author publication.

38. Both the quantity and quality of the plaintiff's first and/or corresponding author publications were also better than those of other departmental faculty members of his rank (associate professor).

39. On behalf of the University and based on the plaintiff's research, the plaintiff applied and received a provisional patent. To the plaintiff's knowledge, neither Dr. Koc nor Dr. Denvir applied and received a patent for the University.

Services

40. Faculty members were assigned to perform service duties by the departmental chair. The service duties assigned to the plaintiff included serving as the co-director of the flow cytometry core facility, serving as a member of the medical school admissions committee and the university academic planning committee. The plaintiff dutifully performed these assigned service duties. As the co-director of the flow cytometry core facility, the plaintiff established a new experimental application of the instrument that was previously not available to the university research community. However, the university had no formal mechanism to evaluate faculty's services.

41. Apart from the assigned service duties, the plaintiff self-initiated a service project that has greatly improved the university's library literature search function. The improved search function could save hundreds even thousands of hours per year for the members of the university. The plaintiff also volunteered to participate in the community outreach program, the local high school research "Café", to enhance the relationship between the university and local public. To the plaintiff's knowledge, Dr. Koc and Dr. Denvir did not have any self-initiated service activities.

42. In terms of services to the national and international scientific communities, the plaintiff had 16 such activities. To the plaintiff's knowledge this number was much higher than those of Dr. Koc's and Dr. Denvir's.

B. Distorting evidence by the defendant to downgrade the plaintiff's credentials

43. The departmental promotion and tenure committee (DPTC) in its review of the plaintiff's tenure application stated that the plaintiff had only 10 hours of medical teaching and 5 hours of graduate teaching. In fact, the plaintiff had average of 17 hours per year of medical teaching, which was higher than the departmental average of 16.25 hours per year for faculty teaching the second year medical students as the plaintiff did. As described above, the plaintiff had an average of 20.83 hours per year of graduate teaching. The interim chair Dr. D. Primerano in his letter to the dean also presented lower numbers of hours of plaintiff's teaching.

44. The Marshall University Medical School was placed on probation by the Liaison Committee on Medical Education (LCME) in 2011. One of the medical school's deficiencies that the LCME identified was "lifelong learning in the curriculum". The plaintiff proactively responded to the LCME's criticism and voluntarily developed 4 active learning modalities for the medical students (vs. departmental average of 2.25). However, the DPTC stated that the plaintiff developed only 2 active learning modalities.

45. The DPTC stated "directing and teaching in one biomedical science course (Molecular Pathogenesis) in your area of expertise in 2010-2011 academic year, Dr. Zeng has not directed or taught in

6

this course". The interim chair wrote "Dr. Zeng has also contributed to four BMS graduate courses". In fact, the plaintiff taught the Molecular Pathogenesis course in not just 1 but 2 academic years. Instead of just 1 or 4 courses, the plaintiff taught 7 biomedical science (graduate) courses, therefore exceeded the job expectation.

46. The DPTC stated "Dr. Zeng's chair evaluation for research is "needs improvement". In fact, the plaintiff had 2 excellent, 1 good and 1 "needs improvement" evaluations by the former chair Dr. Niles. The plaintiff does not agree that "needs improvement" was necessarily a negative evaluation because in the academic year of 2012-2013 that the "needs improvement" evaluation was given, the plaintiff had 2 publications. Such achievement would normally warrant an excellent rating.

47. To the plaintiff's knowledge, the reviewers also distorted evidence in Dr. Denvir's and Dr. Koc's tenure application packets. However, in contract to the plaintiff's case, those distortions inflated Dr. Denvir and Dr. Koc's credentials.

C. Arbitrary and irrational evaluations

48. Despite the plaintiff's excellent teaching score, the interim chair and the dean gave the plaintiff only a "satisfactory" rating. The dean and the DPTC cited low teaching load as the reason for the low rating. However, they did not compare the plaintiff's 17 hours with the departmental average of 16.25 hours per year of medical teaching. They also ignored the plaintiff's substantial graduate teaching. In contrast, Dr. Denvir was promoted and granted tenure for just 2 hours of medical teaching.

49. Ignoring the fact that by comparison, the plaintiff's research productivity (publication) was much stronger than those of the similarly situated employees, the interim chair gave a "satisfactory" rating of the plaintiff's research. After the interim chair reviewed the plaintiff's application, the plaintiff had a manuscript that received favorable review from a highly prestigious journal that is ranked #1 in the field of the plaintiff's research with a high impact factor of 11.476. This was 1 of only 2 articles published in a journal with an impact factor greater than 10 by the entire medical school faculty since the plaintiff joined Marshall University. The manuscript was accepted by the medical school personnel advisory committee (PAC) for review by the PAC and the dean. An unbiased person would expect that with this new information, the dean would gave a higher rating than the interim chair's already unreasonably low rating. Instead, the dean went in the opposite direction and gave a "poor" rating of the plaintiff's research!

