IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

WEI-PING ZENG,

        Plaintiff,

v.                                  CIVIL ACTION NO.  3:17-cv-3008

MARSHALL UNIVERSITY,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

Proceeding *pro se*, Wei-Ping Zeng, Ph.D. ("Plaintiff"), commenced this suit alleging that

Marshal University ("MU"[1] or "Defendant") engaged in unlawful employment practices that

resulted in Plaintiff's discharge from Marshall University School of Medicine ("MUSOM").

*Compl.*, ECF No. 2. Mr. Zeng claims that, in addition to being denied tenure based upon ethnic

discrimination, he was retaliated against, and fired, because he raised questions regarding the

denial of tenure. *Compl.*, at 1. Per standing order, the Court referred this case to Magistrate Judge

Eifert for Proposed Findings and Recommendations ("PF&R"). *Standing Order*, ECF No. 3.

Since that time, Magistrate Judge Eifert has issued two sets of PF&Rs, one on November

6, 2017 and one on December 1, 2017. In the first PF&R ("November PF&R"), Magistrate Judge

Eifert addressed Defendant's Motion to Dismiss, and recommended that this Court grant, in part,

and deny, in part, that motion. *Nov. PF&R*, ECF No. 36, at 2. In the second PF&R ("December

---

[1] At times, where appropriate, "MU" or "Defendant" also encapsulate the MUSOM.

PF&R"), Magistrate Judge Eifert recommended that this Court deny Plaintiff's Motion for Preliminary Injunction, with additional instructions to the parties. *Dec. PF&R*, ECF No. 47, at 1.

The parties have filed various objections to both of Magistrate Judge Eifert's PF&Rs. On November 20, 2017, Plaintiff and Defendant both respectively filed Objections to the November PF&R. *Pl.'s Obj. to Nov. PF&R*, ECF No. 44; *Def.'s Obj. to Nov. PF&R*, ECF No. 43. Additionally, Plaintiff filed Objections to the December PF&R on December 14, 2017. *Pl.'s Obj. to Dec. PF&R*, ECF No. 48. Reviewing the objections of both parties under a *de novo* review, the Court does not agree with them.

As explained below, the Court **ADOPTS** Magistrate Judge Eifert's findings and recommendations in both PF&Rs (ECF No. 36 & 47), consistent with this Memorandum Opinion and Order. Accordingly, the Court **GRANTS**, **IN PART**, and **DENIES**, **IN PART**, Defendant's Motion to Dismiss (ECF No. 17), and **DENIES** Plaintiff's Motion for Preliminary Injunction (ECF No. 32).

## I. Background

Plaintiff is a naturalized United States citizen, originally hailing for China. *Compl.*, at 1. On September 1, 2009, Plaintiff began his employment with MUSOM as an associate professor in the Department of Biochemistry and Microbiology. *Id.* Plaintiff understood that, by taking this position, he would eventually be considered for a tenure position, or on "a tenure track." *Id.* at 5. Generally, in order to be considered for tenure, a professor must demonstrate proficiency in teaching, achievement in research and publishing, and involvement in service to the University. *Id.* at 5-9. MUSOM maintains a policy that each appointed faculty member should receive the requirements and guidelines for achieving tenure, including the department specific requirements. *Id.* at 7. Notwithstanding this policy of advance notice, MUSOM did not provide Plaintiff with the

tenure requirements or guidelines. *Id.* at 7. Plaintiff alleges that this is the first of irregular or unlawful practices directed at his employment with MU. *Id.*

Indeed, even before the submission of his tenure application, Plaintiff claims Defendant began treating him differently. In 2012, three years after he began his employment with MUSOM, Defendant's Departmental Promotion and Tenure Committee ("DPTC") conducted a mid-tenure review of Plaintiff. *Id.* at 8. During this review, Plaintiff received notification from the Committee that he must obtain external research funding in order to be considered for tenure. *Id.* Prior to that mid-tenure review, Plaintiff had never been told that a tenure applicant had to seek external research funding. Moreover, Plaintiff took exception to this requirement that he believed was unfair and abnormal. *Id.* Plaintiff claims that other professors who successfully achieved tenure positions either did not have to acquire external funding, or were given the benefit of preexisting, earmarked funding to satisfy the funding requirement. *Id.*

In addition to the imposition of allegedly *post hoc* funding requirement, Plaintiff claims he experienced various instances of discriminatory treatment, taking a variety of forms. Plaintiff was allegedly denied the opportunities to take certain teaching assignments, meet visiting scholars, and have access to data and research support. *Id.* at 9. Further, Plaintiff claims that higher-ups in his department had already decided that Plaintiff would not receive a tenure recommendation, even before Plaintiff had submitted his tenure application. *Id.*

Finally, in October 2015, Plaintiff submitted his tenure application to the DPTC. *Id.* at 5. At that point, Plaintiff apparently exceeded departmental standards in nearly all of his primary employment responsibilities and tenure requirement categories. *Id.* at 5-9. But according to Plaintiff, the DPTC cited incorrect information regarding almost every aspect of Plaintiff's qualifications for meeting tenure requirements. *Id*.

After the submission of his application, Plaintiff received signals that he would not be awarded tenure. On February 8, 2016, the Dean of MUSOM sent Plaintiff a letter indicating that Plaintiff would not be recommended for tenure. *Id.* at 10. The letter suggested that Plaintiff meet with the dean to discuss this decision. *Id.*

During the February 22, 2016 meeting between Plaintiff and the MUSOM Dean, the Dean apparently offered Plaintiff a conciliatory deal. Plaintiff's current employment contract with MU was set to expire on August 31, 2016. *Id.* However, Plaintiff and a former Chair and Associate Dean had made an agreement whereby Plaintiff's employment contract would not expire until February 2017. *Id.* In this February 22, 2016 meeting, the Dean offered to honor the February 2017 contract expiration date if Plaintiff agreed not to challenge the tenure decision. *Id.* The Dean even offered that that expiration date might be extended to June 2017. However, if Plaintiff did challenge the tenure determination, the Dean supposedly informed Plaintiff that his employment with MU would end on June 30, 2016, prior to the expiration of his then-current contract. *Id.*

After unsuccessfully attempting to resolve the situation with other members of MU's administration, on March 21, 2016, Plaintiff filled out an Equal Employment Opportunity Commission ("EEOC") questionnaire regarding employment discrimination and retaliation. *Id.* Roughly a month thereafter, MU's President made the final decision denying Plaintiff's tenure application. *Id.* In an effort to amicably resolve what appeared to be an embittered relationship, MU's associate general counsel reiterated the terms of offer made by the Dean in a May 5, 2016 email. *Id.* at 10-11. Plaintiff, however, did not take the deal.

Continuing to pursue remedial options to address what he believed was disparate treatment, Plaintiff filed a grievance with the West Virginia Public Employees Grievance Board on May 20,

2016. *Id.* at 11. And on June 30, 2016, Defendant terminated Plaintiff's employment relationship with the institution. *Id.*

Despite MU's rationale that he was denied tenure because of the failure to secure external research funding, Plaintiff claims that MU denied his tenure application because of his race and national origin. *See generally id.* Plaintiff claims that Asian tenure applicants were treated differently from their non-Asian counterparts. *Id.* at 8-11. In addition to facing additional, non-standard requirements–such as the external funding requirement–Plaintiff alleges that Asian tenure applicants had to outperform their non-Asian counterparts in order to receive a tenure award. *Id.* Reflecting the difficulty of this task, Plaintiff asserts that the only two Asian professors that received recommendations for tenure were exceptionally successful faculty members, winning awards, and ranking in the top 5-10% of the MUSOM faculty. *Id.* at 9.