50. Without explanation, the interim chair in his letter to the dean gave a "satisfactory" rating of the plaintiff's services. He totally ignored (without any mentioning) the plaintiff's self-initiated service projects. The dean acknowledged the plaintiff's self-initiated services. Given the enormous benefits, particularly that from the improvement of the efficiency of literature search provided by the plaintiff's self-initiated service project, an unbiased person would expect the dean adjust the rating higher. Instead, the dean again went in the opposite direction and lowered the rating to "poor"!

D. Capricious addition of tenure requirements in violation of University policies

51. The school of medicine Promotion and Tenure Regulations stipulate specific requirements for tenure, which do not include external research funding.

52. The Marshall University Board of Governors Policy No. AA-28, 3.1.1 stipulates "at the time of initial appointment, the department chairperson will notify in writing each probationary faculty member of the requirements and guidelines for tenure, including any which apply specifically within the faculty member's department". The Board of Governors Policies take precedence over any other University policies.

53. The departmental chair did not exercise his option to include tenure requirements, "which apply specifically within the faculty member's department" "at the time of initial appointment" because there was no description of "tenure requirements" in the plaintiff's offer letter. In fact, there were not even verbal discussions of tenure requirements during the hiring process.

7

54. In 2012, the DPTC in its mid-tenure review stated that external funding was mandatory. This was the first time that the plaintiff was notified in writing that external funding was a tenure requirement. The plaintiff did not agree to this addition of tenure requirement. In the following year (2013), the former chair reiterated that external funding was mandatory for tenure.

55. The DPTC criticized the plaintiff for not developing new courses, and not being invited as speaker in national or international meetings, implying these were also the requirements for tenure.

56. The DPTC's function was to review and evaluate faculty performance. There were no policies that authorize the DPTC to propose or create new tenure requirements. Doing so was out of the bound of the DPTC's duties. Likewise, no policies authorize the chair to capriciously alter or add tenure requirements after the initial time of a faculty member's appointment. The fact that the Board of Governors Policies specifically stated "at the time of initial appointment" shows that the Board of Governors Policies prohibit the chair or anyone else from capriciously changing tenure requirements after a faculty member has been hired.

E.   Higher standards for the plaintiff and other Asian faculty members

External funding

57. The plaintiff was required to have external funding for tenure. Another Chinese faculty member in the department Dr. Yu testified that he would not have been awarded tenure had he not had external funding at the time of his tenure application. However, Dr. Koc was not required to have external funding and was awarded tenure without external funding. Dr. Denvir was named by the University as a co-investigator in a federal grant ear-marked for historically underfunded states to improve infrastructure and technical support for research. This grant has been awarded to a network of colleges and universities in West Virginia since 2004. Therefore, Dr. Denvir essentially received a free handout, and was artificially made to have satisfied the external funding requirement.

58. The defendant argued that establishing external funding was a job responsibility. However, to the plaintiff knowledge externally funded research was also a job responsibility for Dr. Koc. For Dr. Koc and Dr. Denvir, the defendant treated job responsibilities as expectations not tenure requirements.

59. The defendant ignored the fact that nationwide research funding climate had greatly deteriorated, and as such the primary source of funding the National Institutes of Health had shifted focus to funding large research universities or centers. Marshall University is not a research university therefore is at a disadvantageous position in competing for federal funding for research.

60. The defendants also ignored the important fact that the plaintiff's research progress hence the ability to formulate competitive grant proposal was severely hindered by the University's failure to provide technical supports, which the University was obliged to provide.

61. An administrative law judge had ruled that job expectation did not equate tenure requirement, and university should take into consideration of deteriorated funding climate in tenure decision (Knox, Sarah S. v. W. Va University, Docket No. 2014-1630-WVU, WV PEGB, July 1, 2015).

Teaching

62. The plaintiff had 17 hours per year of medical teaching, yet was wrongfully accused of having low teaching load. Dr. Denvir had only 2 hours of medical teaching but was not only awarded tenure but also received promotion.

Other requirements

8

63. As discussed earlier, the plaintiff was required to develop new courses and be invited as speaker in national or international meetings. These were not even job responsibilities/expectations in the plaintiff's offer letter. To the plaintiff's knowledge, Dr. Koc did not develop a new course, and neither Dr. Koc nor Dr. Denvir had been invited as speakers at national or international meetings.