Plaintiff contrasts these heightened standards for applications by Asian professors with the acceptable, tenure-worthy applications of two Caucasian MUSOM professors. *Id.* 5-11. He claims that the two Caucasian professors carried comparable class loads to Plaintiff, but received tenure despite working at MUSOM for fewer years, having lower evaluation scores and fewer publications in less recognized journals, and achieving less national and professional success than Plaintiff. *Id.* Adding insult to injury, Plaintiff claims that these two professors were not only awarded tenure, but were paid more than Plaintiff. *Id.*

On May 23, 2017, Plaintiff filed a complaint with this Court, asserting various claims stemming from the allegedly unlawful employment practices of MU. In Count 1, Plaintiff claims Defendant violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq*, by maintaining discriminatory employment practices, including denying him equal pay and a tenure award, which was improperly motivated by discrimination on the basis of national origin (Chinese)

and race (Asian). *Id.* at 11. In Count 2, Plaintiff alleges that Defendant retaliated against him in violation of Title VII and 42 U.S.C § 1981, by prematurely terminating his employment contract because Plaintiff refused to abandon his challenge of MU's employment practices. *Id.* Count 3 includes Plaintiff's contention that Defendant unlawfully discriminated against him due the DPTC's distorting of Plaintiff's tenure application, intentional downgrading his accomplishments, and denying him a tenure recommendation, which constitutes a "grievance" under, and violates, West Virginia Code § 6C-2-2(i). Finally, in Count 4, Plaintiff asserts a claim for retaliation under West Virginia Code § 6C-1-1, *et seq.*, the West Virginia Whistle-blower Law ("WVWBL").

Roughly three months after the filing of the complaint, Defendant filed a Motion to Dismiss. *Def.'s Mot. to Dismiss*, ECF No. 17. In the motion, Defendant puts forth multiple reasons why the Court should dismiss Plaintiff's claims. First, Defendant claims that Plaintiff failed to exhaust his available administrative remedies, depriving this Court of jurisdiction to hear this matter. *Id.* at 1. Second, Defendant asserts that MU enjoys the sovereign immunity protections afforded to the States under the Eleventh Amendment to the United States Constitution. *Id.* Third, Defendant argues that even if the preceding two arguments fail, Plaintiff's complaint fails to state claims for which relief can be granted. *Id.*

In the November PF&R, Magistrate Judge Eifert recommended that this Court grant, in part, Defendant's Motion to Dismiss. Agreeing with Defendant and relying upon the Eleventh Amendment, Magistrate Judge Eifert found that MU was entitled to sovereign immunity with respect to both Plaintiff's 42 U.S.C. § 1981 claim and his claim under the WVWBL. *Nov. PF&R*, at 18-19, 21-23. Additionally, she found that Plaintiff had failed to state a claim under Article 2 of Chapter 6C of the West Virginia Code, entitled the West Virginia Public Employees Grievance Procedure ("WVPEGP"). *Id.* at 19-20. Magistrate Judge Eifert concluded that the West Virginia

Code did not create a private cause of action for a claim of discrimination under WVPEGP. *Id.* In reaching these findings, she recommended that this Court dismiss Plaintiff's § 1981 claim alleged in Count 2 of his complaint, in addition to dismissing the entirety of Counts 3 and 4. *Id.* at 23.

But Magistrate Judge Eifert also recommended that the Court deny, in part, Defendant's Motion to Dismiss, allowing two of Plaintiff's claims to continue. Magistrate Judge Eifert found that, not only had Plaintiff exhausted his administrative remedies for the Title VII claims, but she also concluded that Defendant was not entitled to sovereign immunity for those Title VII claims. *Id.* at 11-16. Magistrate Judge Eifert found that Congress had expressly abrogated Eleventh Amendment, and therefore MU's, sovereign immunity, in passing Title VII. *Id.* Finally, reviewing the sufficiency of the pleading, Magistrate Judge Eifert found that Plaintiff had made a satisfactory showing, and stated facially plausible Title VII claims for discrimination and retaliation. *Id.* at 16-19.

Prior to the issuance of the November PF&R, citing concern for his biological samples and reagents, as well as other supplies and lab equipment, Plaintiff filed a Motion for Preliminary Injunction. *Pl.'s Mot. for Prelim. Inj.*, ECF No. 32. In that Motion, Plaintiff asserts that Defendant had threatened to discard or destroy his valuable biological and experimental items and samples that constitutes a large portion of Plaintiff's academic work. *Id.* at 1. Additionally, Plaintiff contends that MU had denied him access to one of their scientific facilities that is normally made available to outside researchers. *Pl.'s Mem. in Supp. of the Mot. for Prelim. Inj.*, ECF No. 33, at 4. Plaintiff requests that the Court issue a preliminary injunction, preventing MU from discarding Plaintiff's materials, and preventing MU from denying Plaintiff access to the lab, his materials, and the noted scientific facility. However, Magistrate Judge Eifert determined that these contentions were insufficient.

In the December PF&R, Magistrate Judge Eifert recommended the denial of Plaintiff's

Motion for Preliminary Injunction because Plaintiff had failed to show that he was likely to suffer

irreparable harm upon the denial of the injunction. *Dec. PF&R*, at 6-7. Citing the availability of

private storage facilities, Magistrate Judge Eifert concluded that although Plaintiff might want to

avoid the expense of taking his samples and materials elsewhere, this aversion to cost would not

substantiate the strong showing necessary to justify an injunction. *Id.* That Plaintiff had options

for safe storage of his biological and experimental items defeated his claim of irreparable harm.

*Id.* However, Magistrate Judge Eifert did provide that Plaintiff should have a reasonable time, not

to exceed thirty days, to retrieve his property from MU. *Id.* at 9. Again finding Plaintiff's showing

on the irreparable harm element insufficient, Magistrate Judge Eifert also recommended the denial

of Plaintiff's request to enjoin MU from preventing Plaintiff from accessing certain of its scientific

facilities. *Id.* at 7-9.

## II.  Standard of Review

This Court conducts a *de novo* review of those portions of the magistrate judge's proposed

findings and recommendations to which a party objects. 28 U.S.C. § 636(b)(1)(C) ("A judge of

the court shall make a *de novo* determination of those portions of the report or specified proposed

findings or recommendations to which objection is made. A judge of the court may accept, reject,

or modify, in whole or in part, the findings or recommendations made by the magistrate."). The

Court, however, is not required to review, under a *de novo* or any other standard, the factual or

legal conclusions of the magistrate judge as to those portions of the findings or recommendations

to which no objections are made. *Thomas v. Arn*, 474 U.S. 140, 150 (1985).[2]

_____

[2] Neither Plaintiff, nor Defendant contest the factual findings made by the Magistrate Judge.
Instead, both parties object to the Magistrate Judge's legal conclusions as outlined in this
Memorandum Opinion and Order. Finding support in the record for the Magistrate Judge's factual

With regard to the November PF&R, analyzing Defendant's Motion to Dismiss, both parties maintain various objections. Plaintiff has submitted three objections: (1) Plaintiff claims that typographical confusion resulting from his choice of font resulted in the Magistrate Judge misconstruing the code on which Plaintiff's argument relied; (2) that MU has no sovereign immunity from suit under the WVWBL; and (3) Federal and West Virginia law create additional, applicable causes of action, which Plaintiff had not included in his current complaint, but wishes add to an amended complaint at some point. *Pl.'s Obj. to Nov. PF&R*, at 1-5. Defendant also advances three objections, but they generally boil down to a central premise: the Magistrate Judge erred by finding that Plaintiff does not have to exhaust his ongoing administrative proceedings before the PEGB. *See generally Def.'s Obj. to Nov. PF&R*.