Higher standards for other Asian faculty members

64. In response to the plaintiff's argument that the defendant had higher standards for the plaintiff, the interim chair responded that he had previously recommended 2 Asian faculty members – Dr. Yu and Dr. Santanam for tenure. Dr. Yu testified that he was 2-time recipient of the University Distinguished Scholar Award. Based on many years of his experience of reviewing faculty promotion and tenure applications, Dr Yu ranked himself top 5% or 10% among the faculty. Dr. Santanam was a recipient of the University's MU-Advance Merit Award. Thus, both Dr. Yu and Dr. Santanam were exceptionally successful faculty members. The interim chair's recommendation for their tenure in fact supported the plaintiff's view that he had higher standards for Asian faculty.

School of medicine policies allow lesser areas be balanced with strength in other areas

65. The school of medicine P&T regulations state "for each individual, it is required that lesser achievement in one area be balanced by excellence in another". The plaintiff was more harshly treated than this policy intends to. The plaintiff had in fact no weakness in all areas of teaching, research and service in comparison with the similarly situated employees Dr. Koc and Dr. Denvir. In absolute terms, the plaintiff had weakness in only a fraction of one area of research, i.e., the lack of external funding. However, external funding was not an official requirement for tenure in the school of medicine P&T regulations, and was not required for Dr. Koc. Thus, the plaintiff argued that on balance he should have been awarded tenure if his application were fairly treated according to the school's official policy.

F. Other discriminatory treatments

66. The plaintiff was initially hired as a successor to Dr. Jackman to teach Immunology. However, when Dr. Jackman retired, the plaintiff was not offered the opportunity to take over her teaching responsibilities.

67. Among the three similarly situated employees Dr. Koc, Dr. Denvir and the plaintiff, the plaintiff had the most experience as a faculty member in biomedical research and education. However, to the plaintiff's knowledge, the plaintiff's pay was the lowest.

68. The plaintiff was denied opportunities to interact with visiting scholars, which is an important aspect of the academic profession.

69. The plaintiff was refused access to clinical data, clinical research facility and personnel support. Hence his ability to work was impeded.

G. Interference and abnormalities of the tenure application review process

70. Before the plaintiff even submitted his tenure application, the departmental interim chair informed the DPTC chair Dr. E. Hardman and the medical school PAC chair Dr. B. Beaver that he would not recommend the plaintiff for tenure. The interim chair thus had no respect for the procedure fairness and effectively damaged the independence of the committees. Dr. Beaver testified in the grievance hearing that the PAC had never made any decision that contradicted chair's decision. The interim chair admitted that he had "put the cart before the horse".

71. The school of medicine P&T regulations stipulate that part-time faculty member is not eligible to served on P&T committee. Dr. E. Hardman was part-time employee at the time of the plaintiff's tenure

9

application. The plaintiff requested Dr. Hardman be removed from his committee. The plaintiff's request was denied.

72. The school of medicine PAC reviewed the plaintiff's tenure application on January 14, 2016, but did not issue its decision to the plaintiff until February 8, 2016. PAC chair Dr. Beaver testified at the grievance hearing that she met with the dean to discuss the plaintiff application before the decision letter. This was again out of the order of the sequence of the review process.

H. Early termination of employment as retaliation for opposing unlawful discrimination

73. Title 133 Procedural Rule West Virginia Higher Education Policy Commission, Series 9, Section 3.14 states: "every faculty contract at any institution shall be for one fiscal year, or part thereof, in accordance with and in compliance with the annual budget of the institution, or supplementary actions thereto, as provided by law". The phrase **"part thereof"** in this provision means that a contract can start or end at any date of fiscal year.

74. The plaintiff joined the University on September 1, 2009, but was not assigned a lab until February 2010. The former chair and associate dean for research and graduate education Dr. Niles told the plaintiff that the plaintiff's tenure clock would not start until the plaintiff had the lab set up. Therefore, if this promise were to be honored, the plaintiff's 7-year contract would end in February 2017. If this promise were not honored, the contract should end on August 31, 2016.

75. The plaintiff submitted tenure application in October 2015. In November 2015, the DPTC and the interim chair reviewed the application and decided not to recommend the plaintiff for tenure.