Only Plaintiff filed objections to the December PF&R, recommending the denial of the Motion for Preliminary Injunction. Plaintiff objected on four bases: (1) the Magistrate Judge did not take into account that Defendant created the adverse relationship between the parties; (2) that Defendant did not show likelihood of harm; (3) that Magistrate Judge erred in her determination regarding the showing of irreparable harm; and (4) that the Magistrate Judge incorrectly determined that 42 U.S.C. § 2000a, prohibiting discrimination in places of public accommodation, did not provide a basis of relief in this instance. *See generally Pl.'s Obj. to Dec. PF&R*

Having explained the lengthy context of this matter, the Court will address each of the motions, and their respective PF&Rs, in turn.

---

conclusions, the Court adopts the factual findings relevant to Defendant's Motions to Dismiss and Plaintiff's Motion for Preliminary Injunction as presented in the PF&Rs. Likewise, finding support in the factual record and the applicable law, the Court adopts the legal conclusions of the Magistrate Judge to which no objections were made, and to the extent that they are not contradicted in this Memorandum Opinion and Order.

### III. Discussion

### A. Defendant's Motion to Dismiss and the November PF&R

Having reviewed, *de novo*, the objections, the PF&R, and the relevant facts and law, the Court agrees with the conclusions of the Magistrate Judge and will accept the recommendations contained within the November PF&R. The Court rejects the parties' objections. The Court will dispense with Plaintiff's objections first, then the Court will confront Defendant's objections.

### a. Standard of Review

Although neither party challenges Magistrate Judge Eifert's statement of the relevant standards under which to analyze Defendant's Motion to Dismiss, the Court will briefly restate them here in the interest of clarity.

Defendant's first moves to dismiss Plaintiff's claims based upon a lack of exhaustion and Eleventh Amendment sovereign immunity. If well-taken, these grounds would preclude this Court's jurisdiction over this matter, constituting a motion under Rule 12(b)(1).[3] *See Hentosh v. Old Dominion Univ.*, 767 F.3d 413, 417 (4th Cir. 2014) (describing the exhaustion requirement of Title VII as jurisdictional); *Coleman v. Md. Ct. App.*, 626 F.3d 187, 190, 194 (4th Cir. 2010) (reviewing and affirming, in relevant part, a district court's granting of a 12(b)(1) motion to dismiss due to Eleventh Amendment sovereign immunity); *see also D.T.M ex rel. McCartney v. Cansler*,

---

[3] The Fourth Circuit has reached different conclusions regarding whether failure to exhaust administrative remedies under Title VII constitutes a jurisdictional bar. *See Reid v. Prince George's Cty. Bd. Of Educ.*, 60 F.Supp.3d 601, 605 (D. Md. 2014) (examining differing Fourth Circuit precedent and providing that in some cases the court considered exhaustion jurisdictional and in some it did not); *Plummer v. Wright*, No. TDC-16-2957, 2017 WL 4417829, at *4 n. 3 (D. Md. Oct. 3, 2017) (same); *compare Hentosh*, 767 F.3d at 417 (describing the exhaustion requirement of Title VII as jurisdictional) *with Edelman v. Lynchburg Coll.*, 300 F.3d 400, 404 (4th Cir. 2002) (finding that failure to exhaust upon an allegation of an untimely filed administrative claim is not jurisdictional for a Title VII claim). However, given the nature of the allegations before this Court, the Court construes the exhaustion requirement as a jurisdictional one.

382 Fed.Appx. 334, 336 (4th Cir. 2010) (unpub.) (referring to Eleventh Amendment sovereign immunity as a concern of subject-matter jurisdiction under 12(b)(1)); *Andrews v. Daw*, 201 F.3d 521, 524 n.2 (4th Cir. 2000) ("Our cases have been unclear on whether a dismissal on Eleventh Amendment immunity grounds is a dismissal for failure to state a claim under Rule 12(b)(6) or a dismissal for lack of subject-matter jurisdiction under Rule 12(b)(1)." (citations omitted)). Rule 12(b)(1) raises the fundamental question of whether a court is competent to hear and adjudicate the claims brought before it. Without proper jurisdiction, a court must dismiss the action. *United States ex. rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009)

A Rule 12(b)(1) motion can follow two tracks. Under the first track, a party asserts a "factual attack," claiming that the jurisdictional allegations made in the complaint are inaccurate. *See Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (describing this type of jurisdictional challenge). For a "factual attack," court may consider evidence beyond the allegations contained within a complaint. *Id.* Under the second track, referred to as a "facial attack," a party asserts that the jurisdictional facts contained within the complaint, taken as true, fail to support a court's subject matter jurisdiction over the action. *Id.*; *see Thigpen v. United States*, 800 F.2d 393, 401 n.15 (4th Cir. 1986) (referring to an attack that claims that "the allegations of the complaint are facially insufficient to sustain the court's jurisdiction"). When considering a "facial attack," a court affords the plaintiff "the same procedural protection as he[or she] would receive under a Rule 12(b)(6) consideration." *Kerns*, 585 F.3d at 192 (internal quotation marks and citation omitted). Defendant has asserted a facial attack, thus the Court will proceed under the Rule 12(b)(6) procedural framework.

To overcome a motion to dismiss under Federal Rule 12(b)(6), a complaint must state plausible claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546 (2007). This standard requires a

plaintiff to set forth the "grounds" for an "entitle[ment] to relief" that is more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action. . . ." *Id.* at 555 (internal quotations and citations omitted). A complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citation omitted). Facial plausibility exists when a claim contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted).

Accepting the factual allegations in the complaint as true, the allegations "must be enough to raise a right to relief above the speculative level . . . . " *Twombly*, 550 U.S. at 555 (citations omitted). If the allegations in the complaint, assuming their truth, do "not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id.* at 558 (internal quotations and citations omitted). "Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (internal quotations and citation omitted). Additionally, a court must also "draw[ ] all reasonable factual inferences from those facts [alleged] in the plaintiff's favor . . . ." *Martin v. Duffy*, 858 F.3d 239, 248 (4th Cir. 2017) (internal quotations omitted) (quoting *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (internal citations omitted)). And in the case of a *pro se* filing, the Court should construe the pleading liberally. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

### b. Plaintiff's Objections to November PF&R

As noted above, Plaintiff submits three objections to Magistrate Judge Eifert's November PF&R: (1) that a typographical choice lead to confusion as to the applicable statute, leading to an

erroneous determination by the Magistrate Judge; (2) that MU has no sovereign immunity for a suit under WVWBL, and that claim should not be dismissed; and (3) that subsequent research by Plaintiff revealed additional claims which he had not included in his original complaint, but would like to add in another complaint. *Pl.'s Obj. to Nov. PF&R*, at 1-5. The Court disagrees with each of Plaintiff's grounds for objection to the November PF&R.

Assuming Plaintiff correctly points out that a typographical choice lead to confusion regarding the statute giving rise to his claim under the WVPEGP, the confusion is immaterial. Plaintiff claims that he intended to cite to West Virginia Code § 6C-2-2(i), which provides the definition for "Grievance" under the WVPEGP. *Id.* at 2. However, because of Plaintiff's font choice for his complaint, the "i" looked like a lower case "l." *Id.* Therefore, Plaintiff claims that the Magistrate Judge and Defendant mistakenly believed that Plaintiff relied upon section 6C-2-2(l), instead of section 6C-2-2(i) for his claim. Further, Plaintiff appears to implicitly contend that the confusion created by this font decision affected the correctness of Magistrate Judge Eifert's findings. Unfortunately, the font made no difference in the correct legal analysis.