76. On Feb 8, 2016, the medical school dean Dr. J. Shapiro sent his decision letter to the plaintiff, in which the dean informed the plaintiff that he recommended to the University president against awarding tenure to the plaintiff. In the letter, the dean suggested that the plaintiff had a meeting with the dean. The plaintiff had a meeting with the dean in the dean's office on Feb 22, 2016. In the meeting the dean told the plaintiff if the plaintiff did not make a fuss about his tenure decision, the dean would honor the Feb 2017 end date and even extend the end date to June 2017. However, if the plaintiff decided to challenge the dean's or the University's decision, the plaintiff's employment would end June 30, 2016. The dean also told the plaintiff that he had discussed his decision with the president and the president agreed with him.

77. On March 16, 2016, the plaintiff had a meeting with the interim chair Dr. D. Primerano. The interim chair reiterated the dean's position and said that the dean told him that the plaintiff would be the interim chair's problem from then on, meaning that the dean had delegated the handling of the issues related to the plaintiff's tenure application to the interim chair.

78. After the meeting with interim chair, the plaintiff wrote to the University president to urge him to reconsider the dean's negative decision.

79. The plaintiff did not receive positive response from the president. Therefore, on March 21, 2016 the plaintiff filed a questionnaire with the EEOC regarding employment discrimination based on race and national origin, and retaliation for opposing unlawful discrimination. About a month later, the plaintiff received a phone call from EEOC. The EEOC asked whether the plaintiff wished to file formal charges against the university. The plaintiff agreed to file formal charges of discrimination based on race and national origin, and retaliation for opposing the unlawful discrimination.

80. On April 30, 2016, Marshall University President made the final decision to deny the plaintiff tenure.

81. On May 5, 2016, the plaintiff received an e-mail from the Marshall University Associate General Counsel Ms. J. Houdyschell stating that Feb 1, 2017 would be the end date of the plaintiff's employment if the

10

plaintiff 1) withdrew EEOC charge; 2) waive the right to grievance; and 3) bring no further claim against the University including the School of Medicine.

82. On May 20, 2016, the plaintiff filed grievance with the WV PEGB.

83. The defendant materialized its threat of retaliation, and retaliated the plaintiff by early termination of the plaintiff's employment on June 30, 2016.

**VI. Causes of Action**

**Count 1.** Discriminatory employment practice in violation of Title VII

84. The plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 83, inclusive, as if fully set forth herein.

85. The defendant discriminated against the plaintiff on the basis of his race/national origin (Chinese) in violation of 42 USC §2000e-2 by denying him the same terms and conditions of employment applied to similarly situated employees of the majority race, specifically by denying the plaintiff tenure and equal pay.

86. As the results of the defendant' discriminatory practice, the plaintiff has suffered and continues to suffer damage to his professional reputation and opportunities, economical loss, emotional distress and mental anguish, including but not limited to depression, humiliation, embarrassment, stress and anxiety, emotional pain and suffering.

87. The defendant distorted evidence, capriciously set higher standards to falsely give low evaluations of the plaintiff's credentials for tenure. Hence, these conducts were intentional, in disregard of official policies and the plaintiff's civil rights, entitling the plaintiff to awards of compensatory and punitive damages.

**Count 2.** Retaliation in violation of Title VII and §1981

88. The plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 87, inclusive, as if fully set forth herein.

89. The defendant retaliated the plaintiff for opposing unlawful discriminatory employment practice in violation of 42 USC §2000e-3 and §1981 by ending his employment contract prematurely.

90. The defendant's retaliation has caused the plaintiff to suffer damage of professional reputation and opportunities, economical loss, emotional stress and mental anguish, including but not limited to depression, humiliation, embarrassment, stress and anxiety, emotional pain and suffering.

91. The defendant's unlawful discrimination, and the plaintiff's opposition to the unlawful discrimination were the direct and determining reasons for the retaliation, i.e., premature termination of the plaintiff's employment. In other words, had the plaintiff given up his right to oppose, the plaintiff's employment would not have been ended prematurely. Thus, this claim satisfies the "but for" standard of proof.

92. The defendant's retaliation intended to cause maximum stress for the plaintiff, and the pre-meditated threat of such retaliation was intended to force the plaintiff to give up his right to oppose the unlawful discrimination. Thus, the retaliation was intentional, in disregard of the official policies and the plaintiff's civil rights, hence entitling the plaintiff to awards of compensatory and punitive damages.

**Count 3.** Unlawful discrimination in violation of West Virginia Code

93. The plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 92, inclusive, as if fully set forth herein.

94. The defendant discriminated against the plaintiff in violation West Virginia Code §6C-2-2(I) by misinterpretation of the policies, rules or written agreements applicable to the employee, and denying the plaintiff tenure and equal pay.