Regardless of the formatting, Article two of Chapter 6C of the West Virginia Code provides the procedure for public employees to file employment grievances. *See* W. Va. Code § 6C-2-1, *et seq.* As correctly noted by Magistrate Judge Eifert, the Supreme Court of Appeals of West Virginia ("West Virginia Supreme Court") recently clarified, in an unpublished decision, that Article two of Chapter 6C of the West Virginia Code does not create a private cause of action. *Subramani v. West Virginia Univ. Bd. of Governors*, No. 14-924, 2015 WL 7628720, at *6-7 (W. Va. Nov. 20, 2015) (unpub.). In *Subramani*, the West Virginia Supreme Court reviewed the dismissal of a complaint filed by a tenured associate professor. *Id.* at *1. The plaintiff professor based one of his claims upon the WVPEGP, § 6C-2-1, *et seq.* Applying the four-part test under West Virginia law,

the Court analyzed whether a violation of the statute provided a private cause of action. *Id.* at *6-7. Ultimately, the Court concluded that the circuit court had properly found that the WVPEGP did not bestow a private cause of action upon potential plaintiffs. Based upon that conclusion, the Court affirmed the dismissal of the claim.

Although *Subranmani* is an unpublished decision, this Court finds the guidance provided by the West Virginia Supreme Court on the State's law persuasive. *See Biscayne Oil & Gas, Inc. v. Burdette Oil & Gas Co., Inc.*, 947 F.2d 940, at *2 (4th Cir. Nov. 5, 1991) (unpub. table op.) (providing that when reaching a conclusion upon the application of West Virginia law, a federal court must consider the issue "in light of guiding principles of state law [and decide] how the West Virginia Supreme Court would decide the question" (internal citation omitted)). And where the WVPEGP does not provide a private cause of action, reference to subsection 2(i) as opposes to 2(l) makes no difference. Regardless of the font, or the letter, both subsections fall within an Article of the West Virginia Code that a party may not enforce by a private cause of action in a judicial forum. Count 3 of Plaintiff's complaint fails.

In his second objection, Plaintiff claims Magistrate Judge Eifert incorrectly determined that MU had sovereign immunity protection for his claim under the WVWBL.[4] *Pl.'s Obj. to Nov. PF&R*, at 2-3. Citing to a West Virginia Supreme Court case, Plaintiff correctly asserts that state

---

[4] Additionally, Plaintiff contends that 42 U.S.C. § 1983 would allow MU's officials to be held liable for violations of the WVWBL. *Pl.'s Obj. to Nov. PF&R*, at 2-3. Without commenting on that question, the Court finds Plaintiff's contention fails because, as explained by Magistrate Judge Eifert, Plaintiff's complaint names MU as the sole defendant. *Nov. PF&R*, at 10-11. Having reviewed Plaintiff's complaint, the Court agrees with the Magistrate Judge's reading. Therefore, without state officials named as defendants to this action, Plaintiff's section 1983 argument holds no water. Further, as noted in the discussion of the next objection, Plaintiff still has a Motion to Amend Complaint (ECF No. 28) pending before the Magistrate Judge. Issues regarding additional parties may become relevant, depending upon the adjudication of that motion.

agencies are subject to suit for claims alleging violations of the WVWBL.[5] *Id.* (citing *Taylor v. W. Va. Dep't of Health and Human Res.*, 788 S.E.2d 295 (W. Va. 2016)). However, Plaintiff's argument misconstrues the basis for Magistrate Judge Eifert's finding.

In reaching her finding that the Count 4 WVWBL claim should be dismissed, Magistrate Judge Eifert properly applied Eleventh Amendment sovereign immunity jurisprudence. The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The United States Supreme Court has determined that this language includes actions brought in federal court against a State by its own citizens. *See Port. Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (2009) (citations omitted). This immunity protection covers not only the State, but also its agencies, divisions, departments, and other "arms of the State." *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 70 (1989); *see also Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1977) (providing that the Eleventh Amendment has long encompassed the State and its agents and instrumentalities). It is well-settled that MU constitutes an arm of the State of West Virginia, and as such is entitled to the protection of Eleventh Amendment sovereign immunity. *Kerr v. Marshall Univ. Bd. of Governors*, No. 2:14-

---

[5] Plaintiff also cites to a case from this district to support his claim that a federal court may hear a claim arising under the WVWBL. Plaintiff cites to *Hope v. Bd. of Dirs. Of Kanawha Pub. Serv. Dist.*, No. 2:13-cv-6559, 2013 WL 3340699, at *3 (S.D.W. Va. July 2, 2013) (Copenhaver, J.). In *Hope*, the plaintiff brought claims against a state subsidiary and an official in his official and individual capacity. *Id.* at *1. The plaintiff brought various claims against the state subsidiary, however, the plaintiff brought a WVWBL claim only against the chairman of the public board individually. *Id.* at *3. Therefore, the plaintiff brought the WVWBL claim against an individual, not the State, its arm, or agency. *See id.* As such, *Hope* does not support Plaintiff's position in this matter.

CV-12333, 2015 WL 1405537, at *9 (S.D.W. Va. Mar. 26, 2015), *aff'd*, 824 F.3d 62 (4th Cir. 2016) (citation omitted).

However, the Eleventh Amendment does not form an absolute bar to suing states in federal court. *Lee-Thomas v. Prince Goerge's Cnty. Pub. Schs.*, 666 F.3d 244, 248-49 (4th Cir. 2012) (citing *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 204 (1990)). Three narrow exceptions to the Eleventh Amendment immunity exist. *Id.* First, "Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) (internal quotation marks and alterations omitted). This first exception does not apply as the statute at issue is a West Virginia statute. Although it may be theoretically possible, Congress has not expressly abrogated West Virginia's sovereignty for claims under the WVWBL. Second, "the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004). This exception is also inapt in this case. As noted, Plaintiff only named MU as the defendant in this action. *See supra* note 4.

The only fitting exception warranting serious consideration is the third. Under the third exception, the State may expressly waive its Eleventh Amendment immunity protection and consent to suit in federal court. *See Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002). This waiver by the State must be an "'unequivocal' statement of the State's intention to subject itself to suit *in federal court*." *Westinghouse Elec. Corp. v. West Virginia Dept. of Highways*, 845 F.2d 468, 470 (4th Cir. 1988) (emphasis original) (citing *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985)). A State's waiver of immunity in state court will not meet the unequivocal standard necessary to abrogate the Eleventh Amendment immunity. *See id.* at 470-

71 (finding that the inspected sections of West Virginia Code "at most, [can] be construed as waiving the state's immunity from suit in *state court*" but lacks the unequivocal statement to waive immunity in federal court (emphasis original)); *see also Kula v. West Virginia*, No. 3:11-cv-34, 2011 WL 13196150, at *3 (N.D.W. Va. June 10, 2011), *aff'd sub nom. Kula v. West Virginia Dep't of Transp. Motor Vehicle Admr's*, 455 Fed.Appx. 302 (4th Cir. Nov. 22, 2011) (providing that the relevant area of West Virginia Code dealing with insurance waived immunity in state court actions).