95. As the results of the defendants' discriminatory practice, the plaintiff has suffered and continues to suffer damage to his professional reputation and opportunities, economical loss, emotional distress and mental anguish, including but not limited to depression, humiliation, embarrassment, stress and anxiety, emotional pain and suffering.

96. The defendant distorted evidence, capriciously set higher standards than those applied to similarly situated employees to falsely give low evaluations of the plaintiff's credentials for tenure. Hence, these conducts were intentional, in disregard of official policies and the plaintiff's civil rights, entitling the plaintiff to awards of compensatory and punitive damages.

**Count 4.** Retaliation in violation of West Virginia Code

97. The plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 1 through 96, inclusive, as if fully set forth herein.

98. The defendant retaliated the plaintiff for opposing unlawful discriminatory employment practice in violation of West Virginia Code §6C-1-3 by changing the employee's terms, or privileges of employment, i.e., by ending the plaintiff's employment contract prematurely.

99. The defendant's retaliation has caused the plaintiff to suffer damage of professional reputation and opportunities, economical loss, emotional stress and mental anguish, including but not limited to depression, humiliation, embarrassment, stress and anxiety, emotional pain and suffering.

100. The defendant's unlawful discrimination, and the plaintiff's opposition to the unlawful discrimination were the direct and determining reasons for the retaliation, i.e., premature termination of the plaintiff's employment. In other words, had the plaintiff given up his right to opposite, the plaintiff's employment would not have been ended prematurely. Thus, this claim satisfies the "but for" standard of proof.

101. The defendant's retaliation intended to cause maximum stress for the plaintiff, and the premeditated threat of such retaliation was intended to force the plaintiff to give up his right to oppose the unlawful discrimination. Thus, the retaliation was intentional, in disregard of the official policy and the plaintiff's civil rights, hence entitling the plaintiff to awards of compensatory and punitive damages.

**VII. Pray for Relief**

102. WHEREFORE, the plaintiff prays that the court enters judgment in his favor and against the defendant, containing the following relief:

A. An order directing the defendant to award tenure to the plaintiff, which the plaintiff would have been awarded but for the defendant's discriminatory treatment.
B. Back pay plus monetary equivalent to the loss of all fringe benefits from July 1, 2016 until the time the pay and benefits are reinstated.
C. Correcting and compensating for the lower pay.
D. Compensatory damages for the plaintiff's suffering of damage of professional reputation and opportunities, emotional distress and mental anguish due to employment discrimination and retaliation for opposing the discrimination.
E. Punitive damages for employment discrimination and retaliation for opposing the discrimination.

F. Statutory interest.
G. Cost and reasonable attorney fee if any incurred in this action to the fullest extent permitted by law.
H. Such other and further relief as the court may deem just and proper.

## VIII. Jury Demand

103. Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Respectfully submitted pro se

*/signature/*

Wei-ping Zeng

3008 Fillmore Avenue
El Paso, TX 79930 (current and temporary address)
Tel: 304 942-6668; Email: weipingzengny@gmail.com

May 23, 2017

13

Wei-ping Zeng, Ph.D.
3008 Fillmore Avenue
El Paso, TX 79930
Tel: 304 942-6668
Email: weipingzengny@gmail.com

May 23, 2017

United States District Court
Southern District of West Virginia

To Whom It May Concern:

    I am submitting pro se a complaint against Marshall University in Huntington, West Virginia for violations of Title VII of Civil Rights Act of 1964, as amended and Civil Rights Act of 1866.
    Included please find the following:
1. Complaint and Demand of Jury Trial
2. EEOC notice of right to sue
3. Copy of EEOC charge form (Form 5), prepared by EEOC and signed by the plaintiff
4. Copy of EEOC intake questionnaire prepared and signed by the plaintiff
5. Receipt of WV Public Employee Grievance Board (PEGB) of grievance form (level I) filed by the plaintiff
6. Copy of WV PEGB grievance form (level III)

    Marshall University is the major employer in Huntington and surrounding areas, and many local residents or their families or relatives are employed or educated by the University. For fair trial and jury selection, I would like to have my case transferred to the Charleston court for jury selection and trial.
    I have contacted every employment attorney I could find, but was not able to find an attorney who is willing to represent me. Therefore, I have to file and handle the lawsuit pro se. I apologize for any potential inconvenience caused by my unfamiliarity to the court procedure and technical compliance. I would appreciate any help to prevent or lessen such inconvenience.

    With best regards,

Respectfully,

*[signature]*

Wei-ping Zeng