Applying that standard here, the language of the WVWBL does not support the application of the state waiver exception to Eleventh Amendment sovereign immunity. Section 6C-1-4(a) allows an individual who has allegedly been a victim of actions impermissible under that article to "bring a civil action in a court of competent jurisdiction." W. Va. Code § 6C-1-4(a). Undoubtedly, this language permits actions by individuals making claims against the State and its arms or agencies. *See Taylor v. West Virginia Dep't of Health & Human Res.*, 788 S.E.2d 295, 307-10 (W. Va. 2016) (reviewing a WVWBL claim brought against a West Virginia agency). However, this language does not provide an "unequivocal" statement that those suits may be brought in federal court.

Comparing the language of the WVWBL to other areas of the Code reinforces the inadequacy of the WVWBL to waive immunity in federal court. Article Ten of Chapter Eleven of the Code describes "a final decision of a court of competent jurisdiction of this state *or a federal court* having appropriate jurisdiction." W. Va. Code § 11-10-14(b) (emphasis added). Likewise, although contained within the field of domestic relations, traditionally a state court concern, section 48-1-217 of the Code provides that a "'[c]ourt of competent jurisdiction' means a circuit court or family court within this state or a court . . . of another state. . . ." W. Va. Code § 418-1-

217. The West Virginia Legislature has expressly mentioned federal courts in one section, and defined "court of competent jurisdiction" as a state court, in another unrelated field. *See* Based upon the high standard for express waiver of immunity and the contextual reading of the West Virginia Code, the Court is persuaded that the WVWBL does not provide an "unequivocal" statement of intent to abrogate the Eleventh Amendment sovereign immunity.[6]

Furthermore, the subject matter of the WVWBL bolsters the Court's conclusion. The code chapter that envelopes the WVWBL deals with issues related to public employees. *See* W. Va. Code § 6C-1-2. In fact, the WVWBL concerns itself almost exclusively with state or public entities. *See id.* at § 6C-1-2(c) & (e). Where these concerns attend to the internal operation of the sovereign's employee management procedures, the Court believes it must take extra care to approach the potential abrogation of immunity cautiously.

Simply, although Plaintiff could have brought a WVWBL claim against MU in a state court, he cannot do so here. Plaintiff's second objection fails; the Court agrees with the finding of the Magistrate Judge.[7]

Plaintiff's third, and last, objection to the November PF&R contends that Plaintiff may have additional, and currently unpled, claims. Plaintiff appears to want this Court to find that Magistrate Judge Eifert erred because Plaintiff may have had more claims than were originally

---

[6] Of course, West Virginia courts could provide a different interpretation. However, the Court has not found, and Plaintiff has not pointed to, any decisions of state courts addressing the abrogation of Eleventh Amendment sovereign immunity by the language contained within section 6C-1-4. *See Lee-Thomas*, 666 F.3d at 253-54 (explaining that a Maryland Court of Appeals had found that a statute had abrogated Eleventh Amendment immunity, and deferring to the State court's reading of its own law).

[7] This Memorandum Opinion and Order does not foreclose the possibility that Plaintiff may be able to bring a claim under the WVWBL against an individual actor, to the extent that that actor is not protected by the same immunity principles as Defendant, or other such protections. However, the Court does not comment on the validity of such a claim.

contained within his complaint. The Court, however, cannot grant this request because Plaintiff must follow the procedures available to him if he wishes to bring additional claims.

As mentioned in his third objection, Plaintiff has a pending Motion to Amend Complaint before Magistrate Judge Eifert. (ECF No. 28). Plaintiff must pursue that motion, and await the findings and recommendations by Magistrate Judge Eifert, before he may amend his complaint. If Plaintiff is permitted to add the additional claims noted in his objection, then the Court will deal with them as appropriate.

Having disposed of Plaintiff's three objections to the November PF&R, the Court will now turn to Defendant's objections.

### c. Defendant's Objections to November PF&R

Defendant states three objections to the November PF&R. These objections contend that Magistrate Judge Eifert failed to properly address and consider that: (1) Plaintiff has voluntarily availed himself of an administrative procedure for similar claims emanating from the same set of circumstances; (2) the parallel administrative claims which assert similar claims, and seek the same relief, are currently pending before the Circuit Court of Kanawha County, West Virginia; and (3) the final resolution of those administrative claims could potentially have a direct impact on Plaintiff's damages in this case. *Def.'s Obj. to Nov. PF&R*, at 1-5. Although each of the three objections is styled as an individual objection, the Court believes they all reflect a central theme of objection held by Defendant: Magistrate Judge Eifert improperly found that Plaintiff satisfied the exhaustion requirement for his Title VII claims.

From Defendant's view, Plaintiff cannot have "exhausted" his administrative remedies because he continues to prosecute a PEGB administrative claim. *Id.* at 1-2. Defendant complains that Plaintiff's PEGB action asserts the same type of discrimination and retaliation claims, and

seeks the same relief. *Id.* at 3-7. Defendant contends that by continuing to maintain an action so similar to, if not the same as, the present action before this Court, Plaintiff cannot have satisfied the exhaustion requirement. Defendant concedes that Plaintiff could have never filed a claim before the PEGB, and in that case, exhaustion would not have been an issue. *Id.* at 2-3. But, Plaintiff did file a grievance with the PEGB, in addition to filing a grievance with the EEOC. *Id.* As such, Defendant believes Plaintiff must complete that PEGB administrative procedure prior to appropriately appearing before this Court. The Court, however, disagrees.

Before a plaintiff may file a suit under Title VII, he or she "must exhaust [his or] her administrative remedies by bringing a charge with the EEOC." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000) (citing *King v. Seaboard Coast Line R.R. Co.*, 538 F.2d 581, 583 (4th Cir. 1976)). However, when an alleged unlawful employment practice occurs in a State that has a law prohibiting that practice, Title VII permits the State an opportunity to resolve the matter first, before the EEOC acts on the charge filed with it. 42 U.S.C. § 2000e-5(c). Although the State does not have to resolve the dispute, a plaintiff must first comport with the state law and procedures before advancing to the EEOC and federal court in search of relief. *See Davis v. N.C. Dep't of Corr.*, 48 F.3d 134, 140 (4th Cir. 1995) (citing *N.Y. Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 62 (1980)). If the charge alleges unlawful practices by a governmental agency or political subdivision, which go unresolved, the EEOC will provide a complainant with a right-to-sue letter, notifying the complainant that a civil action may be brought against the governmental agency within ninety days. *Id.* § 2000e-5(f)(1); *see also Alvarado v. Bd. of Trs. Of Montgomery Cmty. Coll.*, 848 F.2d 457, 458 (4th Cir. 1988). "Receipt of, or at least entitlement to, a right-to-sue letter is a jurisdictional prerequisite." *Davis*, 48 F.3d at 140.

Complying with these requirements, Plaintiff filed a charge with both the EEOC and the West Virginia Human Rights Commission ("HRC") on May 16, 2016. *Ex. to Compl.*, ECF No. 2-1, at 2. Plaintiff asserted that he was the victim of workplace discrimination and retaliation for opposition to unlawful employment practices. *Id.* Roughly nine months later, the EEOC issued Plaintiff a right-to-sue letter. *Id.* at 1. Filing within the allotted time, Plaintiff filed suit with this Court. Thus, Plaintiff properly complied with the jurisdictional requirement of exhaustion upon the EEOC's issuance of the right-to-sue letter. *See Davis*, 48 F.3d at 138-40 (explaining that filing of a claim under state law, the commencing of an EEOC action, and issuance of a right-to-sue letter are jurisdictional restrictions upon federal courts for Title VII claims); *Franceschi v. U.S. Dep't of Veterans Affairs*, 514 F.3d 81, 85 (1st Cir. 2008) ("Administrative remedies could not be considered to have been exhausted, however, until the EEOC issues [to the plaintiff] a right-to-sue letter.").

Although Plaintiff complied with the statutory requirements for receiving a right-to-sue letter, Defendant implores that the necessary administrative exhaustion goes beyond that. Because Plaintiff choose to avail himself of the protections offered by the PEGB, due to his former employment with an arm of the State, Defendant argues this choice tacked on an additional exhaustion requirement onto the jurisdictional prerequisite of Title VII. But West Virginia case law, as well as the language and history of Title VII, cut against Defendant's attempt to pile up procedural roadblocks. *See Sydnor v. Fairfax Cty., Va.*, 681 F.3d 591, 594 (4th Cir. 2012) (asserting that the exhaustion requirement ""should not become a tripwire for hapless plaintiffs").

Section 2000(e)-5(c) describes the requirement that a complainant must first pursue a remedy under state law, and the state authority established "to grant or seek relief from" the unlawful employment practices described under Title VII. 42 U.S.C. § 2000(e)-5(c). That is, the

complainant must first exhaust his or her claim before the state authority established "to grant or seek relief from" practices that "discriminate against any individual . . . *because of* such individual's race . . . , or national origin." *Id.* § 2000(e)-2(a)(1), 5(c). Congress imposed this requirement in an effort to allow "the problems dealt with by the bill [–which include, in part, employment discrimination because of race or national origin–to] be resolved locally and voluntarily." *E.E.O.C. v. Union Bank*, 408 F.2d 867, 870 n.5 (4th Cir. 1968). However, that state law and those state procedures must be capable of affording substantial relief to the aggrieved person for violations of Title VII. *See id.* at 870 (holding that "where, as here, substantial relief against the alleged discrimination is available under state law, the person aggrieved must pursue state remedies. . . .").

West Virginia sought to provide relief for employment discrimination based upon characteristics such as race and national origin through enactment of the West Virginia Human Rights Act ("WVHRA"). *See* W. Va. Code § 5-11-2 (declaring the policy of the State against discrimination based upon characteristics); W. Va. Code § 5-11-9 (explaining the unlawful practices under the Act). The West Virginia Legislature then created a commission, the HRC, to hear and attempt to resolve complaints based upon, in relevant part, claims of employment discrimination based upon race or national origin. W. Va. § 5-11-8 (establishing and announcing the powers of the commission under the Act). Thus, under the constructs of section 2000e-5(c) of Title VII, the WVHRA provides the binding state law and procedures, which a complainant must first pursue before advancing his or her claim. In other words, Title VII requires a potential plaintiff to exhaust the HRC's administrative procedures provided for his or her claim(s).

In examining the relevant powers and duties of the HRC and the PEGB, West Virginia courts have emphasized that the HRC provides the administrative path for ultimate determinations

regarding discriminatory employment practices based upon personal characteristics such as race or national origin. The West Virginia Supreme Court bluntly declared that the PEGB "does not have authority to determine liability under the [WVHRA]." *Weimer v. Sanders*, 752 S.E.2d 398, 407 (W. Va. 2013) (quoting Syl. pt. 1, *Vest v. Bd. of Educ.*, 45 S.E.2d 781 (W. Va. 1995)). But the PEGB may provide relief for discrimination, as defined in WVPEGP, which "includes jurisdiction to remedy discrimination *that would also violate* the [WVHRA]." *Id.* In addition to different definitions of "discrimination" under the WVHRA and the WVPEGP, the two laws and administrative agencies differ in important respects. *See id.* at 406 n.6.

The Court explained that the "procedures employed by the [PEGB] are not substantially similar to those employed by either a court of law or the [HRC]." *Id.* at 409. Further, these differences are neither insignificant, nor meaningless. Instead, the difference in procedural protections afforded by the HRC and the PEGB are "of profound significance." *Id.* This includes the PEGB's lack of adversarial safeguards such as attorney representation and discovery entitlement, in addition to the absence of entitlement to an independent investigation. *Id.* (citing *Vest*, 45 S.E.2d at 786).

These considerations led the West Virginia Supreme Court to conclude that a claimant need not exhaust remedies under the PEGB to pursue remedy for unlawful practices covered by the WVHRA, even when the actions arise out of the same facts and circumstances. *Id.*

Defendant attempts to distinguish *Weimer* and *Singh*,[8] a case from this District reaching a similar conclusion to *Weimer*, from this case by focusing upon Plaintiff's continuing prosecution of the claims before the PEGB. *Def.'s Obj. to Nov. PF&R*, at 2-7. Defendant claims that, unlike in

---

[8] *Singh v. Nerhood*, No. 3:11-cv-701, 2012 WL 4464025 (S.D.W. Va. Sept. 26, 2012) (Johnston, J.).

*Weimer* and *Singh* where the plaintiffs had abandoned their claims before the PEGB, Plaintiff has continued to pursue his claims before the PEGB.[9] Therefore, Defendant argues, if Plaintiff had not chosen to pursue, or had ceased pursuing, relief from the PEGB, then *Weimer* and *Singh* would support that Plaintiff need not exhaust the PEGB administrative process. But since Plaintiff chose to file a charge with the PEGB, and has continued to advance claims with the PEGB, Defendant contends he must exhaust that process. The Court rejects this idea.

Defendant appears to overlook the fact that, simply, exhaustion is exhaustion. Plaintiff does not have to exhaust the PEGB procedures to pursue his claims of employment discrimination because of race or national origin, as explained by the West Virginia Supreme Court. That he wishes to utilize an additional process provided to him as a former employee of the State cannot change that determination. If he could have started the PEGB process, then ceased it, and permissibly not been required to exhaust, then Plaintiff may certainly continue to pursue PEGB claims, without yet reaching a final determination, and not be required to exhaust. Not having to exhaust means that a plaintiff does not have to finish the administrative process. *See Singh v. Nerhood*, No. 3:11-cv-701, 2012 WL 4464025, at *9 (S.D.W. Va. Sept. 26, 2012) (discussing *Vest* and explaining that voluntarily relinquishment of a claim before an administrative body does not rise to exhaustion). Therefore, it does not matter whether Plaintiff has not completed the PFGB process because he abandoned his claim, or because the claims before the PFGB have yet to reach a final resolution.

In light of Title VII and the WVHRA, and their respective bodies of case law, the Court finds that Plaintiff satisfied the exhaustion requirement to bring his Title VII claims. He properly

---

[9] It appears from the briefing that the PEGB decision has been appealed to the Circuit Court of Kanawha County, West Virginia. *Def.'s Obj. to Nov. PF&R*, at 3-4.

received the right-to-sue letter from the EEOC, the jurisdictional requirement to satisfy exhaustion under Title VII. And he did not have to exhaust the PEGB process prior to raising his Title VII claims before this Court.

In its objections, Defendant also appears to allude to a different argument, without clearly providing law on the point. Defendant indirectly argues that because the PEGB claims are substantially similar[10], and arising out of the same facts, this Court should dismiss this action until the PEGB claims have reached a final determination. *Def.'s Obj. to Nov. PF&R*, at 4, 6-7. This argument, although appearing to touch upon the concept of abstention, misapprehends the permissibility of maintaining simultaneous actions in different forums.

As a general rule, "our dual system of federal and state governments allows parallel actions to proceed to judgment until one becomes preclusive of the other." *Chase Brexton Health Servs., Inc. v. Maryland ("Chase")*, 411 F.3d 457, 462 (4th Cir. 2005). Although this concept may appear to waste judicial resources, and double the necessary effort required to resolve a dispute, it is a well recognized rule "that the pendency of an action in the state [system] is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *Id.* (insertion original) (quoting *McLaughlin v. United Va. Bank*, 955 F.2d 930, 934 (4th Cir. 1992) (internal quotation marks omitted). Indeed, just as federal courts cannot exercise jurisdiction over matters for which jurisdiction has not been granted, federal courts also cannot decline to exercise jurisdiction over a matter properly before it. *See Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821). However,

---

[10] Defendant argues that the claims before the PEGB, and now the Circuit Court of Kanawha County, West Virginia, are the same as the Title VII claims before this Court. *Def.'s Obj. to Nov. PF&R,* 3-7. However, as noted by Defendant, the PEGB action does not reference Title VII. *Id.* at 3-4. The Court does not have before it the pleadings involved in either the PEGB action, or its subsequent review by the Circuit Court. Therefore, the Court will assume, without deciding, that the PEGB action asserts similar claims regarding discrimination, which arise out of the same factual basis as the Title VII claims before this Court.

under certain "exceptional circumstances," a federal forum may decline to exercise its jurisdiction. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976)). Courts refer to this concept as abstention. *See Chase*, 411 F.3d at 463.

Under the umbrella of abstention doctrines, the Supreme Court of the United States has paved the way for a federal court to abstain "solely as a matter of judicial administration." *Id.* In *Colorado River Water Conservation District v. United States*, the Supreme Court explained that when faced with a duplicative federal action, a federal court may abstain in the interest of "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." 424 U.S. 800, 817 (1976). But due to the exceptional nature of *Colorado River* abstention, a Court must invoke the concept sparingly. *Chase*, 411 F.3d at 463 (providing that the Supreme Court has instructed courts to apply *Colorado River* abstention parsimoniously).

Without referring to either to *Colorado River* and its progeny, or abstention, generally, Defendant appears to argue that the Court should dismiss this action because of the ongoing state court proceedings that closely mirror the action before this Court. Due to the Defendant's conjuring of the broad underpinnings of *Colorado River* abstention, this Court construes Defendant's request as one to abstain under *Colorado River*. Because this case does not satisfy the stringent standard for *Colorado River* abstention, the Court denies that request.

As an initial matter, in order to apply *Colorado River* abstention, the matters before the federal court and state court must parallel each other. That is, "substantially the same parties litigate substantially the same issues in different forums." *vonRosenberg v. Lawrence*, 849 F.3d 163, 168 (4th Cir .2017) (quoting *New Beckley Mining Corp. v. Int'l Union, United Mine Workers of Am.*, 946 F.2d 1072, 1073 (4th Cir. 1991)). To substantiate this strictly construed requirement,

it is not enough that the state action might have a *res judicata* effect upon some of the claims in the federal action. *Id.* (citing *McLaughlin v. United Virginia Bank*, 955 F.2d 930, 934 n.* (4th Cir. 1992)). Instead, *Colorado River* abstention may only apply where the federal court "concludes that the parallel state-court litigation will be an adequate vehicle for the *complete* and prompt resolution of the issues between the parties." *Id.* (emphasis original) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, at 28 (1983)). If the federal court has "any serious doubt that the state action will resolve *all* of the claims," then that court would abuse its discretion by invoking *Colorado River* abstention. *Id.* [11] (emphasis original)

The Court finds that Defendant has not demonstrated that the relevant state court action is parallel to this matter, and thus it would be improper to abstain the exercise of jurisdiction. As explained above, the WVPEGP, and the purview of the PEGB, does not extend over the type of determinations regarding discrimination liability that lie at the heart of the WVHRA and Title VII. *See supra* pp. 21-24. And as Defendant has not established that the state court action includes Title VII claims, the state court action cannot resolve all of Plaintiff's claims. This Court finds that abstention does not fit these circumstances.

---

[11] If a court determines that the state court and federal court actions are parallel, it must then balance at least six factors before abstaining. *vonRosenberg*, 849 F.3d at 168 (quoting *Chase*, 411 F.3d at 463-64). Those six factors are:

> (1) whether the subject matter of the litigation involves property where the first court may assume *in rem* jurisdiction to the exclusion of others; (2) whether the federal forum is an inconvenient one; (3) the desirability of avoiding piecemeal litigation; (4) the relevant order in which the courts obtained jurisdiction and the progress achieved in each action; (5) whether state law or federal law provides the rule of decision on the merits; and (6) the adequacy of the state proceeding to protect the parties' rights.

*Id.* Because the Court does not find that the actions are parallel, it need not apply these balancing factors.

Defendant also contends that because the final adjudication of the PEGB claims may affect the claims before this Court, and the damages awarded if Plaintiff is ultimately successful, the Court should require exhaustion of the PEGB administrative procedures. *Def.'s Obj. to Nov. PF&R*, at 6-8. However, a close reading of *Weimer* should allay Defendant's fears that Plaintiff will receive a double recovery. The West Virginia Supreme Court recognized "that there may be some overlap of remedies between the different statutory schemes." *Weimer*, 752 S.E.2d at 409 n.9. Echoing Defendant's third objection, the Court emphasized that a plaintiff can only get one recovery for each injury. *Id.* But, the Court noted, if necessary, the second forum to provide recovery, for a claim that the plaintiff has already received recompense for, can set off the first award from the second. *Id.*

Addressing Defendant's concern, this Court finds that it is capable of performing the appropriate setoff, if the law requires. Because of that, Defendant need not concern itself, at this point, with Plaintiff receiving a double recovery. Defendant's third objection lacks merit based upon this explanation.

With the objections to the November PF&R discussed, the Court will proceed to Plaintiff's objections to the December PF&R.

### B. Plaintiff's Motion for Preliminary Injunction and December PF&R

Plaintiff objects to Magistrate Judge Eifert's recommendation to deny his Motion for Preliminary Injunction. Plaintiff filed the Motion both to enjoin MU from discarding his lab items and to prohibit MU from denying Plaintiff the opportunity to use its scientific facility and instruments. *Pl.'s Obj. to Dec. PF&R*, at 1. Magistrate Judge Eifert recommended the Motion be denied because Plaintiff had failed to show that he is sufficiently likely to suffer irreparable harm. *Dec. PF&R*, at 6-7. With regard to Plaintiff's request to prohibit MU from denying him

access to a scientific facility, Magistrate Judge Eifert found that even if the facility qualifies as a place of public accommodation under 42 U.S.C. § 2000a, the statute is inapposite because it only prohibits denial on the basis of race, color, religion, or national origin. She explained that, not only did Plaintiff not allege that MU denied access on the basis of race or national origin, but also it is likely that MU denied Plaintiff access due to the adverse litigation relationship between the parties.

Plaintiff believes that Magistrate Judge Eifert was incorrect. Plaintiff believes that Magistrate Judge Eifert erred in four respects: (1) Plaintiff did not create the adverse relationship with Defendant; (2) Defendant did not show likelihood of harm to Defendant; (3) irreparable damage will result if the injunction is not granted; and (4) 42 U.S.C. § 2000a applies, making the MU scientific facility a place of public accommodation. *See generally Pl.'s Obj. to Dec. PF&R*. Having review the issues *de novo*, the Court agrees with Magistrate Judge Eifert, and finds Plaintiff's objections not well-taken.

With regard to his first two objections, Plaintiff misconstrues who must show what. Plaintiff argues that MU created the adverse relationship and that it failed to show a likelihood of harm if the injunction was granted. *Id.* at 2-4. However, as Plaintiff moved for the preliminary injunction for his benefit, he bears the burden of demonstrating, by a clear showing, his entitlement to relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cty.*, 415 U.S. 423, 441 (1974). When assessing the appropriateness of a preliminary injunction, the threshold determination is the plaintiff's showing that irreparable harm is likely to occur if the injunction is not granted. *See Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693-94 (4th Cir. 1994). Therefore, even if Plaintiff correctly contends that MU created

the adverse relationship, that circumstance does not factor into the relevant analysis for issuing a preliminary injunction.

Likewise, Plaintiff's misplaces his focus upon Defendant's showing regarding the likelihood of harm if the injunction was granted. Plaintiff correctly points out that a court should balance the likelihood of harms to the respective parties when considering a motion for a preliminary injunction. *Pl.'s Obj. to Dec. PF&R*, at 3 (citing *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 271 (4th Cir. 2002)). However, as explained by the Fourth Circuit, the court may only proceed to this balancing once the plaintiff sufficiently demonstrates irreparable harm. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 271 (4th Cir. 2002) ("When deciding whether to grant a preliminary injunction, the court must first determine whether the plaintiff has made a strong showing of irreparable harm if the injunction is denied; if such a showing is made, the court must then balance the likelihood of harm to the plaintiff against the likelihood of harm to the defendant." (citing *Safety—Kleen, Inc. (Pinewood) v. Wyche*, 274 F.3d 846, 859 (4th Cir. 2001))). Because Plaintiff has failed to make a strong showing of irreparable harm, the Court does not need to address the relative weight of Defendant's likelihood of harm.

Moving to the Plaintiff's third objection regarding that showing of irreparable harm, Plaintiff argues that because MU planned to dispose of his lab items, the irreparable harm requirement has been met. Additionally, on the issue of Plaintiff's access to MU's scientific facility, Plaintiff claims that irreparable damage will ensue if he is denied that access because he needs to do experiments during his time in Huntington, and these experiments are time sensitive. *Pl.'s Obj. to Dec. PF&R*, at 4. These considerations, however, fail to establish the likelihood and level of harm required to justify this issuance of such an extraordinary equitable remedy like a preliminary injunction. *See Scotts Co.*, 315 F.3d at 272 ("[R]ecognizing that preliminary

injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." (internal quotation marks and citations omitted)).

The facts noted by Magistrate Judge Eifert demonstrate why Plaintiff's irreparable harm argument fails. MU's request of Plaintiff to remove his lab items came more than a year after Plaintiff and MU had severed ties. *Dec. PF&R*, at 5. MU notified Plaintiff that if he did not remove his items, MU would treat them as abandoned property, and they would be subject to disposal. *Id.* Further, during that period of over a year, Plaintiff had not attempted to remove his items, or make other storage arrangements. Despite the fact that Magistrate Judge Eifert identified five commercial, specialized storage facilities appropriate to store Plaintiff's items, Plaintiff had not shown any attempt to contact those facilities, or otherwise arrange storage for his items. *Id.* at 7 & n.2.

Now, however, Plaintiff claims that he has contacted these facilities since the issuance of the December PF&R, but he cannot afford the cost of these facilities. *Pl.'s Obj. to Dec. PF&R*, at 3. But this cost does not substantiate a finding of irreparable harm. Generally, where an award of money damages may compensate a harm, courts are reluctant to find irreparable harm. *See Hughes*, 17 F.3d at 694 (citing *Morton v. Beyer*, 822 F.2d 364, 371-72 (3d Cir. 1987)). As noted by Magistrate Judge Eifert, Plaintiff may seek to recover these expenses should he succeed in this action. Although the Court sympathizes with Plaintiff's predicament, the Court cannot afford to Plaintiff his requested remedy.

Likewise, that Plaintiff has time in Huntington, and needs to perform experiments, does not constitute a showing of irreparable harm. Although Plaintiff contends that MU provides the only "locally" available type of scientific facility necessary for Plaintiff's experiment, Plaintiff

does not contend that MU has the only facility of this kind. *See Pl.'s Obj. to Dec. PF&R*, at 4.

Plaintiff's reliance upon the need to do it "locally" because of the time constraints inherent with

the storage of the materials also falls on deaf ears. Plaintiff has kept his materials and items at

MU for over a year. The Court cannot find that irreparable harm will result if Plaintiff

transported them elsewhere, outside of the "local area," to perform his experiments because of

"the time limit."

Finally, Plaintiff argues that MU cannot deny him access to the scientific facility because

it is a public accommodation under 42 U.S.C. § 2000a. Defendant's counters that section 2000a

does not apply to the scientific facilities because they are places of restricted access due to safety

and security concerns. *Def.'s Resp. to Mot. for Prelim. Inj.*, ECF No. 35, at 6-9. The issue of

statute application, however, is unnecessary to determine the validity of this objection.

Regardless of the statute's application, Plaintiff's argument fails because Plaintiff has not

sufficiently demonstrated that MU denied him access based upon his race or national origin.

Indeed, as mentioned by Magistrate Judge Eifert, MU has likely denied Plaintiff access to its

facilities because of their litigation-imposed adverse relationship. Defendant has also proffered to

the Court that the relevant scientific facility currently hosts various persons of the same race

and/or national origin as Plaintiff. In this context, Plaintiff has failed to provide the minimal

factual support to counter this assertion.

But, even were the Court to assume section 2000a's application, and that MU denied

access based upon Plaintiff's personal characteristics, Plaintiff's demand for preemptory action

by this Court must still fail. Plaintiff may certainly be inconvenienced by his inability to use the

scientific facility. But this inconvenience does not equate irreparable harm. Plaintiff has not

demonstrated that the facilities owned by MU are so unique or special that he would not be able to access equivalent equipment elsewhere.

Therefore, Plaintiff's Motion for Preliminary Injunction cannot succeed. However, in light of the circumstances, the Court believes it prudent to permit Plaintiff an opportunity to recover his property after the denial of his preliminary injunction request.

### IV. Conclusion

Based upon the foregoing analysis, the Court **GRANTS, IN PART**, and **DENIES, IN PART** the Motion to Dismiss (ECF No. 17) as follows:

**DENIES** the Motion to Dismiss with respect to Counts 1 and 2 of the Complaint that allege violations Title VII of the Civil Rights Act of 1964;

**GRANTS, WITH PREJUDICE** the Motion to Dismiss with respect to the § 1981 claim alleged in Count 2, as well as the entirety of Count 3; and

**GRANTS, WITHOUT PREJUDICE** the Motion to Dismiss with respect to Count 4.

Additionally, the Court **DENIES** Plaintiff's Motion for Preliminary Injunction (ECF No. 32). However, the Court **DIRECTS** Defendant to permit a reasonable amount of time, not exceeding 30 days from the date of issuance of this Order, during which Plaintiff may remove his property from MU.

Having found support in the record for the remainder of Magistrate Judge Eifert's PF&R, the Court **ADOPTS** the remainder of both PF&Rs (ECF Nos. 36 & 47), to the extent that it is not contradicted by this Memorandum Opinion and Order. Because some of Plaintiff's claims remain, the Court **REFERS** this matter back to the Magistrate Judge for further proceedings, consistent with this Memorandum Opinion and Order, as well as the previously docketed Standing Order (ECF No. 3).

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unpresented parties.

Enter:        March 21, 2018

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE