IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

WEI-PING ZENG,

  Plaintiff,

v.                                                    Case No.: 3:17-cv-03008

MARSHALL UNIVERSITY,
DR. JEROME A. GILBERT;
DR. JOSEPH SHAPIRO;
DR. W. ELAINE HARDMAN;
DR. DONALD A. PRIMERANO;
and DR. RICHARD EGLETON,

  Defendants.


## PROPOSED FINDINGS AND RECOMMENDATIONS

On May 7, 2018, the second amended complaint, (ECF No. 55), filed by Plaintiff Wei-ping Zeng was officially docketed. (ECF No. 58). This matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and by standing order has been referred to the undersigned United States Magistrate Judge for the submission of proposed findings of fact and recommendations ("PF&R") for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Currently pending are the following dispositive motions:

1.  Plaintiff's Motion for Summary Judgment, (**ECF No. 332**);

2.  Motion of Richard Egleton for Summary Judgment, (**ECF No. 337**);

3.  Motion of Jerome Gilbert for Summary Judgment, (**ECF No. 339**);

4.  Motion of W. Elaine Hardman for Summary Judgment, (**ECF No. 341**);

5.    Motion of Marshall University for Summary Judgment, (**ECF No. 343**);

6.    Motion of Donald A. Primerano for Summary Judgment, (**ECF No. 345**); and

7.    Motion of Joseph Shapiro for Summary Judgment, (**ECF No 347**).

The parties have thoroughly briefed the issues raised in the motions, and the undersigned finds that oral argument is unnecessary.

Having carefully reviewed the motions, memoranda, and evidence produced, the undersigned **FINDS** that there are no ***material facts*** in dispute, and the defendants are entitled to judgment as a matter of law. Therefore, for the reasons that follow, the undersigned **RECOMMENDS** that the presiding District Judge **GRANT** the Motions for Summary Judgment filed by the defendants, (ECF Nos. 337, 339, 341, 343, 345, and 347); **DENY** the Motion for Summary Judgment filed by Plaintiff, (ECF No. 332); **DISMISS** this civil action; and **REMOVE** this matter from the docket of the Court.

## I.    <u>Relevant Background</u>

Plaintiff Wei-Ping Zeng ("Zeng") is a former faculty member with the Joan C. Edwards School of Medicine at Marshall University ("MUSM") in Huntington, West Virginia. This case arises from MUSM's decision to deny Zeng tenure and to terminate his employment. Following is a summary of relevant information gleaned from the documents submitted by the parties.

### A.    Tenure Rules, Regulations and Requirements

For faculty members like Zeng, who began employment with MUSM prior to 2013, the process of obtaining tenure at MUSM was governed by Title 133, Series 9 of the West Virginia Higher Education Policy Commission's Procedural Rule on Academic Freedom, Professional Responsibility, Promotion, and Tenure ("Series 9"); Marshall

University Board of Governor's Policy No. AA-28 ("Policy AA-28"), and MUSM's Faculty

Promotion and Tenure Regulations (pre-2013) ("Tenure Regulations"). Series 9

provided, in relevant part:

> 9.2    In making tenure decisions, careful consideration shall be given to the tenure profile of the institution, projected enrollment patterns, staffing needs of the institution, current and projected mission of each department/division, specific academic competence of the faculty member, and preservation of opportunities for infusion of new talent. The institution shall be mindful of the dangers of losing internal flexibility and institutional accountability to the citizens of the State as the result of overly tenured faculty.

> 9.4    Tenure shall not be granted automatically, or solely because of length of service, but shall result from the action by the institution, following consultation with appropriate academic units.

> 10.2    During the tenure-track period, the terms and conditions of every reappointment shall be stated in writing, with a copy of the agreement furnished the individual concerned.

> 10.3    The maximum period of tenure-track status normally shall not exceed seven years. Before completing the penultimate year (the "critical year") of a tenure-track appointment, any non-tenured faculty member shall be given written notice of tenure, or offered a one-year written terminal contract of employment. During the tenure-track period, faculty members may be granted tenured appointment before the sixth year of service, such appointment to be based upon criteria established by the institution and copies provided to the Policy Commission.

> 10.4    During the tenure-track period, contracts shall be issued on a year-to-year basis, and appointments may be terminated at the end of the contract year. During said tenure-track period, notices of non-reappointment may be issued for any reason that is not arbitrary, capricious, or without factual basis. Any documented information relating to the decision for non-retention or dismissal shall be provided promptly to the faculty member upon request.

> 10.8    Failure to provide timely notice of non-retention to tenure-track faculty would lead to the offer of renewal of appointment for an additional year, but would not prejudge further continuation after that additional year.

> 10.9    Faculty appointed at times other than the beginning of the academic year may choose to have those periods of appointment equal to

or greater than half an academic year considered as a full year for tenure purposes only. Tenure-track appointments for less than half an academic year may not be considered time in probationary status.

10.10 Following receipt of the notice of non-retention, the faculty member may appeal such non-retention decision by requesting a statement of reasons and then filing a grievance as provided in Section 15 of this policy. The request for a statement of reasons shall be in writing and mailed to the president or designee within ten working days of receipt of the notice of non-retention.

(ECF No. 334-11 at 1-13).

Policy AA-28 stated that "[t]enure shall not be granted automatically, or for years of service but shall result from a process of peer review and culminate in action by the President." (ECF No. 333-2 at 1). In addition, it provided, in relevant part:

2.1.2  When a full-time faculty member is appointed on other than a temporary or tenured basis the appointment shall be probationary. The conditions which govern a probationary appointment are in accordance with the Higher Education Policy Commission's Series 9.

2.2.7  The maximum period of probation at Marshall University shall not exceed seven years. Before completing the sixth year of a probationary appointment, a non-tenured faculty member shall be given written notice of tenure, or shall be offered a one-year terminal contract of employment for the seventh year.

3.1.1  At the time of initial appointment, the department chairperson will notify in writing each probationary faculty member of the requirements and guidelines for tenure, including any which apply specifically within the faculty member's department.

3.1.2  All probationary faculty must be notified annually in writing by peer committees, chairpersons, and/or deans of their progress toward tenure and/or promotion. Notifications should identify specific areas of improvement needed for tenure or promotion.

3.2.10 Tenure decisions will result from action by the President at the conclusion of the tenure process. The President will prepare a list of those granted tenure and send an informational copy to the chairperson of the Faculty Personnel Committee by April 30.

3.2.11 The President will inform by letter all candidates for tenure of his or her decision by April 30. An applicant denied tenure will be notified via

certified mail. All application materials will be returned to each candidate at this time. The entire tenure process must adhere to university time guidelines and conclude no later than April 30.

3.2.15 An applicant denied tenure by the President may file a grievance.

(ECF No. 333-2 at 1-3).

The Tenure Regulations indicated that "promotion and tenure decisions made by the School of Medicine will be guided by the University and School regulations in conjunction with peer review by the Personnel Advisory Committee ["PAC"] and the policies and criteria prescribed by each department." (ECF No. 333-1 at 2). The PAC consisted of one elected representative from each department of MUSM. (*Id.* at 3). The representative could not be a department chairperson, and each representative served a three-year term. (*Id.*). The PAC was tasked with assisting MUSM "in maintaining a faculty of excellence." (*Id.* at 2). The PAC made recommendations to MUSM's Dean concerning the promotion and tenure of faculty members. According to the Tenure Regulations, the process of seeking promotion or tenure was to be initiated in the department to which the applicant was assigned. (*Id.*).

The Tenure Regulations explained that each faculty member would receive an annual evaluation. (ECF No. 333-1 at 2). At the beginning of the academic year, the faculty member was expected to complete a Faculty Activities Plan in conjunction with his or her chairperson. Near the conclusion of the academic year, the faculty member prepared a Faculty Activities Report and submitted both the Faculty Activities Plan and the associated Report to the chairperson. (*Id.*). Using these materials, and any other relevant information, the chairperson evaluated the faculty member's performance during the prior academic year and completed an Evaluation form. The chairperson was expected to confer with the faculty member and discuss the evaluation. The Evaluation

form was then sent to MUSM's Dean, while a copy of the Faculty Activities Plan and associated Report were maintained by the faculty member, his or her chairperson, and the Dean. (ECF No. 333-1 at 2).

The Tenure Regulations emphasized that promotions and tenure were not automatic, but were based on merit. (*Id.* at 3). "Because of the varying missions of departments within the School of Medicine, criteria for promotion/tenure [were to] be applied with flexibility." (*Id.*). The Tenure Regulations added: "However, for each individual, it is required that lesser achievement in one area be balanced by excellence in another. Demonstrable competence in teaching, research/scholarly activity and professional service/patient care are of paramount consideration." (*Id.*). Moreover, to receive tenure, the faculty member was expected to achieve all of the requirements necessary to qualify for a promotion to Associate Professor. (ECF No. 333-1 at 7). The basic requirements for promotion to Associate Professor included the following:

> Overall evidence of superior worth to the University as demonstrated by effective performance in all major areas of responsibility and excellence in either teaching or research/scholarly activities.
>
> Minimum experience requirements:
>
> - Two years on faculty at Marshall University
> - Terminal degree and 4 years satisfactory teaching experience at level of Assistant Professor
> - Faculty holding the M.D. degree should be Board certified in a primary or subspecialty
> - Basic science faculty should be qualified to sponsor a Ph.D. student and chair a doctoral dissertation committee
>
> Specific areas for consideration include, but are not limited to:
>
> Teaching
>     evaluations of satisfactory or above by chairperson and peer review
>     factors considered should include the following where appropriate:
> - teaching load
> - development of new courses

- development of syllabus material
- student sponsorship
- resident training
- courses taken to improve teaching effectiveness
- student evaluations

Research/Scholarly Activities
- evidence of establishment/continuation of research/scholarly program substantiated by publications in peer review journals, other activities and chairperson and peer review
- continuing presentation of research at regional, national and international scientific meetings

Professional Service/Patient Care
- evaluations of satisfactory or above by chairperson and peer review

Other Service
- Evaluations of satisfactory or above by chairperson and peer review

(ECF No. 333-1 at 4).

The Tenure Regulations stated that faculty members were responsible for initiating their own applications for promotion. A promotion or tenure application was required to contain certain information and was to be timely submitted to the chairperson of the faculty member's department. (*Id.* at 5, 7). In Zeng's department—the Department of Biochemistry and Microbiology ("Dept. of B&M")—the chairperson referred the application to the Dept. of B&M's Promotions & Tenure Committee ("DP&TC"). The DP&TC examined each applicant's qualifications to receive the requested promotion or tenure and issued a written recommendation, either supporting, or declining to support, the application. The recommendation was given to the Dept. of B&M's chairperson, who individually reviewed the materials and prepared a separate written recommendation, either pro or con, which was submitted to MUSM's Dean, along with the application packet and the DP&TC's recommendation. (*Id.* at 6). The Dean conveyed the packet of information to the PAC, which considered the

information, discussed the applicant, and voted on a final recommendation for or against the request for promotion and/or tenure. (ECF No. 333-1 at 6-7). The PAC's recommendation was returned to MUSM's Dean, who provided all of the information in the application packet, along with the Dean's own recommendation, to the President of Marshall University ("MU"). (*Id.*). At all steps of the process, the applicant was to be notified of the recommendations issued. (*Id.*).

The Tenure Regulations included a timetable for the promotion and tenure review process, providing that applications for promotion and tenure had to be submitted in time for the relevant departmental P&TC to complete its written recommendations by October 15 of the academic year at issue. (*Id.* at 8). Department chairpersons were required to submit their recommendations to MUSM's Dean by November 1, and the PAC was scheduled to receive the applications and other information no later than November 15. (*Id.*). The PAC was required to submit its recommendations on each applicant to MUSM's Dean by February 1 of the following year, with the Dean notifying the department chairs of the final recommendation on the promotion or tenure request of each applicant no later than February 15. Subsequently, the Dean was required to present the final recommendations to MU's President. Promotions and tenure approved by the Dean, MU's President, and the Board of Governors became effective on July 1 of the academic year following submission of the application. The Tenure Regulations provided the following information specific to applications for tenure, as well as a timetable for tenure decisions, beginning with the initial appointment of a tenure-track faculty member through the seven-year probationary period:

8

> Twelve months prior to the conclusion of seven-year, probationary tenure track, continuous employment, faculty must be either notified of termination at the end of the seventh year or awarded tenure at the end of the sixth year. Tenure may be granted prior to the end of the sixth year. Additionally, tenure may be granted at the time of appointment by the President. All changes from a non-tenured to a tenured status will be considered in the same manner as promotions. Procedures for consideration of faculty for tenure are similar to those outlined above for promotions. For award of tenure, a faculty member should meet the criteria outlined above for promotion to Associate Professor. The review procedures and time schedule for submission of documentation are identical to those outlined for promotions.

(ECF No. 333-1 at 7).

### B.    Initial Offer of Employment to Zeng

In addition to physicians, MUSM routinely employed individuals who held Ph.D. degrees in the basic sciences. On August 18, 2009, Dr. Charles McKown, MU's Vice President for Health Services, formally offered Zeng a full-time faculty appointment as an Associate Professor in MUSM's Dept. of B&M. The appointment became effective on September 1, 2009 and was renewable on July 1, 2010,  the beginning of MUSM's next fiscal and academic year. (ECF No. 332-4 at 11). The letter extending the offer described the appointment as being a "tenure-track (probationary)" faculty position pursuant to West Virginia Higher Education Policy Commission Title 133, Procedural Rule Series 9. (*Id.*). The letter advised Zeng that he would be eligible to apply for tenure as early as his third year at MUSM, and no later than his sixth year of continuous full-time employment. (*Id.*). The letter outlined the terms of the appointment, indicating that Zeng would receive a base salary of $75,000 "derived from the Research Challenge Grant (RCG) awarded to Drs. Philippe Georgel and Eric Blough." (ECF No. 332-4 at 11). After the grant expired in June 2012, Zeng's salary would come from the State of West Virginia, or other MUSM funds. Zeng was also given substantial financial support to

establish a research program; to travel to research meetings; to retain an external research advisor; to move his current laboratory equipment, mouse colony, and personal belongings; and for supplies, equipment, and a technician's salary. (ECF No. 332-4 at 11-12).

In exchange for the benefits of employment, Zeng was required to satisfy specific and general duties and responsibilities. (*Id*. at 12). Of particular relevance to this case, Zeng was required to establish an independent and externally funded research program in cellular immunology, teach various courses in Medical Immunology or Medical Microbiology, serve on committees as recommended by the department chair or Dean, and participate in CDDC programs. (*Id*.). The offer letter did not set out any different, particular, or additional requirements needed to achieve tenure.

On August 22, 2009, Zeng signed a Notice of Faculty Appointment, which again stated that the appointment was for the fiscal year beginning July 1, 2009 and ending June 30, 2010. (ECF No. 343-2). Zeng was to start full-time employment on September 1, 2009. His job duties and responsibilities were stated in the Notice; however, unlike the initial offer of employment, none of the listed duties or responsibilities specifically obligated him to obtain external research funding. Instead, Zeng was required to initiate or participate in "scientific research or other scholarly activity which is consistent with your educational background training and/or experience and which  is consistent with the mission and goals of Marshall University." (ECF No. 343-2).

### C.    Zeng's Employment at MUSM

Zeng started employment on September 1, 2009. However, on January 11, 2010, Dr. Richard Niles, Chair of the Dept. of B&M, sent Zeng an email stating: "Yes, as we discussed, the clock on this position does not start until you have set up your laboratory."

(ECF No. 333-18 at 4). According to Zeng, this email was sent after Zeng expressed concern that his laboratory still was not available for use, although he had been at MUSM for more than four months. Zeng began using his laboratory in February 2010. (ECF No. 333-9 at 4). On July 15, 2010, Zeng signed a new Notice of Faculty Appointment, covering his second year of employment as a member of MUSM's faculty. (ECF No. 343-3 at 1-2). According to the agreement, Zeng's appointment began on July 1, 2010 and terminated on June 30, 2011. (*Id.*).

In September 2010, Dr. Niles and Dr. Donald A. Primerano ("Primerano"), the Section Head of Microbiology, held a Faculty Activities Conference with Zeng and completed an Evaluation form covering the academic year of July 1, 2009 through June 30, 2010. (ECF No. 332-2 at 13). The Evaluation form had six possible ratings: outstanding, excellent, good, satisfactory, marginal, and unsatisfactory. Zeng was rated excellent in both research and service, but was not given a rating in teaching, because he did not have any teaching assignments his first year. (*Id.*). Dr. Niles and Primerano provided Zeng with suggestions for improving his performance; such as, increasing the number of publications and presentations he completed, collaborating with other professionals, requesting students to participate in a research rotation in his lab, entering the WV-INBRE mentor pool, and joining one scientific society. (*Id.*). Zeng began teaching a Microbiology course in the fall of 2010 and received student evaluations in the high average to good range. (ECF No. 332-2 at 18-21). The evaluation form allowed the students to rate the faculty member as very poor, poor, average, good, and very good. (*Id.*).

On July 26, 2011, Zeng signed a Faculty Appointment agreement, governing his third year of employment as a member of MUSM's Dept. of B&M. (ECF No. 343-3 at 3-

4). The appointment ran from July 1, 2011 to June 30, 2012 and was again described as a tenure-track probationary position. (*Id*.). On August 26, 2011, Dr. Niles and Primerano completed a second Faculty Activities Evaluation form, assessing Zeng's performance during the academic year of July 2010 through June 2011. (ECF No. 332-2 at 14). In this evaluation, Zeng was noted to have devoted 75% of his effort to research, 15% to teaching, and 10% to service. (*Id*.). He was rated excellent in both research and service, and "good" in teaching. (*Id*.). Zeng was provided with some recommendations to improve both his teaching and writing. (*Id*.). Student evaluations of his teaching performance continued to range between average and good. (ECF No. 332-2 at 20-21).

Zeng signed his fourth-year employment agreement with MUSM on July 20, 2012, covering the year of July 1, 2012 through June 30, 2013. (ECF No. 343-at 6-7). On September 17, 2012, Dr. Niles and Primerano met with Zeng to discuss his Faculty Activities Evaluation for the July 2011 through June 2012 academic year. (ECF No. 332-2 at 15). The Evaluation form, which was completed by Dr. Niles and Primerano on September 25, 2012, indicated that Zeng's efforts the prior year were devoted 25% to teaching, 65% to research, and 10% to service. (*Id*.). Zeng received ratings of satisfactory in teaching and good in research and service. (*Id*.). In the comments section, Dr. Niles and Primerano noted that Zeng had received low student evaluations in teaching. Consequently, they made several recommendations on ways that Zeng could improve his teaching skills. For example, they advised Zeng to attend Dr. Susan Jackman's lectures and team-based learning sessions in Immunology and participate in workshops on teaching skills. They discussed with Zeng that his student evaluations were primarily critical of his level of professionalism, and advised Zeng to accept the advice of senior faculty when in the classroom. (*Id*.). Dr. Niles and Primerano also made suggestions on

12

how Zeng could increase the likelihood of receiving grant funding. (ECF No. 332-2 at 15). Specifically, Dr. Niles and Primerano suggested that Zeng contact Jan Taylor in the West Virginia Division of Science and Research to take advantage of its grant application pre-review program.

The overall assessment of Zeng's performance in the eyes of Dr. Niles and Primerano was that Zeng needed to improve both his teaching and research performance. (ECF No. 332-2 at 16). At this time, Zeng's student evaluations hovered in the average range. (*Id*. at 22-25).

On October 12, 2012, Zeng received an evaluation prepared by the Dept. of B&M Mid-Tenure Review Committee, which was comprised of four of Zeng's colleagues, including Dr. Pier Paolo Claudio, Dr. Terry W. Fenger, Dr. W. Elaine Hardman ("Hardman"), and Dr. Hongwei Yu. (ECF No. 333-9 at 1-2). In the evaluation, the Committee reviewed the expectations set forth in Zeng's original offer of appointment and assessed his performance in the areas of teaching, research, and service—"the three critical components for tenure and promotion." (*Id*. at 1). The Committee offered recommendations in all three areas for the purpose of helping Zeng "improve [his] chance of obtaining tenure and eventually promotion." (*Id*. at 1-2). In teaching activities, the Committee suggested that Zeng attend lectures of successful teachers, participate in workshops to improve teaching skills, contact Ms. Sherri Smith in the Teaching and Learning Office to receive evaluation and constructive feedback on his lecture style, and improve his professionalism with colleagues. In research activities, the Committee acknowledged the "significant challenges" in obtaining grant support in the current funding climate, but noted that Zeng had not published many papers derived from research funded by the $300,000 he received at initial appointment. (ECF No. 333-9 at

2). The Committee suggested that Zeng increase his publications—specifically, that he secure two publications within the next year to support grant proposals; develop a working relationship with a clinician to add a clinical aim to his research, making it translational and, thus, more attractive to grantors such as the NIH; collaborate with other scientists to broaden the scope of his research and improve the chance of obtaining NIH grants; have another experienced scientist read his grant proposals to help polish them; and obtain external funding as required by his employment contract. (ECF No. 333-9 at 2). The Committee also recommended that Zeng be an active participant in several committees of which he was a member and document the number of meetings.

Less than a month later, Primerano sent an email to Zeng, confirming their discussion on November 2, 2012 regarding the Mid-Tenure Review Committee's recommendations and Zeng's progress. (*Id.* at 3). Primerano reminded Zeng that Dr. Niles had agreed to review Zeng's grant applications. (*Id.*). Zeng was asked to add his comments to the Committee's recommendations. On the issue of research, Zeng stated that the Mid-Tenure Review had occurred earlier than he expected given Dr. Niles's confirmation that his tenure clock did not start until February 2010, when his laboratory was finally ready for use. (ECF No. 333-9 at 4). Nonetheless, Zeng generally agreed to work on fulfilling the recommendations. (*Id.* at 4-6).

On May 28, 2013, Zeng signed his fifth-year employment agreement with MUSM, which again appointed Zeng to the faculty as an Associate Professor—this time for the fiscal/academic year of July 1, 2013 through June 30, 2014. (ECF No. 343-3 at 8-9). On June 21, 2013, Dr. Niles completed Zeng's 2012-2013 Faculty Activities Evaluation form, which reviewed Zeng's performance in his fourth year with MUSM. (ECF No. 333-19 at 10-19). Dr. Niles noted that Dr. Zeng had devoted 25% of his time during the last year to

teaching, 60% to research, and 15% to service. He added that Zeng was being mentored in teaching by Dr. Fenger. (ECF No. 333-19 at 11). Dr. Niles assessed Zeng as needing improvement in teaching, noting that his student evaluations had gotten better, but still were not good enough to obtain tenure. (*Id.* at 13). Zeng's student evaluations fell between the high average and good ranges, which showed progress, but were not within the "very good" range. (ECF No. 332-3 at 1-4). Zeng was given explicit recommendations on how to improve his teaching skills. (ECF No. 333-19 at 13). In particular, he was instructed to contact Ms. Smith in the Center for the Advancement of Teaching and Learning to improve his speaking and lecturing skills. He was told to use a microphone at all lectures and to ensure that the volume was adequate, to record his lectures, and to attend lectures offered by two other faculty members, Dr. Jackman and Dr. Fenger.

With respect to research, Dr. Niles found that Zeng also needed improvement in that activity, stating that for Zeng to be awarded tenure, he would need to increase his number of publications per year and obtain external funding. (ECF No. 333-19 at 15). Once again, Zeng received specific recommendations on how to improve his research efforts; including, that he establish a collaboration with Dr. Uma Sundaram, the Cancer Center Director, and contact Dr. Todd Davies in the Clinical Trials Center to review and comment on Zeng's grant applications prior to submission. (*Id.*). Dr. Niles rated Zeng as "Professional" in the categories of Professionalism and Professional Development, but reiterated that Zeng needed improvement in the areas of teaching, research, and scholarly activities. (*Id.* at 17-19). Because Zeng's performance was rated as "needing improvement," the department chair was required to re-evaluate Zeng half-way through the calendar year, in addition to performing the next annual review. (*Id.* at 19).

On March 10, 2014, Dr. Niles and Primerano fulfilled this requirement by writing a letter to Zeng memorializing the mid-year evaluation of his academic progress. (ECF No. 333-19 at 20). They confirmed Zeng's agreement to be mentored in research by a scientist at the University of Minnesota and to visit his laboratory to learn mouse model methods relevant to Zeng's research. They strongly suggested that Zeng meet with Dr. Uma Sundaram to develop a clinical translational science aspect to his work. Primerano and Dr. Niles also made some recommendations to improve Zeng's chances of getting an outside grant. (ECF No. 333-19 at 20). In regard to teaching, Dr. Niles and Primerano reiterated that Zeng needed to improve, and they offered some suggestions, including that they attend one of Zeng's lectures and provide constructive criticism. They noted that his Fall 2013 student evaluations were not significantly better than the prior year's evaluations and warned him that he needed to enhance his teaching skills in order to fall within an acceptable range. They suggested that Zeng better organize his handouts.

Lastly, Dr. Niles and Primerano reminded Zeng that because he arrived in 2009, his tenure application would be due in October 2014, noting that "tenure must be granted no later than the end of your sixth year (2014-15)." (*Id.*). They suggested that he ask the DP&TC to provide him with a preliminary evaluation of his tenure application. (*Id.* at 20-21). Dr. Niles and Primerano acknowledged that Zeng might want to request a re-set of the tenure clock so that 2009-10 did not count, but advised that, if timing became material, approval for a delay of his application would have to come from MUSM's Dean or the PAC. (ECF No. 333-19 at 21).

Zeng followed-up on the suggestion to have the DP&TC provide him with a preliminary review of his tenure application. (ECF No. 343-4). On March 31, 2014, the DP&TC provided its evaluation. (ECF No. 343-5). The DP&TC advised Zeng that, for an

award of tenure, he needed to meet certain basic requirements, including four years of satisfactory teaching experience. (ECF No. 343-5). In addition, Zeng had to submit "[o]verall evidence of **superior** worth to the University as demonstrated by <u>effective performance in all major areas</u> of responsibility and <u>excellence in either teaching or research/scholarly activities</u>." (*Id.*). The DP&TC pointed out that Zeng had not met the teaching requirements for tenure, because he had not received satisfactory teaching scores for the requisite four years.

The DP&TC further found that Zeng's research and publication activities were inadequate, noting that he had not received a grant since coming to MUSM and did not have sufficient publications to indicate an active research program, explaining that "[t]wo original research papers in 4.5 years does not indicate an active research program." (ECF No. 343-5). Moreover, Zeng had not listed in his CV any presentations since coming to MUSM, "not even local research meetings that would have no cost to attend." (*Id.*). The DP&TC advised Zeng that, based on his current achievements, he would not be recommended for tenure. (*Id.*). The DP&TC again made specific recommendations for improvement, emphasizing that Zeng needed to publish more research papers and get external research funding. (*Id.*). Many of the research-related recommendations mirrored those set forth in the Mid-Tenure Review. The DP&TC further suggested that Zeng get assistance from Ms. Smith in the Teaching and Learning Office to improve his teaching style and attend professional development on teaching skills offered by the Office of Faculty Development. (ECF No. 343-5).

### D.    Zeng's Tenure Application and Review

On August 1, 2014, Zeng sent a letter to MUSM's Dean, Dr. Joseph Shapiro ("Shapiro"), requesting an extension of time in which to apply for tenure. (ECF No. 343-

6). Zeng acknowledged that "[s]ince I arrived in 2009, the Faculty Promotion and Tenure Regulations would require I apply for tenure in my sixth year (the fall of 2014)," but given the impediments to completing his research, Zeng asked to apply in the Fall of 2015. (ECF No. 343-6). On August 7, 2014, Primerano, who was now Interim Chair of the Dept. of B&M, sent an email to Zeng, notifying him that Shapiro had approved Zeng's request for a one-year delay in applying for tenure, making his application due in the Fall of 2015. (ECF No. 333-35 at 2). Twelve days later, Zeng signed his sixth-year faculty appointment agreement with MUSM, accepting the position of Associate Professor for the fiscal year beginning July 1, 2014 and ending June 30, 2015.  (ECF No. 343-3 at 10-11). Student evaluations prepared between August and October 2014, rating Zeng's class on the Principles of Disease, showed that Zeng had improved, but was still below departmental averages in multiple categories. (ECF No. 332-3 at 5-6).

Shapiro and Primerano wrote a letter to Zeng on March 24, 2015 to provide guidance on future tenure considerations. (ECF No. 343-7 at 1). They emphasized that the Fall of 2015 was Zeng's last opportunity to apply for tenure, and he needed to submit his application no later than October 1, 2015. (*Id.*). Shapiro and Primerano set forth the documents Zeng would need to supply with his tenure application and reminded him that if "tenure is not approved, your contract will expire on June 30, 2016." (*Id.*). Student evaluations completed between January 2015 and May 2015, relating to Zeng's class on Diseases and Therapeutics, generally continued to fall at or slightly below departmental averages. (ECF No. 332-3 at 7-9).

In response to the letter, Zeng sent Primerano an email communication on May 7, 2015. (ECF No. 339-8). The email expressed Zeng's concern over two dates contained in the March correspondence: the October 1, 2015 deadline for submitting his tenure

application and the June 30, 2016 employment termination date. (*Id*.). Zeng stated that October was a busy month for grant proposals, so he wanted to move his application deadline to November 2015. In addition, Zeng felt that because his employment started on September 1, 2009, his contract termination date should be August 30, 2016 rather than June 30, 2016. (ECF No. 339-8). Zeng was given until October 19, 2015 to submit his tenure application, but the employment termination date was not changed. (ECF No. 333-6 at 145).

On July 13, 2015, Zeng signed his seventh-year employment agreement with MUSM, covering the July 2015 through June 2016 academic year. (ECF No. 339-9). The contract expressly stated that Zeng's appointment began on July 1, 2015 and expired on June 30, 2016. (ECF No. 339-9). Once again, the document did not explicitly require Zeng to obtain external grant funding; instead, it required Zeng to initiate and/or participate in "scientific research or other scholarly activity which is consistent with your educational background training and/or experience and which is consistent with the goals of Marshall University." (*Id*).

On October 7, 2015, Primerano sent an email to Zeng, on which he copied Dr. Bonnie Beaver, chair of the PAC, and Hardman, chair of the DP&TC. (ECF No. 333-18). In the email, Primerano stated that he needed to revise Appendix C of the tenure application form to reflect that Primerano was not recommending Zeng for tenure. (*Id*.). Primerano later admitted that sending such an email before Zeng had even submitted his tenure application was not proper; however, he explained that he was preparing Appendix C as part of his responsibilities as chair of the Dept. of B&M and noticed that there was no option on the form to not recommend a candidate. Primerano felt that this needed to be corrected before the review, because getting through the process usually

required haste. (ECF No. 333-11 at 54-56). Primerano added that his concerns regarding Zeng's performance were already known by the DP&TC based on his participation with the committee prior to his appointment as interim chair of the Dept. of B&M. (ECF No. 333-11 at 56).

On October 26, 2015, the DP&TC issued its recommendation to decline Zeng's tenure application. (ECF No. 343-9). The committee found Zeng to be adequate in teaching, but felt that he did not display *excellence* in that area. (*Id*. at 1-2). The DP&TC acknowledged that Zeng's student evaluations had improved, at this point generally exceeding departmental averages, (ECF Nos. 332-3 at 11-12), but stated that his teaching load was minimal; he had not developed any new courses; and he had not served as the chair of a graduate committee, or acted as the primary mentor of a graduate student. (ECF Nos. 341-5; 343-9).

Likewise, the DP&TC did not believe that Zeng had achieved excellence in his research endeavors. (*Id*.). In particular, the DP&TC noted that Zeng had not been invited to lecture at any conferences since coming to MUSM, had made only a handful of presentations in six years of employment, had not received any national research funding despite submitting many grant proposals, and had published a mere five papers in six and half years, with only two of those being original research papers. (*Id*.). The DP&TC also reviewed Zeng's performance against the job requirements set forth in his initial offer of appointment and found him lacking. Specifically, the DP&TC indicated that Zeng had not developed any independent, externally funded research program. (ECF Nos. 341-5 at 3, 343-9 at 3).

On October 27, 2015, Primerano sent an email to Zeng, advising him that the DP&TC had decided not to recommend Zeng for tenure. (ECF No. 333-13 at 1). This

email was followed a few days later by a letter from Primerano to Shapiro in which Primerano agreed with the DP&TC that Zeng did not satisfy the requirements for tenure. (ECF No. 333-21). Primerano acknowledged that Zeng met the minimum standards as stated in the Tenure Regulations; nevertheless, Primerano did not feel that Zeng showed "[o]verall evidence of superior worth to the University as demonstrated by effective performance in all major areas of responsibility and **excellence** in either teaching or research/scholarly activities." (*Id*.). Primerano stated that Zeng had not received any external funding since coming to MUSM and had reported having only six publications since his appointment, two of which were review articles and one was actually published at or near the inception of his employment with MUSM. Primerano also laid out the reasons for his conclusion that Zeng was only satisfactory in teaching, noting that while Zeng's student evaluation scores had improved, they were still below "the composite departmental averages for the same courses and years."(ECF No. 333-21 at 2). He added that Zeng had not served as a primary mentor of any Ph.D. student, nor served on a medical or graduate education committee. Primerano concluded by stating that the DP&TC voted unanimously not to recommend Zeng for tenure. (*Id*.). As required, Shapiro forwarded this information to the PAC.

Zeng met with Dr. Beaver prior to the PAC's quarterly meeting. At Dr. Beaver's request, Zeng wrote a letter to the PAC clarifying the timing of his employment and providing information about a manuscript he had submitted to the Journal of Allergy and Clinical Immunology. (ECF No. 333-13 at 2). Zeng explained that he officially began employment with MUSM on September 1, 2009, but a laboratory was not provided until February 2010. For that reason, Dr. Niles and Primerano agreed that Zeng's "tenure clock would not start until [he] got [his] lab." (*Id*.). Zeng added that he requested a "delay

of tenure application" from Shapiro in August 2014, and the request was granted, which explained why his application was being submitted one year later than usual. (*Id.*).

On January 25, 2016, the PAC issued its recommendations regarding all pending promotion and tenure applications, including Zeng's application. (ECF No. 333-40 at 3-4). The PAC determined that Zeng's teaching was good, his research was satisfactory, and his service was also satisfactory. However, the PAC did not find these ratings to be sufficient for an award of tenure and "voted unanimously that Dr. Zeng should not be recommended for tenure." (*Id.*). The attached notes from the PAC explained the committee's reasoning, indicating that Zeng did not have the support of his chair; he carried a low teaching load, but had improved his student evaluations; had not mentored a student who published anything; had only presented at three national meetings since 2009; had no invited talks or presentations; had no current research funding; and was not on any university or medical school committee at the time. (ECF No. 333-52 at 47-49). On January 29, 2016, Shapiro notified MU's newly-appointed President, Jerome Gilbert ("Gilbert"), of the PAC's recommendations, including that Zeng should not be awarded tenure. (ECF No. 333-52 at 46).

On February 8, 2016, Dr. Beaver sent a letter to Zeng, advising him that the PAC voted against his tenure application. (ECF No. 333-22). Dr. Beaver explained that the primary reason for the PAC's decision was Zeng's "lack of funded research activity." (*Id.*). She added, however, that to receive tenure, an applicant had to have "effective performance in all major areas of responsibility and excellence in either teaching or research scholarly activities," and Zeng had not met that criteria. (*Id.*). On the same day, Shapiro wrote a letter to Zeng in which Shapiro reported that he had notified Gilbert that Zeng's application for tenure was not supported. (ECF No. 333-14 at 1). Shapiro

based his decision on the PAC's vote and on a discussion Shapiro had with Primerano.

Zeng and Shapiro met on February 22, 2016 to discuss the status of Zeng's application for tenure. (ECF No. 333-19 at 1). According to Zeng, Shapiro offered to extend Zeng's employment until June 2017 if he agreed not to make "a fuss" about the tenure decision. (ECF No. 333-8 at 45). On March 17, 2016, Zeng sent a letter to Gilbert, explaining why Zeng should be awarded tenure. (ECF No. 382-3 at 23-27). Zeng indicated that he felt the tenure application review process was tainted by discrimination and impartiality; particularly, as the DP&TC was merely following the direction of "an authoritative administrator" when it recommended against Zeng's tenure application. (*Id.*). On March 18, 2016, Zeng forwarded a copy of the Gilbert letter to Primerano, along with a message stating that he (Zeng) had no recollection of receiving the March 2015 letter from Primerano and Shapiro notifying Zeng of his June 30, 2016 termination date and adding that he had always thought the end of his seventh year should be February 2017. (ECF No. 382-3 at 23). Zeng later conceded that he did receive the March 2015 letter from Primerano and Shapiro given that, in May 2015, he emailed and met with Primerano about the dates contained in the March letter.

When Zeng did not receive an encouraging response from Gilbert, he proceeded on March 21, 2016 to file a questionnaire with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination in his tenure evaluation. (ECF No. 333-8 at 46). The questionnaire was followed by a formal complaint filed in April 2016. (*Id.* at 47). On April 30, 2016, Gilbert formally notified Zeng that his application for tenure was denied. (ECF No. 333-24). On May 5, 2016, Jendonnae L. Houdyschell, MU's Associate General Counsel, sent an email to Zeng. (ECF No. 333-19 at 2). Ms. Houdyschell indicated that MUSM was willing to accommodate Zeng's request and

extend his employment until February 1, 2017 if he agreed to withdraw his EEOC complaint, waive his right to file a grievance, and forgo any other claims against MU. (ECF No. 333-19 at 2). Zeng did not agree to these concessions.

On May 17, 2016, Zeng filed a grievance with the West Virginia Public Employees Grievance Board ("WVPEGB") in which he alleged that his tenure application was denied on the basis of racial discrimination. He further complained that he was being threatened with early termination of employment as a consequence of his opposition to the unlawful discrimination. (ECF No. 366-1). On June 29, 2016, Primerano wrote a letter to Zeng, confirming that his last day of employment would be June 30, 2016, and asking Zeng to return his University keys and other items to Primerano. (ECF No. 334-13).

### E.    Zeng's Grievance Against MUSM

At all relevant times of Zeng's employment with MUSM, the State of West Virginia had in place the WVPEGB, which oversaw the State's employee grievance procedure. *See* W. Va. Code §§ 6c-2-1 through 6c-2-8. Under the procedure, an aggrieved public employee could challenge an adverse employment action and seek a variety of relief; such as, reinstatement to employment and back pay. W. Va. Code § 6c-2-3. A grievance was defined as:

> (i)(1) "Grievance" means a claim by an employee alleging a violation, a misapplication or a misinterpretation of the statutes, policies, rules or written agreements applicable to the employee including:
>
> (i) Any violation, misapplication or misinterpretation regarding compensation, hours, terms and conditions of employment, employment status or discrimination;
>
> (ii) Any discriminatory or otherwise aggrieved application of unwritten policies or practices of his or her employer;

(iii) Any specifically identified incident of harassment;

(iv) Any specifically identified incident of favoritism; or

(v) Any action, policy or practice constituting a substantial detriment to or interference with the effective job performance of the employee or the health and safety of the employee.

(2) "Grievance" does not mean any pension matter or other issue relating to public employees insurance in accordance with article sixteen, chapter five of this code, retirement or any other matter in which the authority to act is not vested with the employer.

W. Va. Code § 6c-2-2(i). The term "discrimination" was further defined to mean "any difference in the treatment of similarly situated employees, unless the differences are related to the actual job responsibilities of the employees or are agreed to in writing by the employees." W. Va. Code § 6c-2-2(d).

The grievance procedure had three administrative levels, followed by judicial review in the Circuit Court of Kanawha County, West Virginia. W. Va. Code § 6c-2-4. Upon the filing of a grievance, the chief administrator of the state agency or department that employed the grievant, or the administrator's designee, was required to either participate in a private, informal conference with the grievant, or if requested by the grievant, conduct a Level I hearing. *See* W. Va. Code § 6c-2-4. The Level I hearing was held in private, but the grievant was entitled to be heard and present evidence. Both parties were permitted to call witnesses to testify and submit supporting documentation. The chief administrator, or designee, was required to issue a written decision within fifteen days after conclusion of the hearing. If the grievant was unhappy with the decision, he could request mediation or arbitration. If the matter was not resolved at this second level, the grievant could request a Level III hearing before an Administrative Law Judge ("ALJ"). *Id.* The ALJ was authorized to subpoena witnesses, administer oaths,

take testimony, and exercise other powers granted by rule or law. Within thirty days of completing the hearing, or receiving proposed findings of fact and conclusions of law from the parties, the ALJ was required to render a written decision. *Id.* Either party could appeal the ALJ's decision to the Circuit Court of Kanawha County on the grounds that the decision (1) was contrary to law or adopted rule or written policy; (2) exceeded the ALJ's authority; (3) was the result of fraud or deceit; (4) was clearly wrong in view of the record; or (5) was arbitrary and capricious or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion. W. Va. Code § 6c-2-5. The Circuit Court could adopt and enforce the ALJ's decision, or reverse, vacate, modify, or remand the decision. *Id.*

As stated, Zeng filed his grievance with the WVPEGB on May 17, 2016. A Level I hearing was held on June 20, 2016. (ECF No. 333-11). Gilbert selected Steve Hensley, a former MU employee, to act as the Grievance Examiner. (*Id.* at 5). Present at the hearing was Zeng and, on behalf of MUSM, was Primerano. (*Id.*).

Zeng presented evidence that he believed established his superiority to two comparator colleagues in his department. (ECF No. 333-11). Those colleagues, Dr. Koc and Dr. Denvir, were Caucasian and had received tenure two to three years before Zeng submitted his tenure application. (*Id.* at 23-25). Zeng contended that he was denied tenure, despite his accomplishments, due to his race (Asian) and national origin (Chinese). (*Id.* at 23). Zeng believed that the discriminatory motive behind his denial of tenure was proven, in part, by MUSM's requirement that Zeng obtain external research funding, although neither Dr. Koc nor Dr. Denvir was held to that requirement. (*Id.* at 26). In addition, Zeng asserted that discriminatory animus was demonstrated by Primerano, who violated the normal tenure review process by prematurely informing

the DP&TC that he would not recommend tenure for Zeng. (ECF No. 333-11 at 30-31). Lastly, Zeng argued that he had received confirmation in 2009 from the chair of his department that his "tenure clock would not start until February 2010." (ECF No. 333-11 at 32-22). Consequently, Zeng "always thought that the end of [his] seventh year employment at Marshall should be a date in February 2017." (*Id.* at 33).

Zeng testified that when he realized MUSM's intention to terminate his employment in June 2016, he approached Shapiro and argued that he was being prematurely dismissed from the faculty. According to Zeng, Shapiro responded that if Zeng would not "make a big fuss" about being denied tenure, he could stay at MUSM until February 2017, or even until June 2017. (ECF No. 333-11 at 33). Zeng was subsequently contacted by MU's General Counsel, who reiterated that he could remain employed at MUSM until February 2017 if he would waive his right to file a grievance and withdraw his EEOC complaint. In Zeng's view, these requests were evidence of retaliation, because he was already entitled to a one-year "terminal contract" if tenure was denied. In effect, MUSM was threatening him with early termination, unless he agreed to forgo his right to challenge the discriminatory review of his tenure application. (ECF No. 333-11 at 34-35).

In response to Zeng's position, MUSM asserted that Zeng did not receive tenure because he simply did not meet the standards required to obtain tenure. (*Id.* at 37-57). Furthermore, Zeng was terminated on June 30, 2016, because (1) his contract expired on that date; and (2) he had spent seven years at MUSM, the maximum amount of time a nontenured, probationary faculty member was permitted to remain on staff, as was clearly set forth in University and MUSM regulations. In support of its position, MUSM submitted Zeng's yearly evaluations, Mid-Tenure Review, and Pre-Tenure Review,

pointing out that Zeng was repeatedly warned by multiple colleagues over a four-year period that he was not performing at the level necessary to receive tenure. (*Id*. at 37-57).

Primerano also testified at the Level I hearing. (ECF No. 333-11 at 53-83). Primerano explained that once an applicant submits a tenure application, the first administrative body to consider it is the department's P&TC. The P&TC makes a recommendation to the chair of the department on whether or not an applicant should be granted tenure. The chair either agrees or disagrees with the recommendation and then passes the application and recommendations to the PAC. The PAC reviews all of the material and makes a recommendation to MUSM's Dean, who agrees or disagrees with the recommendation. The entire packet—including the recommendations of the committees, the chair, and the Dean—is then submitted to the President of MU, who makes the final decision on tenure. (*Id*. at 53-54). Primerano conceded that he acted improperly by making known to the DP&TC that he did not intend to recommend Zeng for tenure; however, he explained that he had served on the DP&TC in the years prior to Zeng's application being formally submitted, and his views regarding Zeng's qualifications for tenure were known. (ECF No. 333-11 at 55-56). Therefore, the committee members were already aware of Primerano's misgivings. Primerano stated that he based his conclusion regarding Zeng's qualifications on "the absence of external grant funding and limited publications [by Zeng] ...[and] on the long history of advising Zeng that external funding was a mandatory component of his tenure requirement process." (*Id* at 58). According to Primerano, the DP&TC shared his concerns about Zeng's qualifications for tenure. (*Id*. at 59).

Primerano acknowledged that he was aware of Zeng's desire to "reset" the tenure clock to allow an additional six months to one year in which to submit his application,

but Primerano stated that he did not have the authority to accommodate that request. (*Id.* at 62). Primerano explained that whenever a faculty member arrived—whether it was the first day of the fiscal year or the last day—the entire year counted, so "a partial year is still counted as a full year in the tenure clock calculations." (ECF No. 333-11 at 63-64).

Primerano was asked about the letter he and Shapiro wrote in March 2015, providing guidance to Zeng regarding his tenure application. (*Id.* at 67). In the letter, Zeng was advised that he needed to apply for tenure in the Fall of 2015, and if he did not received tenure, his contract would expire on June 30, 2016. Primerano testified that allowing Zeng to apply in the Fall of 2015, rather than 2014 as required, was the result of a specific exception made by MUSM's Dean. (*Id.*). Nevertheless, Zeng was notified in March 2015 that if he failed to receive tenure, his employment would still terminate upon the expiration of his contract in June 2016. When asked about other Asians who received tenure at MUSM, Primerano specifically mentioned his personal recommendation that Dr. Hongwei Yu's 2004 application for tenure be approved, and Primerano's support for the 2008 tenure application submitted by Dr. Nalini Santanam, an Asian female. (*Id.* at 75-76).

After the Level I hearing was resolved against him, Zeng engaged in mediation with MUSM, which failed to settle the dispute. (ECF No. 343-13 at 1). Consequently, Zeng requested a Level III hearing. The Level III hearing was presided over by ALJ Billie Thacker Catlett, who was Chief ALJ for the WVPEGB. The hearing commenced on January 20, 2017. (ECF No. 333-3 at 1, 5). Judge Catlett noted that Zeng's grievance included two components: (1) the denial of tenure due to racial discrimination; and (2) the alleged early termination of employment in retaliation for opposing discrimination

29

in the tenure review. (*Id.* at 5-6). She explained that Zeng had the burden of proving his claims by a preponderance of the evidence, and the inquiry into MUSM's denial of tenure and termination of employment would be limited to whether the decision conformed with applicable policy, or was otherwise arbitrary and capricious. (ECF No. 333-3 at 6). Judge Catlett pointed out that for purposes of the WVPEGB, "discrimination" was defined as "[a]ny difference in the treatment of similarly situated employees, unless the differences were related to the actual job responsibilities of the employees or are agreed to in writing by the employees." (*Id.* at 6). Accordingly, the focus of the examination was not to determine the existence of racial discrimination *per se*, but rather, was to determine if Zeng had been treated differently than others similarly situated. (*Id.* at 7).

Primerano was again called to testify. (ECF No. 333-3 at 42). When asked by Zeng if he compared applicants for tenure with each other, Primerano answered in the negative, stating that applicants were not compared with other applicants; instead, their performance was judged by examining their completion of the requirements set out in their offer letter, which was the standard practice in evaluating tenure applicants. (*Id.* at 46; ECF No. 333-4 at 91). Zeng questioned Primerano about changes in the tenure requirements that applied to faculty coming to MUSM in 2013 and later, and Primerano clarified that Zeng was judged under the old guidelines. (ECF No. 333-3 at 54-56). Zeng emphasized that the new regulations required external funding, when the old regulations did not; thus, suggesting that Zeng's application for tenure was judged under the newer regulations when it should have been evaluated under the old regulations. Primerano denied this inference, stating that Zeng was expected to obtain external funding, because that was a requirement in his offer letter. (*Id.*; ECF No. 333-4 at 72).

Primerano testified that under the relevant rules and regulations, Zeng should have submitted his tenure application no later than the Fall of his sixth year, which would have been the Fall of 2014. (ECF No. 333-3 at 76-77). However, in August 2014, Zeng requested that he be allowed to apply in his seventh year—2015. That request was granted by Shapiro, Dean of MUSM. Notwithstanding the extension for submission of the application, Primerano testified that he did not believe that changed or extended Zeng's terminal year, which ran from July 1, 2015 through June 30, 2016. (ECF No. 333-3 at 79). Primerano conceded that Zeng had received an email from Dr. Niles, then Chair of the Dept. of B&M, stating that Zeng's tenure clock would not start until his laboratory was established. (*Id.* at 88-89).

Following Primerano's testimony, Shapiro was called as a witness by Zeng. (*Id.* at 98). Shapiro testified that since coming to MUSM approximately five years earlier, he had never reversed a recommendation of the PAC. (*Id.* at 103). Shapiro explained that his role in the tenure process was to review the packet submitted by the PAC and determine whether the PAC's recommendation was reasonable. (*Id.* at 104). Most of the time, the PAC provided a positive recommendation. In fact, Shapiro could only recall two times when promotion or tenure was not recommended by the PAC. (*Id.*).

Shapiro testified that he gave more attention to Zeng's application packet than usual, because of the negative recommendation of the PAC. (ECF No. 333-3 at 106). Shapiro also spoke with Dr. Beaver, Chair of the PAC, about Zeng's application and the PAC's recommendation. (*Id.* at 108). Shapiro could not recall the credentials and qualifications of Drs. Koc and Denvir, but remembered that they had received enthusiastic recommendations for tenure. (*Id.* at 103, 109). Shapiro testified that tenure decisions are important, and recommendations to deny tenure are not made lightly or

31

often. (*Id*. at 125-127).

Hardman was called as the next witness. (ECF No. 333-5 at 11). Hardman testified that, typically, in the Dept. of B&M, tenure-track faculty underwent a Mid-Tenure Review. (ECF No. 333-5 at 13). The purpose of the review was to give prospective applicants an idea of how they were progressing toward tenure. The expectations against which the faculty member was judged were generally agreed upon by the department chair and the faculty member at the time of the faculty member's initial hiring. (*Id*. at 15). Hardman testified that if the faculty member was hired to do research, the member was expected to obtain external funding via grants from outside agencies; such as, the NIH and the American Cancer Society. (ECF No. 333-5 at 16). In order to receive grants, the faculty member was expected to publish his or her research. Hardman indicated that most outside agencies evaluated the productivity of a researcher prior to devoting funds to a research project. (*Id*. at 16-17). She explained: "Publishing is how you tell your granting agency and the public what kind of work has been done. It allows for peer review, so that other scientists can read this work and judge the value of it." (*Id*. at 17). Hardman confirmed that Zeng held a research-focused position as opposed to a teaching-focused position. (*Id*. at 19).

Hardman testified that she served as a member of Zeng's Mid-Tenure Review Committee. (*Id*. at 19). She stated that the members of the Committee unanimously agreed with the evaluation sent to Zeng. (ECF No. 333-5 at 22). The Committee felt that Zeng's teaching was inadequate; that he needed to improve his engagement with the students; that he should attend lectures given by successful teachers; improve his professionalism; and meet with Ms. Sherri Smith, at the Teaching and Learning Center, for help with his teaching style. (*Id*. at 22-23). In addition, the Committee believed that

32

Zeng needed to publish considerably more research. The Committee explained to Zeng that publications supporting his hypotheses were critical to his likelihood of obtaining outside research funding. (*Id* at 23). The Committee also suggested that Zeng find someone to read his grant proposals in order to get another point of view, reiterating the importance of obtaining external research grants. The Committee emphasized that Zeng was not achieving excellence in either teaching or research, and he would be required to do so in order to obtain tenure. (ECF No. 333-5 at 24). At this time, Zeng had approximately two years in which to make the improvements suggested by the Committee before his tenure application was due.

Hardman confirmed that she also participated in the DP&TC's Pre-Tenure Review of Zeng's proposed application, submitted approximately six months before he was supposed to formally apply. (ECF No. 333-5 at 31). She explained that the purpose of the Pre-Tenure Review, which was typically completed in the Spring just prior to the Fall due date of the tenure application, was to give the prospective applicant notice of what kind of recommendation he or she was likely to receive from the DP&TC based on current evidence; thus, giving the applicant a window of time in which to improve specific deficiencies. (*Id.* at 32).

In the Pre-Tenure Review, the DP&TC found that Zeng was still lacking in teaching, as he was required to show four years of satisfactory teaching evaluations, and he had not achieved that goal. (ECF No. 333-5 at 33). Zeng's research likewise was not up-to-par, because he had not received any grants and had only published five papers in five years, three of which were reviews of other papers, rather than original research. (*Id.* at 34). According to Hardman, most institutions expect their researchers to publish two to three research papers per year. (*Id.*). In addition, Hardman testified that Zeng

had failed to obtain any grants. She stated: "[W]e reiterated what we had told him almost two years before. He had to get the publications. He has to be doing work and get it published. He had to get grant support. He had gotten three grants before he came to Marshall, but once he came to Marshall no more happened. So there's little additional productivity on his CV. So for what he has to show in writing, there's not much there to show for almost five years' worth of work." (ECF No. 333-5 at 38).

The DP&TC made specific recommendations to Zeng for improvement, again suggesting that he consult with Ms. Smith. Hardman noted that the DP&TC had recommended this two years earlier, apparently without compliance by Zeng. (*Id.* at 37). The DP&TC concluded that Zeng had done little to improve his teaching, although his student evaluations were better. Still, the DP&TC did not feel Zeng's teaching was in the excellent range. (ECF No. 333-5 at 37). In regard to research, Zeng was encouraged to cultivate contacts with medical doctors to ensure that his research had "clear translational significance." (*Id.* at 38). Hardman added that DP&TC members "try to give the applicants the best help that we can, so that when they come up for tenure, they'll be awarded tenure. We know that it's important. It's critical for a person's career that they make this steady progression through their career." (*Id.* at 42).

Hardman was also asked to discuss the DP&TC's final recommendation that Zeng not receive tenure. (*Id.* at 47-59). Hardman testified that Zeng's DP&TC consisted of four individuals, with her as the chair. (ECF No. 333-5 at 47). The four individuals were the same faculty members that had performed Zeng's Mid-Tenure Review and his Pre-Tenure Review. The DP&TC examined three categories of activity; including teaching, research, and service. Zeng was not rated excellent in either teaching or research, and his service was satisfactory. (*Id.* at 47). She explained that Zeng's teaching activities were

not sufficient to justify tenure, because of his light teaching load and his failure to develop any new courses. Although Zeng created a couple of active learning exercises, they were not evaluated by students, so the DP&TC could not determine their success. In addition, one of Zeng's responsibilities as a researcher was to direct graduate students in his lab. While Zeng had worked with one resident and one graduate student in a lab rotation, he had not chaired a graduate student committee, or acted as the primary mentor for a graduate student. (ECF No. 333-5 at 50-51). These were all factors to be considered pursuant to the Tenure Regulations.

With respect to Zeng's research activities, Hardman noted that he had submitted a number of grant proposals, but none of them had resulted in an award of funding. (*Id.* at 51). Zeng had not received any invitation to act on the editorial board of a respected journal, and he had not published any new papers. (*Id.* at 53-54). Zeng had not been invited to lecture at any meetings, and he did little to promote his research. Hardman testified that the decision of the DP&TC to decline a recommendation of tenure was unanimous. (ECF No. 333-5 at 58). She stated that one of Zeng's biggest problem was his failure to provide evidence of the work he was doing by publishing his research findings. (*Id.* at 62). Without the publications, he simply could not obtain the funding expected.

When questioned about the timing of Zeng's tenure application, Hardman testified that Zeng was given an extra year to apply. (*Id.* at 64). She explained that generally the application is submitted before the end of the sixth year of employment, so that if the application is denied, the applicant has a year to find another job. She stated that Zeng was given more time because his laboratory was delayed, although according to the rules, the full academic year counted on the tenure clock regardless of when in the

year employment began. She explained: "If you begin employment one day before the end of the fiscal year, then that still counts as a full year." (ECF No. 333-5 at 64). Hardman added that she wanted to be sure the ALJ understood "that we appreciate the gravity of the situation and the decision that we're making. ... But at the same time, we understand the importance of awarding tenure to the school." (ECF No. 333-5 at 65).

On cross-examination by Zeng, Hardman testified that in making tenure decisions, the committee did not compare tenure applicants to each other, because "faculty have different responsibilities and different expectations." (*Id.* at 74). Instead, each applicant was evaluated against his or her personal expectations that were set out at the time of the initial offer. (*Id.* at 74-75). Hardman pointed out that Zeng had only produced two papers in his first four years at MUSM, which she described as "not very active." Zeng asked Hardman to estimate how much Primerano's negative evaluation influenced the DP&TC's review of his tenure application, and Hardman stated that Primerano had no influence on the evaluation. (*Id.* at 79). She indicated that the decision was made based upon the application packet Zeng provided to the committee. Consequently, if he failed to include all of the favorable data, then that was his fault, because he had the responsibility to supply all applicable information to the committee. (ECF No. 333-5 at 80). Hardman confirmed for Zeng that the members of the DP&TC that recommended against his tenure included her, Dr. Claudio, Dr. Fenger, and Dr. Yu. (*Id.* at 82). Although she was also on the DP&TC that recommended tenure for Dr. Koc and Dr. Denvir, Hardman could not recall the specifics of their application packets.(ECF No. 333-5 at 86). When Zeng stressed his contributions to certain research findings, Hardman responded that Zeng did very good work, which "was part of the reason we hired you. We expected you to do very good work. But for you to be important to

36

Marshall, you have to continue to do very good work. We know you have the ability, but we didn't see from the evidence that you presented that great work was still going on at Marshall." (ECF No. 333-5 at 87).

Dr. Zeng asked Hardman if she was prejudiced against him, and she testified that she had no reason to be prejudiced. (ECF No. 333-5 at 89). Zeng questioned why, then, she felt his tenure packet was weak even though he submitted letters of recommendation touting his research contributions. Hardman replied:

> Because looking at the whole package of you, we know about support letters. We've all written support letters. You can put in firm details—and he did—about your past work done when you were at Rochester, but there's no strong statements about current work. Well, maybe you've made some progress in understanding the basis of allergy, but we need some more proof, not just statements. We have to look at the whole package. ... If you want tenure at Marshall University, then you have to look at your value and your productivity while you're at Marshall, not what you did at Rochester.

(*Id.* at 89).

After Hardman, Dr. Hongwei Yu was called as a witness. (ECF No. 333-6 at 17). Dr. Yu testified that he came to Marshall University in 1999 and received tenure in 2005. At present, he was a full professor in Microbiology. (*Id.* at 30). Dr. Yu served on the DP&TC that considered Zeng's Mid-Tenure Review. (*Id.*). Dr. Yu indicated that Zeng's application was evaluated using MUSM's Tenure Regulations and Zeng's appointment letter. (*Id.* at 32).

Dr. Yu discussed the Committee's findings and recommendations regarding Zeng's mid-tenure application, stating that, in regard to teaching, the Committee wanted Zeng to increase engagement with students and attend some selected lectures in MUSM's Academy for Educators. Zeng was instructed to contact Ms. Smith for help with his teaching skills and to improve his professionalism. (ECF No. 333-6 at 33). As to

research and scholarly activities, Dr. Yu testified that the Committee wanted Zeng to increase his research productivity and felt that improvement in his collaborations with others would lead to better productivity. (*Id.* at 34). Dr. Yu stated that Zeng had been provided with $300,000 in his startup package, and the Committee wanted to see that money translated into publications. The Committee believed that Zeng would have a better chance of receiving outside research funding if he collaborated with other scientists to make joint grant proposals. Zeng was encouraged to have someone else read his grant proposals to make suggestions regarding the draftsmanship, with the aim of improving the likelihood that he would receive funding. (ECF No. 333-6 at 35). The Committee emphasized to Zeng that he was required to obtain external funding. Dr. Yu explained that external funding was an indication of peer acceptance, making it an important criteria in evaluating research performance. (*Id.* at 37).

Dr. Yu likewise served on the DP&TC that performed Zeng's Pre-Tenure Review. (*Id.*). That DP&TC examined Zeng's preliminary application for tenure, with its attached documentation, using the Tenure Regulations and Zeng's appointment letter as the measuring sticks. (ECF No. 333-6 at 39). The first criteria considered by the committee was "[o]verall evidence of superior worth to the University as demonstrated by effective performance in all major areas of responsibility and excellence in either Teaching or Research activities." (*Id.* at 39). Dr. Yu testified that his main concern for Zeng was his lack of research productivity. (*Id.* at 40). Although Zeng had been in the Dept. of B&M for nearly five years, he had not secured any major grants. Moreover, Zeng had published only five papers since arriving at Marshall, and three of those papers were reviews rather than original research. (ECF No. 333-6 at 42). Consequently, the committee advised Zeng that "[t]wo original research papers in 4.5 years does not

indicate an active research program," given that faculty members were expected to publish two or three original research papers per year to demonstrate productive research activities. (*Id.* at 43). Dr. Yu added that the DP&TC's concerns with Zeng's preliminary application were essentially the same concerns that the Mid-Tenure Review committee had communicated to Zeng years earlier. (ECF No. 333-6 at 44). The DP&TC again made specific recommendations to Zeng about how to improve his application, believing that if Zeng followed the recommendations, he would increase his chances of obtaining tenure. (*Id.* at 46). Dr. Yu acknowledged the difficulty in securing external grants, but believed that there were resources available to Zeng to assist him in preparing successful grant proposals. (*Id.* at 47).

Dr. Yu confirmed that he was a member of the DP&TC responsible for reviewing Zeng's tenure application. (*Id.*). Dr. Yu noted that Zeng was given an additional year to apply for tenure. (*Id.* at 49). With respect to Zeng's application, Dr. Yu stated that Zeng was rated as satisfactory in teaching, but not excellent. (*Id.* at 51-52). The reasons for this rating included Zeng's light course load, his failure to develop any new courses, his failure to serve on a graduate student committee, and his failure to have a graduate student rotating in his lab. (ECF No. 333-6 at 51). While Zeng's student evaluations improved during his last year, Dr. Yu clarified that student evaluations were only one aspect of the teaching score. (*Id.* at 52). Similarly, Zeng was not rated as excellent in research and scholarly activities. Dr. Yu testified that Zeng had not obtained a sufficient return on his $300,000 start-up package and never received an invitation to join the editorial board of a recognized journal. Moreover, Zeng had not published any additional articles since the Pre-Tenure Review and, in five years, had only presented twice at a national conference. (ECF No. 333-6 at 55).

When asked if applicants for tenure were judged uniformly, Dr. Yu testified that each person is different; therefore, the terms of his or her appointment would be different. Applicants for tenure were judged, in part, on the conditions set forth in the appointment letter. Consequently, the requirements for obtaining tenure were somewhat different for each applicant. (ECF No. 333-6 at 58).

On cross-examination, Zeng explored this testimony by asking about Drs. Koc and Denvir. (*Id.* at 63-64). Dr. Yu pointed out that Dr. Koc's situation was different, because she was hired primarily to teach, and Zeng was hired primarily for research activities. (*Id.* at 64). Dr. Yu reiterated that to obtain tenure, the applicant had to be excellent in either teaching or research. (*Id.* at 69). He indicated that the members of the DP&TC tried very hard to be fair when considering an application for tenure. When an applicant did not appear to meet the tenure requirements, the committee members would give extra attention to the applicant's criteria and performance. (*Id.* at 70). Dr. Yu testified that the majority of applicants seeking tenure were successful in obtaining it, although he could remember a couple applicants who were not. (*Id.* at 74). In particular, Dr. Yu mentioned Dr. Wilkerson, who had a grant and some publications, but nonetheless was not considered excellent. (ECF No. 333-6 at 76). Because Dr. Wilkerson was on the borderline, he did not receive tenure. Dr. Yu mentioned Dr. Park, as well, who did not receive tenure despite having external grant funding, because she did not publish enough papers. (*Id.* at 76-78).

After Dr. Yu completed his testimony, Dr. Beaver was called as a witness. (*Id.* at 100). Dr. Beaver testified that she was a practicing pediatric surgeon and a full professor in the Department of Surgery at MUSM. (*Id.* at 101). At the time of Zeng's tenure application, Dr. Beaver served as chair of the PAC, which was comprised of thirteen

members—one appointee from each academic department at MUSM. (ECF No. 333-6 at 102). Dr. Beaver explained that the PAC functioned as an advisory body to MUSM's Dean on issues of promotion and tenure. (*Id.* at 103). The PAC met four times per year to review academic portfolios of applicants seeking tenure or promotion and provided recommendations to the Dean. (ECF No. 333-6 at 103). Each application was assigned to three PAC members, who were tasked with closely reviewing the application and accompanying documentation. (*Id.* at 106). Then, each application was presented by one of the three members assigned to the application, and the full committee considered the applications in turn. (*Id.* at 106-07). In Zeng's case, Dr. Beaver recalled that two members in basic science departments and one clinical member were assigned to perform the extensive review of Zeng's application and supporting materials. Dr. Richard Egleton ("Egleton") was one of the three members assigned to extensively review Zeng's application, and he presented the application to the full PAC. Dr. Beaver stated that before the review she supplemented Zeng's application with a letter he had recently received, indicating that an article of his was going to be published in an esteemed journal. (ECF No. 333-6 at 106-07, 115-16). Dr. Beaver testified that Zeng's application was closely reviewed by the PAC, because the DP&TC had not recommended tenure. (*Id.* at 117). Ultimately, the PAC similarly voted not to recommend Zeng's request for tenure. (*Id.* at 118). Dr. Beaver admitted that it was not common for a tenure applicant to lack the support of his or her department chair, and she could not recall any occasion on which the PAC overrode the department chair's recommendation. (ECF No. 333-6 at 129).

On cross-examination, Dr. Beaver testified that tenure applicants were not compared with each other. (*Id.* at 130). Instead, the PAC's recommendation was based

on the portfolio submitted by the applicant. (ECF No. 333-6 at 130). Dr. Beaver conceded that the lack of support for Zeng's tenure application expressed by the DP&TC and department chair were considered by the PAC and reflected negatively on Zeng. (*Id.* at 132). While Dr. Beaver denied that those recommendations against tenure dictated the PAC's decision, she agreed that the PAC was influenced by the lack of support, explaining: "If the chair doesn't endorse you for the award of promotion and/or tenure, then who are we to make recommendations to support for [sic] you if you have not earned excellence in either Teaching/Advising and/or Research and Scholarly Activity and are [sic] of superior worth to the University." (ECF No. 333-6 at 135-36).

Primerano was called again to testify; this time on behalf of MUSM. (*Id.* at 138-39). Primerano reiterated that he was the interim chair of the Dept. of B&M in October 2015, when Zeng submitted his tenure application. (*Id.* at 140). Primerano testified that two years earlier, in 2013, he and the then chair of the Dept. of B&M, Dr. Niles, performed an annual progress report on Zeng in which they ranked him as "needing improvement." (*Id.* at 141). Because of that rating, Primerano and Dr. Niles were required to complete a follow-up review in March 2014. By this time, Dr. Niles had "brokered an agreement with Mark Jenkins at the University of Minnesota, who had agreed to help Dr. Zeng in his research." (*Id.*). Primerano and Dr. Niles also made suggestions to Zeng on how to improve his teaching; for example, to organize his student handouts better. (*Id.* at 142).

In the March 2014 review, Primerano and Dr. Niles acknowledged that Zeng might want to request a reset of the tenure clock, but advised that the request should be directed to MUSM's Dean, or to the PAC. (ECF No. 333-6 at 142). Zeng wrote a letter to Shapiro, MUSM's Dean, in August 2014, requesting an extension of the deadline for

42

filing his tenure application; that request was granted. (ECF No. 333-6 at 143-45). Primerano confirmed, however, that the extension applied to the application only as Zeng did not request or receive an extension of the terminal year of employment. (*Id.* at 145).

Primerano testified that, in keeping with Shapiro's extension, Primerano and Dr. Niles wrote a letter to Zeng on March 24, 2015, confirming that Zeng could file his tenure application in October 2015, but advising him that if tenure were not granted, his employment would cease on June 30, 2016, the expiration date of his current appointment. (*Id.* at 146). Primerano was asked about Zeng's subsequent statements in which Zeng denied receiving the March 25, 2015 letter. Primerano responded that, contrary to Zeng's representation, Primerano believed that Zeng had received the letter. As proof, Primerano testified that in early May 2015, Zeng sent an email to Primerano in response to the letter, expressing concern about the October 1, 2015 deadline for filing his application and the June 30, 2016 termination date. (*Id.* at 147). Accordingly, Primerano met with Zeng on May 11, 2015 to discuss his concerns. (*Id.* at 147-49).

At the meeting, Primerano sent Zeng an email, attaching copies of the old and new P&T Regulations for Zeng's review. (*Id.* at 150). Primerano stated that, as a result of the meeting, Zeng was permitted to submit his application to the DP&TC on October 19, 2015—instead of October 1—but Primerano could not change the end date of Zeng's faculty appointment, as that was a matter left to MUSM's Dean, who did not extend the employment contract. (ECF No. 333-6 at 203-04). Primerano indicated that he sent another copy of his March 24, 2015 letter to Zeng in October 2015, along with some application instructions. (*Id.* at 146-47).

Primerano testified regarding Zeng's tenure application and the letter Primerano

wrote to Zeng, informing him that tenure would not be recommended. (ECF No. 333-6 at 157-63). Primerano indicated that he found Zeng's teaching activities to be satisfactory, but not excellent for the same reasons noted by the DP&TC. Zeng's teaching hours were low; he had never been a mentor to a graduate student; and he had not served on any medical or graduate education committee. Primerano further found Zeng to be satisfactory in research and scholarly activities, but not excellent, because Zeng had too few publications and had not obtained any external research funding. Primerano agreed with the thoughts expressed by the DP&TC, but stressed that he did his own evaluation before issuing a recommendation to decline Zeng's application for tenure. (*Id.* at 161-62).

Primerano was asked some questions regarding a request by Zeng to have his teaching load reduced. (*Id.* at 172-74). Primerano recalled the request, but testified that he refused it, because he needed Zeng to teach Medical Immunology. (*Id.* at 172). Primerano denied that Zeng asked to take over Dr. Jackman's courses when she retired. (*Id.* at 172, 174). However, Primerano acknowledged that there were other occasions upon which Zeng sought an increase in his teaching load. (*Id.* at 205).

Primerano confirmed that Zeng was employed in September 2009, and he was an employee of MUSM throughout that fiscal year despite the delay in setting up his laboratory. (*Id.* at 177-78). Primerano denied that all faculty appointments were the same, explaining that faculty members might have different requirements of employment, depending upon MUSM's particular needs to conduct research, support existing grants, and provide medical education. (ECF No. 333-6 at 178-79). As a result, appointment letters were tailored to the specific needs of MUSM at the time of appointment. (*Id.* at 178-79). Primerano testified that, during Zeng's employment with

MUSM, both Primerano and Dr. Niles made detailed recommendations in Zeng's annual evaluations, with the intention of strengthening his research, improving his teaching skills, and encouraging his professional development. (ECF No. 333-6 at 180-83).

Next, Zeng testified out of order in his case-in-chief. (ECF No. 333-7 at 24). Zeng agreed that the prior witnesses had testified negatively about Zeng's job performance at MUSM, and that they had submitted evaluations corroborating their testimony. (*Id.* at 25). Nonetheless, Zeng contended that the negative evaluations, like the negative testimony, were not based on objective data. To the contrary, Zeng argued, the objective data proved that his job performance in teaching, research, and service exceeded the performances of Dr. Koc and Dr. Denvir, who were employees similarly situated to Zeng that had received tenure. (*Id.*). Zeng further asserted that the objective evidence demonstrated that he was held to a higher standard in the tenure evaluation process than the standard that was applied to his colleagues. Zeng proceeded to supply the ALJ with exhibits consisting of comparative data that ostensibly established Zeng's superior performance when compared to Drs. Koc and Denvir. (ECF No. 333-7 at 27-50).

Zeng addressed the teaching evaluations completed by his students, explaining why his evaluations were particularly low one year. According to Zeng, his evaluations were poor, because he had an exchange of words with Dr. Jackman during a class that she directed. (*Id.* at 52-53). As Zeng recalled, Dr. Jackman had notified Zeng that his lecture time was up, but Zeng disagreed with Dr. Jackman and continued to lecture. As a result, the class evaluated Zeng as being disrespectful and unprofessional. (ECF No. 333-7 at 53).

Zeng also provided responses to many of the concerns raised by the DP&TC and the PAC, arguing that the findings of the committees were contrary to the evidence. (*Id.*

at 54-88). Zeng provided statistics to demonstrate that his teaching load was not low in comparison to Drs. Koc and Denvir; that his teaching evaluations were not below the departmental average; that Hardman inflated her teaching hours during her testimony; that he did participate in student seminars; that he did not mentor a graduate student, because there was only one new graduate student in his department while he was there; that he did not have a graduate student rotate in his laboratory, because he did not have research funds to allow for a graduate student; and that his research and research reputation were stellar based on his discoveries in Immunology. (ECF No. 333-7 at 54-88).

Zeng testified that the research papers published by Drs. Koc and Denvir were not as impressive as his publications, describing Dr. Denvir's performance as a "rather meager research or scientific accomplishment." (*Id*. at 88-99). He provided the ALJ with a chart he had prepared comparing himself to others in the department, including Hardman and Dr. Yu, to show that they were not as productive as described in their witness testimony. (*Id*. at 99-105). Zeng also addressed external research funding. He pointed out that while his initial appointment letter required him to obtain external funding, that job duty was never identified as a tenure requirement. Zeng stressed that the appointment letters of both Drs. Koc and Denvir included job responsibilities and separate tenure requirements, while his letter did not include any specific tenure requirements. Moreover, Dr. Koc's job duties required her to obtain external funding, but external research funding was not listed as a tenure requirement. (*Id*. at 107). Zeng noted that Dr. Koc had only applied for four grants before obtaining tenure, and Zeng had applied for fourteen by the time he submitted his tenure application. (ECF No. 333-7 at 107-08).

In the conclusion of his presentation, Zeng produced other documents that he had either found on the internet, prepared himself, or generated from documents provided by MUSM to show that he had attempted to fulfill the recommendations made by Primerano, Dr. Niles, and the DP&TC during his various evaluations. (ECF No. 333-7 at 158-73). Zeng testified that, as he approached the Fall of 2015, he found it harder to accomplish the committees' research and teaching recommendations. Zeng speculated that other researchers and MUSM students became less interested in participating in his projects, because word had started to circulate that Zeng would not receive tenure. (*Id.* at 168-172).

Zeng also submitted a table he prepared showing that his starting salary was lower than the salaries paid to Dr. Koc and Dr. Denvir. (ECF No. 333-8 at 29-30). According to Zeng, this salary difference was evidence of discrimination. (*Id.* at 31). Zeng additionally argued that his opportunities to interact with visiting scholars was limited by MUSM, again proof of discrimination, which impaired his job performance. (*Id.* at 33-34). Zeng argued that Primerano's decision to deny Zeng's tenure application was made in advance of the application being submitted—another example of discrimination. (*Id.* at 36). Zeng contended that Primerano's premature decision was communicated to others, thus tainting the tenure application review process. In support of that contention, Zeng referred to Dr. Beaver's testimony that the PAC considered Primerano's negative recommendation, and that recommendation influenced the PAC's decision. (*Id.* at 36-37).

Zeng asserted that the termination of his employment, without the granting of a terminal year, violated the tradition of American universities. (*Id.* at 44). Zeng recounted his meeting with Shapiro in which the Dean offered to extend Zeng's contract if he did

not "make a fuss" over the denial of tenure. (ECF No. 333-8 at 45). Zeng attempted to speak with Gilbert about the discrimination he believed he was encountering in the tenure review, but Gilbert was not responsive to Zeng's efforts. (*Id.* at 46). For that reason, Zeng filed an EEOC questionnaire on March 21, 2016. He followed up the questionnaire with a formal complaint in April 2016. (ECF No. 333-8 at 47). Zeng subsequently received an email from MU's lawyer offering to continue Zeng's employment if he waived his right to file a grievance and withdrew his EEOC complaint. (*Id.*). When Zeng refused, he was terminated on June 30, 2016.

To support his contention that Asians were held to higher tenure standards at MUSM, Zeng argued that two Asian faculty members who received tenure, Dr. Yu and Dr. Santanam, were highly distinguished faculty with many awards. (*Id.* at 50). Zeng concluded that they received tenure only because they performed well above the standards for tenure applied to Caucasians.

On cross-examination, Zeng admitted that he wrote a letter to Shapiro in which Zeng acknowledged that he was required to apply for tenure in the Fall of 2014, because that was his sixth year of employment. (*Id.* at 70). Zeng also admitted that, while he did request an extension of the filing deadline, he did not request an extension of his employment contract. Zeng conceded that he was told in March 2015 that if his tenure application was rejected, his employment with MUSM would terminate on June 30, 2016. (*Id.* at 72).

With respect to his charts, designed to show how he compared with Drs. Koc and Denvir, Zeng testified that some of the data used in the charts he found in the public domain. He did not submit all of this data with his tenure application, because a portion of the information was acquired after Zeng initiated his grievance. Zeng agreed that

some of the charts he submitted reflected only a portion of the available information, or included information that was not part of the tenure application packet he submitted for review; for example, a chart prepared by Zeng, which showed student evaluations of his teaching, included the six-month period before his tenure application and the six-month period *after* his application was submitted. (ECF No. 333-8 at 79). In practice, however, the tenure committees considered the student evaluations for the entire period that the applicant taught at MUSM. In Zeng's case, the committees considered approximately five years of student evaluations. Additionally, Zeng admitted that the publications he used in his charts to show the productivity of Drs. Koc and Denvir did not include all of the papers they published. (*Id.* at 82-85). Similarly, Zeng conceded that his chart regarding the service of faculty members on committees did not include service on university-level committees. (*Id.* at 86).

Primerano was called as a rebuttal witness. (*Id.* at 89). Primerano challenged some of the choices made by Zeng in preparing his comparative charts, indicating that Zeng did not include publications in which the faculty member was a co-author, although such publications were considered by the tenure committee. (*Id.* at 91). He also explained why the chart undervalued Dr. Denvir's collaboration with other scientists. When asked about Zeng's contention that Primerano made his decision to deny Zeng tenure before he had even submitted an application, Primerano essentially agreed that Zeng's perception was correct. (*Id.* at 95-97). Primerano testified that he was familiar with Zeng's productivity and had reached an conclusion regarding his qualifications for tenure prior to the Fall of 2015. (*Id.* at 97).

Dr. Beaver also testified as a rebuttal witness. (ECF No. 333-8 at 111). Dr. Beaver indicated that Zeng's calculation of the impact factor associated with various

publications by Zeng, Dr. Denvir, and Dr. Koc would not have changed her opinion regarding Zeng's tenure application. (ECF No. 333-8 at 113). In regard to teaching skills, Dr. Beaver reiterated that student evaluations were not the only factor relevant to rating an applicant's performance.

Hardman next appeared and was asked whether Primerano's premature decision to recommend that Zeng not be awarded tenure influenced the recommendation of the DP&TC. (*Id.* at 117). Hardman testified that Primerano's recommendation on Zeng's application, which was communicated to her in an email by Primerano, did not influence the committee, because the other members did not receive the email, and she did not bring it up during their assessment of Zeng's application. (*Id.*).

At the conclusion of the hearing, which spanned five days during the months of January through March 2017, the parties were given twenty days in which to submit Proposed Findings of Fact and Conclusions of Law. (ECF Nos. 333-8 at 155; 343-13 at 1). On August 18, 2017, the ALJ issued her decision. (ECF No. 343-13). The ALJ noted that Zeng had raised two grievances: (1) denial of tenure due to discrimination based on race; and (2) early termination of employment for opposing unlawful discrimination. (*Id.* at 1). The ALJ concluded that Zeng had not shown that Drs. Koc and Denvir were similarly situated employees; however, the ALJ did find that MUSM improperly considered Zeng's failure to secure external funding in its tenure decision. Nevertheless, the ALJ further found that the decision to deny Zeng tenure was otherwise sound, and Zeng had failed to establish discrimination in the review of his tenure application. (*Id.* at 67). As to Zeng's grievance related to early termination, the ALJ concluded that it was not timely filed. Accordingly, that issue was not addressed on the merits. (*Id.* at 67-68).

According to the docket sheet provided by the Clerk of the Circuit Court of

50

Kanawha County, West Virginia ("Circuit Court"), Zeng appealed the ALJ's decision to the Circuit Court on September 20, 2017. The entire record from the proceedings before the ALJ was submitted to the Circuit Court and incorporated into its record. On November 1, 2018, the Circuit Court entered a Final Order, affirming the ALJ's decision. *Zeng v. Marshall University,* Civ. A. No.: 17-AA-72 (Cir. Ct. Kan. Cty. Nov. 1, 2018). The Circuit Court agreed with the ALJ that some irregularities occurred in Zeng's employment with MUSM—for example, his initial appointment did not specify requirements for tenure separate from the general conditions of employment. However, the tenure decision was sound, because the various reviewers followed the correct process and reached recommendations that were consistent with Zeng's tenure application packet and the tenure policies. *Zeng,* Civ. A. No. 17-AA-72 at 12. On November 30, 2018, Zeng filed a Notice of Appeal with the West Virginia Supreme Court of Appeals ("WVSC"). According to the Clerk of the WVSC, the appeal is currently pending. *Zeng v. Marshall University,* Case No. 18-1035 (W. Va. Nov. 30, 2018).

## II.    Procedural History in the Instant Action

On May 23, 2017, Zeng filed suit in this Court, alleging discrimination on the basis of race and national origin, as well as retaliation. (ECF No. 2). Zeng was granted leave to amend his complaint on two occasions, (ECF Nos. 28-1, 55), and the parties were given over one year to conduct discovery. Upon completion of discovery and mediation, the parties were ordered to file dispositive motions no later than September 16, 2019. (ECF No. 329).

## III.    Motions for Summary Judgment

Zeng and all six defendants timely filed Motions for Summary Judgment with supporting memoranda and exhibits. The motions are briefly summarized below. These

summaries are not intended to restate all of the information and arguments contained in the motions, but are only intended to provide an overview of the issues.

### A.    Zeng's Motion

In his 62-page Motion for Summary Judgment, Zeng asserts that he and Drs. Koc and Denvir were similarly situated employees of MUSM. (ECF No. 332). All three were hired as tenure-track, probationary faculty members in the Dept. of B&M. Zeng is Asian of Chinese descent, while both Drs. Koc and Denvir are Caucasian. Drs. Koc and Denvir were hired in 2011, and Zeng was hired in 2009. (ECF No. 332 at 6). Zeng claims that his credentials and performance exceeded the credentials and performance of Drs. Koc and Denvir; however, they were awarded tenure in 2013 and 2014, respectively, and Zeng was denied tenure in 2016. Zeng claims that the denial of his tenure application is proof that the defendants discriminated against him on the basis of race and national origin. Zeng offers the following as additional evidence of the defendants' discriminatory animus: (1) Zeng was paid a lower salary than the salaries paid to Drs. Koc and Denvir; (2) in performing their reviews, the tenure committees distorted and discounted Zeng's contributions to MUSM while inflating the contributions of Drs. Koc and Denvir; (3) the committees engaged in an arbitrary and capricious tenure application review by failing to objectively compare Zeng's contributions to the other tenure applicants; (4) Zeng was not assigned to teach Dr. Jackman's Immunology courses, although Zeng was specifically hired to replace Dr. Jackman when she retired; (5) Primerano intentionally interfered with and prevented a fair tenure application review by communicating to the committee members—prior to Zeng submitting his tenure application—that Primerano did not intend to recommend Zeng for tenure; (6) Zeng's contract was prematurely terminated because he refused to accept the defendants' discriminatory actions; (7) Zeng

was fired just a few months after his tenure application was rejected; thereby, denying him the terminal year to which he was entitled under the Tenure Regulations; and (8) Zeng's due process rights were violated by his early termination and by a tainted and sham Level I grievance hearing. (ECF No. 332).

As further proof of discrimination, Zeng points out that he was not provided with any specific requirements to obtain tenure, while Drs. Koc and Denvir were given explicit requirements. In addition, of the three who applied for tenure, Zeng was the only one expected to obtain external grant funding. Zeng claims that he was not told external funding was necessary in order to receive tenure until 2012, three years into his employment with MUSM. (ECF No. 332). According to Zeng, making external funding a requirement for tenure was extremely harmful to his prospects, because external grant funding was becoming increasingly more difficult to obtain. Despite adding this requirement well into Zeng's years on the faculty, and despite knowing that there was an absence of external funding, the defendants expressly refused tenure to Zeng on that ground.

In addition to the evidence already discussed herein, in support of his motion, Zeng submits the following exhibits: (1) forms substantiating that Drs. Koc and Denvir are Caucasian, as well as a similar form pertaining to Dr. Gullo, another member of the Dept. of B&M; (2) Dr. Koc's initial appointment letter, showing that her starting salary was higher than the salary offered to Zeng and that she was given express tenure requirements, while Zeng was not; (3) Dr. Denvir's initial appointment letter, showing that his starting salary was higher than the salary offered to Zeng; (4) the DP&TC letters pertaining to the tenure applications of Zeng, Dr. Koc, and Dr. Denvir; (5) MUSM's curriculum table; (6) exhibits from the WVPEGB hearings; (7) letters from Shapiro

regarding the applications of Drs. Koc, Denvir, and Zeng; (8) NIH documents; (9) portions of the deposition transcripts of Drs. Dedilow, Thompson, Claudio and Shapiro; (10) PAC evaluations pertaining to Drs. Koc, Denvir, and Zeng; (11) Dr. Richard Egleton's ("Egleton") tenure application packet; (12) information about the INBRE grant; (13) student evaluations of lectures delivered by Zeng and Dr. Gullo, showing largely positive comments for Zeng and mixed comments for Gullo; and (14) Zeng's medical records.

### B.    Egleton's Motion

Egleton was the PAC member from a basic science department at MUSM selected to extensively review and then present Zeng's tenure application to the PAC. Egleton argues that Zeng has produced no evidence to establish that any of the defendants discriminated against him and, in any event, the state court judgment, which rejected Zeng's discrimination claim, is entitled to full faith and credit. (ECF No. 337). Egleton further asserts that he is entitled to qualified immunity. In his supporting memorandum, Egleton points out that at the same time Zeng's tenure application was considered, the PAC reviewed the application of Dr. Komal Sodhi, who is Asian like Dr. Zeng. (ECF No. 338). The committee unanimously voted to recommend Dr. Sodhi for tenure; thereby, proving that the PAC was not biased against Asian applicants.

Egleton also submits his own affidavit, in which he confirms that he served on the PAC during the 2015-16 academic year. (ECF No. 337-1). Egleton indicates that there were twelve faculty members applying for promotion or tenure that year, including Zeng. Egleton, Dr. Richard Crespo, and Dr. Alan Koester were assigned to review Zeng's application packet. (*Id*.), In evaluating Zeng's application, neither Egleton, Dr. Crespo, nor Dr. Koester relied on any information other than that supplied by Zeng. Egleton

presented the application to the full PAC, which, after a thorough discussion of Zeng's qualifications, decided not to recommend him for tenure. (ECF No. 337-1). Egleton testifies that the decision was not motivated by race or national origin. Indeed, those characteristics were never considered. Moreover, the PAC did not compare Zeng's qualifications to any other tenure applicants, past or present; rather, his application was evaluated in the standard fashion, by examining his credentials, accomplishments, and the requirements of his position. (ECF No. 337-1). Egleton verifies statements in his memorandum that at the same PAC meeting, the application of another Asian faculty member was considered, and that applicant received an unanimous recommendation for tenure. (*Id.*). Egleton states that a few months later, he wrote a letter of recommendation in support of Dr. Jianming Xiang's application for promotion at the University of Michigan. Egleton explains that his support for Dr. Xiang was based on Dr. Xiang's accomplishments; his race and national origin were not relevant factors in Egleton's view. Egleton denies that Zeng was held to a higher standard than Caucasian applicants; instead, Egleton testifies that Zeng was denied tenure because he failed to demonstrate excellence in either research or teaching. (*Id.*). Egleton emphasizes that all thirteen members of the PAC agreed that Zeng did not satisfy the criteria for tenure.

As further support for his motion, Egleton offers the affidavit of Marie C. Veitia, Ph.D., another member of the PAC. (ECF No. 337-2). Dr. Veitia affirms that Zeng's application for tenure was unanimously rejected for the simple reason that he failed to demonstrate excellence in either teaching or research. She adds that Zeng's race and national origin were not considered or discussed at the PAC meeting and certainly were not motivating factors in the PAC's decision. (*Id.*).

Egleton also provides deposition testimony of Dr. Ellen Thompson, Dr. Beverly

Delidow, and Shapiro. (ECF Nos. 337-3; 337-4; 337-5). Dr. Thompson served on the PAC and reviewed Zeng's application. Dr. Thompson confirms that Zeng's application was looked at very carefully, because he did not seem to be qualified for tenure. She states that the PAC makes an effort to recommend tenure for everyone that applies, if at all possible. She testifies that during the discussion of Zeng's application, no one mentioned his race, or appeared to judge him differently because of his Asian descent. Dr. Thompson adds that the PAC does not hold Asians to different or higher standards and does not evaluate Asian applicants any differently than non-Asian applicants. She indicates that applicants are not compared to each other, because the tenure review process is not a competition; rather, it is a process designed to determine if a particular applicant is excellent in either teaching or research. (ECF No. 337-3).

Dr. Delidow was another member of the PAC and reviewed Zeng's tenure application. (ECF No. 337-4). She testifies that she saw no evidence of racial bias during the review process. Instead, the applicants were judged based upon the documentation they submitted to the committee. Dr. Delidow does not recall there being any discussion about holding Zeng to a higher standard and confirms that he was not compared to other Asian faculty. (*Id.*). Dr. Dedilow denies that Zeng was treated differently and denies ever hearing anyone say negative things about Zeng related to his race. Furthermore, she did not perceive any bias against Zeng in the tenure process.

Shapiro testifies that Zeng did not publish enough research papers while at MUSM. (ECF No. 337-5). In fact, he believes that Zeng should have doubled his publications during the six plus years he was at MUSM. Shapiro denies that he compared Zeng to other faculty members; rather, he examined Zeng's application and considered the recommendation of the PAC, which he felt was reasonable. (ECF No. 337-5).

### C.    Gilbert's Motion

Gilbert agrees with Egleton that Zeng has failed to offer one shred of evidence establishing discriminatory animus in the consideration of Zeng's tenure application. (ECF No. 340). Gilbert asserts that, since his appointment as President of Marshall University, numerous Asian faculty members have applied for promotion and tenure, and Zeng is the only one who did not receive it. Gilbert adds that he was only one of twenty individuals that reviewed Zeng's application and concluded that Zeng had not achieved excellence in either teaching or research, which was a requirement that had to be met by any faculty member awarded tenure. Gilbert states that Zeng's contention that he should have been compared to other faculty members seeking tenure is simply incorrect, as that is not the accepted standard of review. Gilbert argues that Zeng cannot show that Gilbert conspired to deny Zeng a fair review, or was negligent by preventing retaliation, because no conspiracy existed and no retaliation occurred. Zeng just did not perform to the level necessary to obtain tenure and, in keeping with the Higher Education Policy Commission's regulations, his employment was terminated at the end of seven years.

In support of his motion, Gilbert supplies an affidavit in which he confirms his position as President of Marshall University at the time the decision was made to deny Zeng's tenure application. (ECF No. 339-1). Gilbert indicates that he decided not to award tenure to Zeng based upon the information Gilbert reviewed, the recommendation of the DP&TC, Primerano's and Shapiro's recommendations, and the recommendation of the PAC, none of which was supportive of Zeng's application. Gilbert denies any racial motivation in his actions, again verifying that since his arrival at Marshall, numerous Asian faculty members have been promoted and/or granted tenure.

(ECF No. 339-1). Gilbert also denies any discrimination related to Zeng's salary, pointing out that Dr. Denvir's assistant, Dr. Andrew Nato, is paid more than Dr. Denvir. Dr. Nato is of Asian descent and was hired in 2018, well after Dr. Denvir's initial employment date. (*Id.*).With respect to choosing Mr. Steven Hensley as the hearing examiner at the Level I grievance procedure, Gilbert states that Mr. Hensley had served as a hearing examiner for MU prior to Zeng's grievance and after Zeng's grievance, and has ruled both for and against MU's position. (*Id.*).

Gilbert also relies on the deposition testimony of Shapiro—in which he affirms that applicants for tenure are not typically compared to each other—and the testimony of Zeng, who acknowledges that he was first told of the June 30, 2016 termination date more than a year in advance via the Primerano/Shapiro letter dated March 24, 2015. (ECF Nos. 339-2, 339-3). Gilbert notes that, in Zeng's testimony, he also confirms his understanding that Primerano and Shapiro did not have the authority to terminate his employment; instead, that authority rested with Gilbert, as president of the University. (ECF No. 339-3). Furthermore, Gilbert notes that, in Zeng's testimony, he clarifies that his conspiracy claim does not involve the tenure decision, but rather, is limited to the decision to terminate his employment in June 2016 without offering him a one-year terminal contract. (ECF No. 339-4). Gilbert indicates that Primerano and Shapiro were merely advising Zeng, on behalf of the President's office, of the terms of his employment contract when they notified him that his termination date was June 30, 2016. Gilbert states that Primerano and Shapiro were acting within the scope of their employment in doing so, and nothing about providing this information to Zeng fell outside the scope of their employment. As additional evidence in support of his motion, Gilbert attaches the ALJ's written decision, which found that Zeng did not establish discrimination in the

decision denying him tenure. (ECF No. 339-5).

### D.    Hardman's motion

Similar to the other defendants' motions, Hardman contends that there is no evidence that anyone discriminated against Zeng. (ECF No. 341, 342). Hardman states that she first notified Zeng in October 2012—in the Mid-Tenure Review—that he was not performing to the level required for tenure. She and the other three members of the DP&TC gave Zeng specific recommendations at that time to improve his chances of ultimately receiving tenure. The same group of four faculty members provided Zeng with a Pre-Tenure Review in March 2014 and again notified him that he needed to make improvements in both teaching and research activities in order to achieve tenure. The DP&TC, which included an Asian faculty member of Chinese descent, provided Zeng with multiple suggestions and recommendations, specifically advising him to publish two papers in the next year. According to Hardman, notwithstanding the committee's warnings, Zeng did not improve his performance to the level of excellence required to receive tenure.

Hardman submits in support of her motion an affidavit in which she confirms her role as Chair of the DP&TC, which performed Zeng's Mid-Tenure Review in October 2012, his Pre-Tenure Review in March 2014, and his Tenure Application Review in October 2015. (ECF No. 341-1). She testifies that, in October 2012, the DP&TC concluded during the Mid-Tenure Review that Zeng would not receive tenure unless he made substantial progress in the quality of his teaching and the quantity of his research/scholarly activities. Importantly, the DP&TC found that Zeng had produced little in the way of publications derived from the $300,000 he received in start-up research funds. (*Id.*).

Hardman explains that the purpose of the Pre-Tenure Review, conducted nearly two years after the Mid-Tenure Review, was to help Zeng prepare his tenure application packet and direct him on what additional information and credentials he would need to submit with his packet. The DPT&C felt that Zeng still needed to improve his performance in both teaching and research in order to be recommended for tenure. (ECF No. 341-1). Hardman confirms that when she assessed Zeng's tenure application packet in October 2015, she did not feel Zeng had met the standard of excellence required for an award of tenure. Hardman acknowledges that she received an email from Primerano, communicating his decision not to recommend Zeng's application for tenure, but Hardman claims that she did not share the email, or Primerano's thoughts, with the other DP&TC members. (ECF No. 341-1). She denies that there was any racial bias against Zeng, or any consideration of Zeng's race and national origin in the DPT&C's final decision not to recommend tenure. Hardman states that, during Zeng's employment at Marshall and thereafter, she never heard any racially derogatory comments made about Zeng, nor witnessed any racially-motivated actions directed toward Zeng. (*Id.*).

Hardman also supplies an affidavit prepared by Dr. Hongwei Yu, another member of the DP&TC. (ECF No. 341-2). Dr. Yu confirms the DP&TC's assessment that Zeng's performance in both teaching and research fell short of the level necessary to obtain tenure, and the DP&TC provided Zeng with specific recommendations in both his Mid-Tenure Review and his Pre-Tenure Review on how to improve these activities. (ECF No. 341-2). According to Dr. Yu, the DP&TC stressed to Zeng in the Pre-Tenure Review that publications were critical to achieving tenure and told Zeng that he needed to publish at least two papers in the next year. Dr. Yu testifies that the DP&TC had given

the same advice to Zeng years earlier, but Zeng had disregarded it. (*Id.*). Dr. Yu denies that there was any racial bias or motivation in making these recommendations; to the contrary, he states that the DP&TC was merely trying to help Zeng receive tenure. (ECF No. 341-2). Dr. Yu affirms that Zeng was explicitly told that he would not qualify for tenure if he failed to improve his teaching and research activities. When Zeng ultimately submitted his application, the DP&TC unanimously found that Zeng had not achieved the level of excellence needed for an award of tenure. Dr. Yu states that the DP&TC members were not told of Primerano's negative review before making their decision, and Zeng's race and national origin were never factors in the DP&TC's decision. (*Id.*). Dr. Yu indicates that, like Zeng, he is an Asian faculty member originally from China, and he finds Zeng's accusations of discrimination to be contrary to his experience at MUSM.

Dr. Terry Fenger, another member of the DP&TC, also submitted an affidavit in support of Hardman's motion. (ECF No. 341-3). Like the others, Dr. Fenger insists that there was no racial or national origin discrimination in the DP&TC's unanimous decision not to recommend tenure for Zeng. Dr. Fenger testifies that the Mid-Tenure and Pre-Tenure Reviews were intended to help Zeng obtain tenure, and Zeng expressed appreciation for the DP&TC's assistance after the Mid-Tenure Review. (*Id.*). The DP&TC warned Zeng that his failure to publish more research papers and/or improve his teaching skills would result in a denial of tenure. Notwithstanding this warning, Zeng's tenure application failed to reflect excellence in either teaching or research. Dr. Fenger denies knowing about Primerano's decision not to recommend tenure and affirms that no one directed him to vote against tenure. (ECF No. 341-3). Dr. Fenger agrees with the others that at no time did he observe any racially-motivated actions or hear any racially derogatory statements related to Zeng. (*Id.*).

Hardman further offers deposition testimony taken of Dr. Pier Paolo Claudio, the fourth member of the DP&TC that performed Zeng's Mid-Tenure, Pre-Tenure, and tenure application reviews. (ECF No. 341-4). Dr. Claudio confirms that all four members of the committee agreed that Zeng had not done enough to earn tenure. He reiterates that Zeng's race and national origin were not factors considered by the DP&TC, and Zeng was not the victim of discrimination. Dr. Claudio denies having prior knowledge of Primerano's recommendation to decline Zeng's tenure application, and affirms that Primerano's feelings were not a factor in the DP&TC's decision. Dr. Claudio points out that Dr. Yu, an Asian faculty member, participated on the committee and was equally critical of Zeng's performance. (ECF No. 341-4). Dr. Claudio states that he personally felt that Zeng had not shown excellence in either teaching or research, which is why Zeng's application was deemed insufficient for a positive tenure recommendation.( *Id.*).

### E.    MUSM's motion

MUSM argues that Zeng has filled the record with "beliefs" and "assumptions" of discrimination, but provides no evidence of such—despite having gone through a detailed grievance procedure and having conducted significant discovery in this case. (ECF Nos. 343, 344). MUSM relies on the Circuit Court of Kanawha County's adoption of the ALJ's written opinion and argues that the defendants are entitled to full faith and credit of that judgment. MUSM contends that Zeng was given every opportunity to obtain tenure, and when he did not achieve that goal, his employment was terminated pursuant to the Tenure Regulations. MUSM states that Zeng was notified more than one year in advance that if he did not receive tenure in the Fall of 2015, his employment would end on June 30, 2016. As such, Zeng cannot show any evidence of retaliation when his employment ended upon expiration of his faculty appointment.

MUSM files various documents in support of its motion. An excerpt of Zeng's deposition is included, in which Zeng admits getting the March 2015 letter from Primerano and Dr. Niles, advising him that his employment would terminate on June 30, 2016 if he failed to earn tenure. (ECF No. 343-8). Further, MUSM relies upon the affidavits and testimony of the DP&TC members, (ECF Nos. 343-14, 343-15, 343-16, 343-17), Primerano, (ECF No. 343-18), Egleton, (ECF No. 343-22), other members of the PAC, (ECF Nos. 343-19, 343-20, 343-21), and Gilbert. (ECF No. 343-23). As previously noted, like other members of the PAC, Dr. Thompson and Dr. Dedilow, confirmed that Zeng's race and national origin were not factors considered or discussed in the PAC's recommendation to deny Zeng's application for tenure. (ECF Nos. 343-20, 343-21).

### F.    Primerano's motion

Primerano argues that Zeng has produced no evidence to support his claims of discrimination, retaliation, conspiracy, and due process violations. Primerano states that Dr. Koc, Dr. Denvir, and Zeng were not similarly situated employees, because Dr. Denvir was a mathematician, not a scientist, and he specialized in bioinformatics, and Dr. Koc was an expert in proteomic and mass spectrometry, a specialization that no other faculty member at MUSM held. Primerano asserts that the tenure committees followed the same process in evaluating the tenure application of Zeng as they did with the applications of  Dr. Koc and Dr. Denvir, and that process did not consist of comparing applicants to each other, but instead required an examination of the applicant's performance against the expectations set for the applicant at the time of initial appointment. Primerano testifies that Zeng has failed to show that the standards applied to him were higher than those applied any other faculty member, or that Zeng

was required to show greater excellence in teaching and research than the others. With respect to the claim that he and Shapiro conspired to terminate Zeng's employment prematurely, Primerano points out that he told Zeng at least a year in advance that his employment would terminate in June 2016 if he did not receive tenure, as mandated by the governing regulations, and this was well before Zeng filed any complaints.

In support of his motion, Primerano submits an excerpt of testimony by Zeng in which he states that his claim of retaliation stems solely from his termination of employment. (ECF No. 345-4 at 7). Primerano submits affidavits of Dr. Yu and Hardman, explaining the DP&TC evaluations. (ECF Nos. 345-15; 345-16). Primerano supplies his own affidavit, confirming that he was Vice-Chair of the B&M Department and Dr. Niles was the Chair of the Department at the time Zeng was hired by MUSM. (ECF No. 345-8). As one of Zeng's supervisors, Primerano was aware of problems Zeng was having in both teaching and research. In March 2014, Zeng requested a Pre-Tenure Review to help him learn what additional information and accomplishments he needed to earn tenure. Through the Pre-Tenure Review, Zeng was placed on notice that he was not likely to receive tenure unless he significantly improved his teaching skills and his research productivity. (*Id.*). Shortly after receiving the results of the Pre-Tenure Review, Zeng requested an additional year to apply for tenure. However, Zeng did not request an additional year of employment. (ECF No. 345-8). He was given an extra year to prepare and submit his application packet. As was customary, Primerano and Dr. Niles reminded Zeng in writing in March 2015 that his last contract, covering his seventh year of employment, would expire on June 30, 2016. Therefore, if he did not receive tenure, his employment would terminate on June 30, 2016 at the close of his seventh year on the faculty.

Primerano testifies in his affidavit that when he wrote this letter to Zeng, Primerano did not know who would become MU's next President. The new President would make the final decision regarding Zeng's tenure application. (ECF No. 345-8). Gilbert was announced as the next university President in October 2015 and did not assume the position until January 2016. Given that Primerano did not know who would be making the ultimate decision regarding tenure, he could not have known that Zeng's tenure application would be denied, prompting Zeng to file a grievance and EEOC complaint. Moreover, Zeng had never suggested that he would file a grievance or EEOC complaint if his application for tenure was denied. Accordingly, when Primerano and Dr. Niles wrote the March 2015 letter, they clearly were not retaliating against Zeng, because nothing had occurred to trigger retaliation. Primerano states that, to the contrary, he and Dr. Niles were simply reminding Zeng that he needed to apply for tenure in the fall, and if he did not receive it, his employment would terminate shortly thereafter. (ECF No. 345-8).

Primerano explains that all faculty contracts begin on July 1 and terminate on June 30. (*Id.*). Even if a faculty member began his or her employment with MUSM after July 1, the employment contract still terminates the following June 30. Zeng's contract was no exception. Primerano states that probationary faculty are given a maximum of seven years of employment at MUSM. Thus, Zeng's terminal year ran from July 1, 2015 to June 30, 2016.

Primerano indicates that he agreed with the DP&TC that Zeng had not earned tenure. However, after Primerano and the DP&TC made their recommendations, Zeng's application was still subject to review by the PAC, MUSM Dean, and the President of MU. When Primerano subsequently learned that these individuals also declined to

support Zeng's request for tenure, Primerano again reminded Zeng of his upcoming termination date. Primerano confirms that the reminder was made with the approval of Shapiro and Gilbert. As such, the June 29, 2016 letter to Zeng asking for his keys was not intended by Primerano to be retaliatory, but rather was a formality. (ECF No. 345-8).

Primerano denies holding any racial bias toward Zeng. (*Id*.). He notes that other Asian faculty members were hired, promoted, and tenured in the Dept of B&M, both before and after Zeng's tenure application was declined, and Primerano lists their names. In addition, Primerano underscores that at least one Caucasian faculty member in the basic sciences at MUSM was denied tenure. Primerano denies conspiring with anyone to discriminate against Zeng and confirms that he was always acting within the scope of his employment when taking actions related to Zeng's tenure and employment. (ECF No. 345-8).

Primerano additionally provides the affidavit from Gilbert, confirming that multiple Asian faculty members received employment, promotion, and tenure in the years surrounding Zeng's denial of tenure. (ECF No. 345-9). As previously indicated, Gilbert states that during his years at MU, Zeng has been the only Asian faculty member not to receive a requested promotion or tenure. (*Id*.). Gilbert acknowledges that Primerano and Shapiro were acting within the scope of their employment when they had discussions and correspondence with Zeng regarding the date of his termination from employment, and they were authorized to have those communications in light of their job positions. (*Id*.).

### G. Shapiro's motion

Shapiro makes many of the same arguments as the other defendants. (ECF Nos.

347, 348). He adds that, while Zeng accuses him of interfering with the tenure review process, no evidence has been submitted to substantiate that claim. Zeng alleges that Dr. Beaver met with Shapiro prior to issuing the PAC's recommendation; thereby, allowing Shapiro to influence that decision. Shapiro contends, however, that the evidence proves that the committee had already unanimously voted against Zeng's application before Dr. Beaver met with Shapiro. Shapiro attaches six exhibits in support of his motion, all of which have been discussed above.

### H.    Zeng's response to the defendants' summary judgment motions

In his response to the motions for summary judgment, Zeng attaches 15 additional exhibits. First, he provides a copy of his grievance filed with the WVPEGB, (ECF No. 366-1), which includes the following claims: Zeng was better qualified for tenure than two white colleagues whose applications had been approved; that his expertise in biomedical research was valuable to MUSM; that the DP&TC did not function independently due to Primerano's interference; and that Zeng was entitled to a terminal contract, or at least to be employed until February 2017, but was being threatened with early termination if he did not abandon his grievance. (ECF No. 366-1). He also attaches various articles and publications for the purpose of corroborating his arguments as to his qualifications. (ECF Nos. 366-3 through 336-8). Finally, Zeng submits an affidavit. (ECF No. 366-14).

In his affidavit, Zeng testifies that he applied for an open position at MUSM as an professor in Immunology. (ECF No. 366-14). He was interested in the position because of the teaching opportunity. Zeng knew that there had been a decrease in research funding nationwide, and he believed he had a better chance of obtaining job security if he focused on teaching. Zeng states that MUSM needed to fill the open position quickly,

as it was facing a loss of the funding earmarked for the position. Zeng also learned that the first candidate offered the position had refused it. Zeng states that the position was extended to him, but it came with a salary significantly lower than his current salary at the University of Rochester. Zeng asked for a salary adjustment, but was told the salary was consistent with salaries in West Virginia. Zeng acknowledges that his salary was adjusted slightly, and he accepted the position assuming that his salary was comparable to others in West Virginia. Zeng indicates that, at the time of his appointment, there were no discussions about requirements for tenure. (ECF No. 366-14).

After arriving at MUSM, Zeng learned that Dr. Jackman, the professor whose position he was to fill, had decided not to retire; therefore, Zeng was asked to teach Microbiology courses instead of Immunology course, although Microbiology was not his first area of expertise. (*Id.*). Finally in 2011, after making repeated requests, Zeng was assigned to teach Immunology classes. Zeng indicates that Dr. Jackman resented Zeng's participation in the Immunology curriculum, because it required her to share some of her teaching assignments. (ECF No. 366-14). When giving a lecture in 2012, Zeng had a disagreement with Dr. Jackman, who was present at the lecture. The disagreement occurred in front of the students, resulting in Zeng receiving unfavorable evaluations from the students, who felt that Zeng had acted unprofessionally. Nevertheless, Zeng noted that the students in his classes performed historically the best on national examinations. (*Id.*).

Zeng states that when Dr. Jackman retired, Zeng believed that he would be assigned to teach Dr. Jackman's courses. (ECF No. 366-14). However, the courses were given to Dr. Charles Gullo to teach, while Zeng was assigned to teach very complex courses in Bacterial Genetics, Immunologic Tolerance, and Autoimmunity. (*Id.*).

According to Zeng, in 2011, MUSM was placed on probation by the Liaison Committee on Medical Education. To help MUSM address this problem, Zeng voluntarily developed four active learning sessions. He also uploaded links to the sessions, so faculty and students could easily access them.

In 2013, Zeng's colleague, Dr. Koc, approached Zeng and advised that she had been asked by the department chair to submit her tenure application. (*Id.*). Dr. Koc asked Zeng about the requirement to obtain external research funding. Zeng reassured her that since the department was initiating the tenure process, she was probably going to be okay without research funding. Dr. Koc received a positive tenure recommendation at the end of 2013. (ECF No. 366-14).

Since Zeng was hired before Dr. Koc, he decided to inquire as to whether he should submit a tenure application. Dr. Niles and Primerano recommended that Zeng first seek a Pre-Tenure Review. (*Id.*). Dr. Zeng did as requested and received a harsh denial to his proposed application. The DP&TC informed Zeng that he needed to obtain external funding to receive tenure, although Dr. Koc was not required to have similar funding.

Zeng requested an extension of the time in which to submit a tenure application. (ECF No. 366-14). During a subsequent conversation with Primerano, Zeng learned that Primerano did not intend to recommend Zeng for tenure. Zeng told Primerano that he would not tolerate a denial of tenure if different standards were being applied to him than were used to evaluate Dr. Koc and Dr. Denvir. Sometime later, Zeng received a letter from Primerano and Shapiro advising that if Zeng did not obtain tenure, his employment would terminate on June 30, 2016. Zeng states that he was not consulted about this letter prior to it being sent to him, and Zeng complained to Primerano that

the termination date stated in the letter was less than seven years from his initial appointment. (*Id.*).

In the days leading up to Zeng's submission of his tenure application packet, Primerano again stated that he would not recommend an award of tenure for Zeng. Zeng felt that Primerano enjoyed sharing this "hostile intent" with Zeng, because Primerano was always smiling when he said it. (*Id.*). Zeng indicates that Primerano's words were dreadful and stressful for Zeng to hear. Zeng states that the denial of his tenure application and the early termination of his employment causes him sadness, depression, intense anxiety, and insomnia, all of which have negatively affected his health.

In further response to the evidence submitted by the defendants, Zeng challenges Gilbert's affidavit where he claims to have authorized various actions by other defendants. Zeng does not believe these representations are true, because the actions allegedly authorized by Gilbert were inconsistent with University policy. (ECF No. 366-14). Furthermore, Zeng argues that Gilbert failed to produce documentation to substantiate his representations. (*Id.*). Zeng also disagrees with Primerano's statement that Zeng sought Pre-Tenure Review. Zeng clarifies that he only requested the review because Primerano and Dr. Niles recommended that he do so. Zeng refutes Primerano's statement that Zeng was required to submit a tenure application in October 2014; instead, claiming that he was "permitted by policies" to do so, but was not required, and that he did not need the Dean's permission to apply for tenure in October 2015. Zeng claims that Primerano knew when he wrote the March 24, 2015 letter that Zeng would challenge any decision denying him tenure. Zeng denies and disagrees with all statements by MUSM employees advancing the argument that his denial of tenure was

70

not motivated by race or national origin and that he was refused tenure based on policy and his failure to show excellence. Finally, Zeng disagrees with all statements indicating that Zeng's employment was not prematurely terminated. (ECF No. 366-14).

## I.    Defendants' responses to Zeng's summary judgment motion

Defendants respond to Zeng's dispositive motion by reiterating that he has failed to produce any evidence in support of his claims. (ECF Nos. 360, 362). In regard to Zeng's claim of discrimination, Defendants note that twenty individuals at MUSM, comprising many different races and national origins—including Asian of Chinese descent—agreed  that Zeng failed to meet the level of excellence required for tenure. Defendants argue that it is absurd to conclude that all twenty individuals were motivated in making their recommendations by a discriminatory animus. Defendants assert that the evidence unequivocally proves *the absence* of discrimination in MUSM's tenure process, noting that multiple Asian faculty members in the science departments at MUSM were hired or promoted both before and after Zeng's tenure application was denied. Specifically, Defendants mention Dr. Jiang Lui, Dr. Jung Han Kim, Dr. Yu, Dr. Piyali Dasgupta, Dr. Nalini Santanam, Dr. Ruu-Tong Wang, Dr. Wei Li, and Dr. Alejandro Nato. (ECF No. 362). Other tenured Asian faculty at MUSM include Drs. Felix Cheung, Silvestre Cansino, Uma Sundaram, Raj Khanna, and Dilip Nair. (*Id.*; ECF No. 345-8 at 5-6). Indeed, Defendants argue that Zeng was the only Asian faculty member denied tenure during the relevant period.

Furthermore, they disagree vehemently with Zeng's basic premise that the tenure application review policy at MUSM is inherently flawed because the applicants are not compared to each other. (ECF No. 360 at 3-8). Defendants contend that the standard process employed by most universities in evaluating a tenure application is the precise

review standard used by MUSM. Defendants emphasize that Zeng offers no law, policy, regulation, or rule that requires such a comparison of faculty when making tenure decisions. (*Id*.). Defendants argue that Zeng wishes to compare himself to Drs. Koc and Denvir, even though they applied for tenure in different years than Zeng; however, he resists being compared to other highly acclaimed faculty; such as, Dr. Yu and Dr. Jackman. In effect, Zeng wants to arbitrarily select his "comparators." Defendants assert that Zeng's process injects just as much subjectivity into the tenure application review process as Zeng claims is present in the current process; notwithstanding that alleged subjectivity in the review process is the very crux of Zeng's complaint. (*Id*.).

Defendants contend that Zeng uses the wrong measurement in prosecuting his discrimination claims. (ECF No. 360 at 8-9). Zeng complains that the decision to deny him tenure was arbitrary and capricious; however, that is not the standard by which racial or national origin discrimination is established. (ECF No. 360 at 8-9). Defendants argue that the decision was not arbitrary and capricious; indeed, the tenure committees at MUSM focused on the same weaknesses in Zeng's performance that prevented him from obtaining tenure at the University of Rochester. (ECF Nos. 360-3). Zeng simply never published enough research papers to qualify for tenure, and his "teaching and service contributions [were] not substantial enough to offset the concerns regarding [his] research program." (ECF Nos. 360-3).

## IV.    **Standard of Review**

Zeng asserts discrimination claims under:

(1)  42 U.S.C. § 2000e et seq. ("Title  VII");

(2)  42 U.S.C. §§ 1983, 1986; and

(3)  the West Virginia Human Rights Act ("WVHRA");

He also alleges interference with the tenure process in violation of 42 U.S.C. §§ 1981 and the WVHRA; illegal retaliation under Title VII, 42 U.S.C. §§ 1981, and the WVHRA; failure to prevent retaliation under 42 U.S.C. § 1986; conspiracy to retaliate under 42 U.S.C. § 1985, the WVHRA, and West Virginia common law; and common law breach of contract. Lastly, Zeng claims violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution ("due process clause") arising from his allegedly early termination and grievance.

The parties have filed cross motions for summary judgment pursuant to Fed. R. Civ. P. 56. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper when no genuine issue of material fact is in dispute, and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law," and a disputed issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* The party moving for summary judgment bears the initial burden of showing the "absence of a genuine issue of material fact." *Celotex Corp.,* 477 U.S. at 323. "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

If the moving party meets this burden of proof, then the burden shifts to the nonmoving party, who "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322, n.3; *also Anderson,* 477 U.S. at 249-50 (holding that there is no triable issue without "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."). The nonmoving party must do more than rely on the allegations or the denial of allegations contained in his pleadings to defeat a motion for summary judgment; instead, he must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson,* 477 U.S. at 256. Concrete evidence consists of "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The nonmoving party is not required to produce evidence "in a form that would be admissible at trial in order to avoid summary judgment." *Celotex Corp.,* 477 U.S. at 324. Rather, a summary judgment motion may be opposed "by any of the kinds of evidence listed in Rule 56(c), except the mere pleadings themselves." *Id.* The court must not resolve disputed facts, nor weigh the evidence. *Russell v. Microdyne Corp.,* 65 F.3d 1229, 1239 (4th Cir. 1995). Instead, the court must accept as true the facts asserted by the nonmoving party and review the evidence "draw[ing] all justifiable inferences" in its favor. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520 (1991).

The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent entry of summary judgment. *Anderson,* 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano,* 557 U.S. 557, 586 (2009),

(quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). "When a plaintiff presents no genuine issue of material fact, but merely a question of interpretation, summary judgment is warranted." *Allman v. Westmoreland Coal Co.,* 898 F.2d 144, 1990 WL 27215, at *4 (4th Cir. 1990) (citations omitted). While any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co,* 475 U.S. at 587, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Anderson,* 477 U.S. at 249-50).

> In the event of cross-motions for summary judgment:
>
> [T]his Court applies the same standard of review to both motions, considering "'each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Defenders of Wildlife v. North Carolina Dept. of Transp.,* 762 F.3d 374, 392 (4th Cir. 2014) (quoting *Bacon v. City of Richmond, Va.,* 475 F.3d 633, 638 (4th Cir. 2007)). "[B]y the filing of a motion [for summary judgment,] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Brown v. Perez*, 835 F.3d 1223, 1230 n.3 (10th Cir. 2016) (citation omitted); *see also Sherwood v. Washington Post, 871 F.2d 1144, 1148 n.4* (D.C. Cir. 1989) ("[N]either party waives the right to a full trial on the merits by filing its own motion."). "However, when cross-motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they "'may be probative of the non-existence of a factual dispute." *Syncrude Canada Ltd. v. Highland Consulting Group, Inc.,* 916 F. Supp. 2d 620 (D. Md. 2013) (quoting *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983)); *Georgia State Conference of NAACP v. Fayette County Bd. of Comm'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015).

*Kirgan v. Manufacturers & Traders Tr. Co.,* No. CV RDB-19-0199, 2019 WL 4141016, at *5 (D. Md. Aug. 30, 2019).

## V.    Discussion

The second amended complaint includes 11 counts. These counts are addressed below.

### A.    Discrimination Claims—Counts 1, 2, 3, 4, 8, 9

Zeng charges MUSM with discrimination on the basis of race and national origin in violation of Title VII. He also accuses MUSM and the individual defendants of discrimination on the same prohibited characteristics in violation of the WVHRA. Finally, Zeng claims that the individual defendants are additionally liable under 42 U.S.C. §§ 1981, 1983.

### 1. Discrimination in Violation of Title VII

Title VII of the Civil Rights Act of 1964 prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment" on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. There are two ways to prove discrimination in violation of Title VII; either by direct or circumstantial evidence, or under a burden-shifting framework. *Diamond v. Colonial Life & Acc. Ins. Co.,* 416 F.3d 310, 317-18 (4th Cir. 2005). When confronted with a motion for summary judgment filed by the employer:

> [a] plaintiff has two potential avenues to avoid summary judgment in a Title VII discrimination claim. *Diamond v. Colonial Life & Acc. Ins. Co.,* 416 F.3d 310, 318 (4th Cir. 2005). He may, under what has been referred to as the "mixed-motive" framework, present direct or circumstantial evidence that creates a genuine issue of material fact as to whether an impermissible factor such as race solely or partially motivated the employer's adverse employment decision. *Id.* Or he may proceed under the *McDonnell Douglas* pretext framework. *Id.*

*Perkins v. Int'l Paper Co.*, 936 F.3d 196, 206, n. 4 (4th Cir. 2019). Direct evidence of employment discrimination is "'evidence of conduct or statements that both reflect

directly on the alleged discriminatory attitude and that bear directly on the contested employment decision.'" *Johnson v. Mechs. & Farmers Bank,* 309 F. App'x 675, 681 (4th Cir. 2009) (quoting *Taylor v. Va. Union Univ.,* 193 F.3d 219, 232 (4th Cir. 1999)). In contrast, circumstantial evidence is direct evidence of one fact from which a person may reasonably infer the existence or nonexistence of another fact. For example, a plaintiff may raise the inference that an adverse employment action was made with racially discriminatory intent by showing "a general pattern of racial discrimination in the employment practices of the defendant." *Moore v. City of Charlotte, NC*, 754 F.2d 1100, 1105 (4th Cir. 1985) (citing *Reynolds v. Abbeville County School District No. 60,* 554 F.2d 638, 642 (4th Cir. 1977)). A discrimination claim based solely on circumstantial evidence will withstand a motion for summary judgment if the evidence is of "sufficiently probative force to raise a genuine issue of material fact." *Cutshall v. Potter*, 347 F. Supp. 2d 228, 233 (W.D.N.C. Dec. 1, 2004) (citing *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996)).

While the plaintiff must show that discriminatory animus motivated the employer's adverse employment decision, the plaintiff is not required to "demonstrate that the prohibited characteristic was the sole motivating factor to prevail, so long as it was a motivating factor. In such cases, historically referred to as 'mixed-motive' cases, it is sufficient for the individual to demonstrate that the employer was motivated to take the adverse employment action by both permissible and forbidden reasons." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004). However, to establish discrimination through direct or circumstantial evidence, the plaintiff must present evidence that "both display[s] a 'discriminatory attitude' and bear[s] a causal relationship with the adverse employment action." *Ousley v. McDonald*, 648 F.App'x

346, 349 (4th Cir. 2016) (quoting *Warch v. Ohio Cas. Ins.* Co., 435 F.3d 510, 520 (4th Cir. 2006)). "Absent direct or circumstantial evidence of discrimination, a plaintiff may proceed under the burden-shifting framework first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)." *Danial v. Morgan State Univ.*, No. CV CCB-17-959, 2019 WL 6064900, at *4 (D. Md. Nov. 15, 2019); *also Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007).

Under the *McDonnell Douglas* framework, the plaintiff must first show, by a preponderance of the evidence, a prima facie case of discrimination. Once the plaintiff meets that burden of proof, the burden shifts to the employer to demonstrate a legitimate, non-discriminatory reason for its action. *Holland*, 487 F.3d at 214. The Supreme Court of the United States ("Supreme Court") explains:

> To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255–56 (1981).

In general, to establish a prima facie case of employment discrimination under Title VII, a plaintiff must show that:

> (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) at the time of the adverse employment action, he was performing up to his employer's expectations; and (4) similarly situated employees who were not members of the protected class received more favorable treatment.

*Holland*, 487 F.3d at 214 (citing *McDonnell Douglas Corp.,* 411 U.S. at 802); *also Supinger v. Virginia*, 259 F. Supp. 3d 419, 433 (W.D. Va. 2017) (citing *Holiday v. New Hanover Cty. Registrar of Deeds*, 317 Fed. Appx. 344, 345 (4th Cir. 2009)). When the adverse employment action is a failure to promote, the plaintiff must demonstrate 'that (1) [he] is a member of a protected group, (2) [he] applied for the position in question, (3) [he] was qualified for that position, and (4) the defendant[ ] rejected [his] application under circumstances that give rise to an inference of unlawful discrimination.'" *Matias v. Elon Univ.*, 780 F. App'x 28, 31 (4th Cir. 2019) (quoting *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005) *and Williams v. Giant Food Inc.*, 370 F.3d 423, 430 & n.5 (4th Cir. 2004) (applying same test to claims under § 1981 and Title VII)). The plaintiff's "own naked opinion, without more, is not enough to establish a prima facie case of discrimination" under Title VII. *Goldberg v. B. Green & Co.*, 836 F. 2d 845, 848 (4th Cir. 1988).

A prima facie claim of "wage or salary discrimination under Title VII can be analyzed under the framework for a claim of wage and salary discrimination brought under the Equal Pay Act ("EPA")". *Babus v. M/A-COM Private Radio Sys., Inc.*, No. CIV 606CV00048, 2007 WL 2288021, at *5 (W.D. Va. Aug. 7, 2007) (citing *Toulan v. DAP Prods., Inc.,* No. CCB-05-2254, 2007 WL 172522, at *6, (D. Md. Jan. 17, 2007)). To state such a claim, the plaintiff must show "that he received less pay than similarly situated employees outside of his protected class." *Thomas v. The Univ. of S.C.*, No. C.A.3:04 0628 MBS, 2006 WL 2521592, at *6 (D.S.C. Aug. 31, 2006) (citing *Houck v. Virginia Polytechnic Institute and State University,* 10 F.3d 204, 206 (4th Cir. 1993) (Plaintiff must show he receives less pay than a co-employee, outside of his protected class, performing work substantially equal in skill, effort, and responsibility under similar

working conditions.)). Employees are "similarly situated" when they perform jobs that have "a common core of tasks, i.e., significant portions of the two jobs are identical; such an inquiry turns on whether the differing or additional tasks require greater skill or responsibility." *Babus,* 2007 WL 2288021, at *5 (quoting *Hassman v. Valley Motors, Inc.,* 790 F. Supp. 564, 567 (D. Md. 1992)) (internal markings omitted). "Skill is a function of experience, training, education, and ability, and is measured in terms of the performance requirements of the job. Responsibility measures, among other things, the degree of accountability to higher-ups." *Id.* (quoting *Hassman,* 790 F. Supp. at 567-68.).

As stated, "once an employer rebuts the prima facie case with a legitimate, nondiscriminatory reason for the employment action, 'the *McDonnell Douglas* framework—with its presumptions and burdens—disappear [s], and the sole remaining issue [is] discrimination *vel non.*'" *Diamond*, 416 F.3d at 318 (quoting  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142–43 (2000)). The burden shifts back to the plaintiff to prove that the employer's proffered reason for the employment action is actually a pretext for discrimination. *Id.* at 215. Pretext is not shown by pointing to "minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it." *Hux v. City of Newport News,* 451 F.3d 311, 315–16 (4th Cir. 2006). Instead, the plaintiff satisfies his or her burden with evidence demonstrating that the employer's explanation is "unworthy of credence." *Dugan v. Albemarle Cty. Sch. Bd.*, 293 F.3d 716, 721 (4th Cir. 2002). The plaintiff fails to meet his burden when he "create[s] only a weak issue of fact as to whether the employer's reasons were untrue and there [is] abundant and uncontroverted independent evidence that no discrimination ha[s] occurred." *Holland*, 487 F.3d at 215.

"The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Cmty, Affairs v. Burdine,* 450 U.S. 248, 253 (1981). As the Supreme Court notes, the central "question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 153 (2000). Therefore, "[c]ourts must ... resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination of 'the ultimate question of discrimination *vel non*.'" *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 295 (4th Cir. 2010) (quoting *Proud v. Stone,* 945 F.2d 796, 798 (4th Cir. 1991)).

Importantly, in cases of alleged discrimination in the promotion and tenure of university faculty, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") has stated that "while Title VII is available to aggrieved professors, we review professorial employment decisions with great trepidation." *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 376 (4th Cir. 1995). The *Jiminez* Court cautioned:

> We must be ever vigilant in observing that we do not sit as a super personnel council to review tenure decisions, always cognizant of the fact that professorial appointments necessarily involve subjective and scholarly judgments, with which we have been reluctant to interfere. ... Courts must be vigilant not to intrude into tenure determinations, and should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure. Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professional, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges. The federal courts have adhered consistently to the principle that they operate with reticence and restraint regarding tenure-type decisions. Our review is narrow, being limited to

determining whether the appointment or promotion was denied because of a discriminatory reason. In other employment contexts, we have explained that Title VII is not a vehicle for substituting the judgment of a court for that of the employer. Title VII, therefore, is not a medium through which the judiciary may impose professorial employment decisions on academic institutions.

*Id.* at 376-77 (citations, quotations, and markings omitted); *also Davis v. Western Carolina University,* 695 F. App'x. 686, 689 (4th Cir. 2017) ("Moreover, in accord with our sister circuits, we are hesitant to second guess the 'subjective and scholarly judgments' involved in professional employment matters."); *and Byrge v. Virginia State Univ. Bd. of Visitors,* No. 3:13CV031-HEH, 2013 WL 2490183, at *5, n. 4 (E.D. Va. June 10, 2013) ("Our analysis does not delve into the rationality or wisdom of a university's decision to not grant tenure; it is limited to a probe of whether the denial of tenure was the result of unlawful discrimination.") (citing *Jiminez,* 57 F.3d at 376-77).

### 2. Discrimination and Discriminatory Breach of Contract in violation of the WVHRA

Under the West Virginia Human Rights Act ("WVHRA"), W. Va. Code §§ 5–11–1, *et seq.*, it is unlawful for any employer "to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment" on the basis of race, color, national origin, or ancestry. W. Va. Code §§ 5-11-3(h), 5-11-9(1); *also Porter v. M.W. Logistics Servs., LLC*, No. 1:18CV122, 2019 WL 4007351, at *4 (N.D.W. Va. Aug. 23, 2019) (quoting *Ford Motor Credit Co. v. W. Virginia Human Rights Comm'n*, 696 S.E.2d 282, 292 (W. Va. 2010)). The WVSC "construes the WVHRA to coincide with Title VII, unless the West Virginia statute directs otherwise." *Constellium Rolled Prod. Ravenswood, LLC v. Rogers*, No. 2:15-CV-13438, 2017 WL 1552325, at *5 (S.D.W. Va. Apr. 28, 2017) (citing *Hanlon v. Chambers*, 464 S.E.2d 741, 754 (W. Va. 1995)). "Whether arising under Title VII or the WVHRA, claims of discrimination and

retaliatory discharge share the same analytical framework." *Id.* Thus, a plaintiff may establish employment discrimination under the WVHRA by supplying direct evidence that discrimination "motivated the employer's adverse employment decision," or by using the *McDonnell Douglas* burden-shifting approach. *Price v. Region 4 Planning and Development Council,* No. 2:16-cv-1529, 2019 WL 1869961, at *12 (S.D.W. Va. Apr. 25, 2019) (citing *Hill*, 354 F.3d at 284-85); *also Halstead v. Res-Care,* No. 3:18-0586, 2019 WL 1867444, at *2 (S.D.W. Va. Apr. 24, 2019).

To establish a prima facie case of employment discrimination under the WVHRA, the plaintiff must show that: (1) he or she is a member of a protected class; (2) the employer made an adverse decision concerning the plaintiff; and (3) but for the plaintiff's protected status, the adverse decision would not have been made. *Blessing v. Supreme Court of Appeals of W. Virginia*, No. 13-0953, 2014 WL 2208925, at *4 (W. Va. May 27, 2014). The last prong of the test is satisfied by "evidence which would sufficiently link the employer's decision and the plaintiff's status as a member of a protected class so as to give rise to an inference that the employment decision was based on an illegal discriminatory criterion." *Conaway v. Eastern Associated Coal Corp.*, 358 S.E.2d 423, 429-30 (W. Va. 1986). In *Conaway*, the WVSC explained that "[t]his evidence could, for example, come in the form of an admission by the employer, a case of unequal or disparate treatment between members of the protected class and others by the elimination of the apparent legitimate reasons for the decision, or statistics in a large operation which show that members of the protected class received substantially worse treatment than others." *Id*. at 430.

If a prima facie case is demonstrated, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment decision.

If the employer fulfills its burden, "then the [plaintiff] has the opportunity to prove by a preponderance of the evidence that the reasons offered by the [employer] were merely a pretext for the unlawful discrimination." *Shepherdstown VFD v. W. Va. Human Rights Comm'n,* 309 S.E.2d 342, 352 (W. Va. 1983) To show "pretext," the plaintiff may use "(1) comparative evidence, (2) statistical evidence, and (3) direct evidence of discrimination, in the form of discriminatory statements and admissions." *Constellium Rolled Prod. Ravenswood, LLC*, 2017 WL 1552325, at *5 (quoting *Charleston Town Ctr. Co., LP v. W. Va. Human Rights Comm'n.*, 688 S.E.2d 915, 921 (W. Va. 2009)).

### 3. Discrimination in violation of 42 U.S.C. §§ 1981, 1983

Title 42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, given evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). For the purposes of § 1981, "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* at § 1981(b). 42 U.S.C. § 1983 is the procedural vehicle for enforcing the rights secured by § 1981 and for bringing claims related to violations of § 1981. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 731 (1989) ("Congress intended that the explicit remedial provisions of § 1983 be controlling in the context of damages actions brought against state actors alleging violation of the rights declared in § 1981."). In order to state a cause of action under § 1983, a plaintiff must show that: (1) a person (the defendant) deprived the plaintiff of a federally protected civil right, privilege or immunity and (2) that the defendant did so under color of state law. *Mentavlos v. Anderson*, 249 F.3d 301,

310 (4th Cir. 2001) (quoting *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 150 (1970)). If either of these elements is missing, the complaint fails to state a claim for relief under 42 U.S.C. § 1983. *Flagg Bros. v. Brooks*, 436 U.S. 149, 156 (1978).

"There are three elements that a plaintiff must prove in a case premised on § 1981: (1) that the plaintiff is a member of a racial minority, (2) that the defendant intended to discriminate against him on the basis of race, and (3) that the discrimination concerns one or more of the activities protected by § 1981." *Williams v. Wicomico Cty. Bd. of Educ.*, No. CIV.A. WMN-10-3582, 2012 WL 4517745, at *5 (D. Md. Oct. 1, 2012), *aff'd sub nom. Williams v. Bd. of Educ. of Wicomico Cty.*, 512 F. App'x 277 (4th Cir. 2013). Claims of discrimination under §§ 1981 and 1983 are analyzed under the same framework as claims made pursuant to Title VII of the Civil Rights Act of 1964. *Davis v. Lewis*, 376 F. Supp. 3d 629, 642 (E.D.N.C. 2019) (citing *Gairola v. Va. Dept. of Gen. Servs.*, 753 F.2d 1281, 1285-86 (4th Cir. 1985)). Consequently, "[c]laims of discrimination under § 1981 are subject to the burden-shifting framework developed in *McDonnell Douglas Corp. v. Green." Turner v. Copart, Inc.*, 744 F. App'x 836 (4th Cir. 2018).

### 4.  Analysis of Zeng's Discrimination Claims

Zeng's discrimination claims center on three overarching matters: (1) the denial of his tenure application, (2) the alleged salary disparity between him and Caucasian faculty, and (3) the refusal to assign Zeng teaching assignments in Immunology and extend other "employment privileges." Zeng offers no direct or circumstantial evidence that any of the defendants discriminated against him on the basis of race or national origin. Therefore, Zeng's discrimination claims are reviewed under the *McDonnell Douglas* burden-shifting framework.

Looking first at the failure to promote Zeng to tenured faculty status, the undersigned notes that while the elements of a prima facie case of discrimination are slightly different under Title VII and the WVHRA, they are similar enough to be analyzed together. Under both tests, Zeng establishes that he is a member of a protected class, he applied for tenure, and he did not receive it. Yet, Zeng's case falters on the remaining two elements of the tests; that being, that he was qualified for tenure and the rejection of his tenure application occurred under circumstances giving rise to an inference of impermissible discrimination.

To satisfy these elements, Zeng offers comparative data purportedly showing his superiority to two Caucasian faculty members who received tenure in the years prior to Zeng filing his application. However, as was thoroughly explained in the ALJ's written decision, Zeng "appears to frequently manipulate data in his own calculations to detract from the performance of compared faculty members and enhance his own."[1] (ECF No. 343-13 at 41). For example, Zeng compares his career publications against those of Drs. Koc and Denvir, although the tenure committees at MUSM considered only the publications generated while the applicant was at MUSM. The tenure committees evaluated research publications in this manner, because they were primarily concerned with the applicant's value and productivity *while at MUSM*, not over the applicant's entire career. In addition, Zeng compares the number of his publications to the number of publications generated by Drs. Koc and Denvir without reference to time frame. Thus, he counts his papers written over six years, while counting papers written by Drs. Koc

---

[1] The ALJ's written decision is attached to MUSM's Motion for Summary Judgment. (ECF No. 343-13). The ALJ provides a comprehensive review of the curriculum vitae and performance ratings of Drs. Koc, Denvir, and Zeng, the findings of which are not refuted by other facts in the record. Therefore, the ALJ's comparisons of the information supplied to the tenure committees by these three applicants are considered, but not repeated in this PF&R.

and Denvir in half that time.

Moreover, when counting research publications, Zeng excludes some of the papers written by Drs. Denvir and Koc based upon Zeng's unilateral determination that papers written by the tenure applicant as a co-author should not be counted. (ECF No. 343-13 at 41-45). Unfortunately for Zeng, this method of counting publications does not comport with the method used by members of the tenure review committees, who disagreed with Zeng's perception of the role of co-authors. Witnesses testified that scientific research has grown increasingly more specialized and collaborative, which has resulted in greater significance being given to the contributions of co-authors, both in the underlying research and the publication.

When taking these differences into consideration, the evidence shows that Zeng's research productivity at MUSM, contrary to his contention, did not exceed that of Drs. Denvir and Koc. Based on the evidence presented during the grievance hearing, the ALJ correctly concluded that Zeng published three original research papers in six years of employment, while Dr. Denvir published approximately thirteen papers in three years, and Dr. Koc published at least two original research papers in two years. (ECF No. 343-13 at 45). Although Zeng rated the quality of his own publications as being superior to those of Drs. Koc and Denvir based on the impact factors of the journals in which the articles were published, the evidence demonstrates that the tenure committees were not required to consider cumulative impact factors. (*Id.* at 44). In any event, the witnesses agreed that while some of the journals in which Zeng published had a greater impact factor, this did not make up for his overall lack of publication productivity.

The ALJ notes other discrepancies in Zeng's data compilations and finds that Zeng's data regarding participation in scholarly events, such as conferences, and his

measurement of teaching skills were likewise misleading and self-serving. (ECF No. 343-13 at 46-59). The ALJ emphasizes throughout her written decision that the tenure committees could only judge performance based on the information supplied by the applicant with the tenure application. The ALJ points out that much of the information now submitted by Zeng to prove his superiority to Drs. Koc and Denvir was not contained in the tenure application packet supplied by Zeng. Consequently, rather than comparing the materials that were actually submitted to the tenure committees by Zeng, Dr. Koc, and Dr. Denvir, Zeng reworked and repackaged the information in his own comparative charts, adding and subtracting data as he saw fit. (*Id.* at 53).

Zeng's data compilations do not reflect the information actually considered by the tenure committees when performing their deliberations and do not measure the information in the same manner as used by the committees members. The witnesses universally testified that the tenure committees at MUSM judged Drs. Koc, Denvir, and Zeng—like every other tenure applicant—on the materials that each applicant submitted with his or her tenure application. The committees did not compare applicants to each other; rather, the committees compared the information in each tenure application packet against the requirements set out in the applicant's initial appointment letter and those contained in the Tenure Regulations. Consequently, even if the *post facto* data comparisons created by Zeng demonstrate his superiority in certain aspects, those compilations shed little light on the key issue of whether there was an improper discriminatory motive in the decision not to award Zeng tenure. *See Hawkins v. Pepsico, Inc.,* 203 F.3d 274, 280 (4th Cir. 2000) (explaining that the merits and accuracy of the employer's performance evaluation is not the issue; rather, the court's "sole concern is whether the reason for which the defendant discharged the plaintiff was

discriminatory.")

Like the plaintiff in *Hawkins*, Zeng cannot establish a key element of the prima facie case, because he cannot show that he was performing up to his employer's expectations for a faculty member worthy of tenure. *Hawkins,* 203 F.3d at 281 (holding that the plaintiff must present facts to show that the adverse employment decision was due to discrimination rather than the employer's "admittedly low regard" for the employee's individual performance.). When reviewing this element of the test, the undersigned bears in mind that Zeng's "perception of himself ... is not relevant. It is the perception of the decisionmaker which is relevant." *Smith v. Flax,* 618 F.2d 1062, 1067 (4th Cir. 1980); *also Ostrem v. Arlington Cty. Sch. Bd.,* No. 1:18-CV-746, 2019 WL 6188278, at *4 (E.D. Va. Nov. 19, 2019) ("A plaintiff's disagreement with an employer's criticisms is not relevant because the inquiry is not whether an employer's assessments of a plaintiff were accurate. It is well-established that a court is not a super-personnel department weighing the prudence of employment decisions.") (citations and markings omitted). Considered from this perspective, the evidence of record shows the opposite of Zeng's perception to be true. Zeng's annual evaluations, Mid-Tenure Review, and Pre-Tenure Review uniformly demonstrate that, in the eyes of the reviewers, Zeng was not performing at the level required to receive tenure. Beginning with his second annual evaluation, Zeng's performance in teaching activities was rated as good, but not excellent or outstanding. By his third annual evaluation, Zeng's rating in teaching skills had dropped to satisfactory, and his rating in research had dropped from excellent to good. Zeng was repeatedly told by multiple colleagues that he needed to improve his performance in both of these core areas.

In October 2012, a full three years before Zeng submitted his tenure application,

he received the Mid-Tenure Review. The committee, which included an Asian faculty member of Chinese descent, unanimously believed that Zeng was not performing to the level necessary for an award of tenure, and the committee clearly told Zeng so. The committee made numerous and detailed recommendations designed to increase Zeng's chances of receiving tenure. The committee specifically advised Zeng that he needed to increase his publications by issuing two research papers in the next year, to collaborate with others, participate in conferences, and ask other scientists to review his grant proposals to help polish them before submission.

Thereafter, Zeng was mentored by another faculty member to help Zeng better his teaching performance. He received his fourth annual review and was again notified that his performance needed improvement in both teaching and research activities. In his filings, Zeng stresses that these reviewers improperly required him to obtain outside research funding. However, the lack of funding was far from the reviewers' only criticism. In the reviews given to Zeng prior to filing his application for tenure, his colleagues and supervisors repeatedly told Zeng that he needed to publish more research papers; that he needed to show some return on the $300,000 investment made by MUSM when it hired Zeng. Zeng was given clear, straightforward, and obtainable goals to achieve in order to increase his chances for tenure. He was told to establish a collaboration with Dr Sundaram in the Cancer Center and contact Dr. Davies in the Clinical Trials Center to help with his grant applications. He was provided with recommendations to further increase the numbers on his student evaluations and was told to expand his participation in other teaching activities and graduate committees. Despite the efforts of Zeng's colleagues to help him augment his chances of receiving tenure, Zeng simply did not follow through on all of the committees' recommendations.

In sum, Zeng's inability to show that he was performing to the decisonmakers' satisfaction is fatal to his discrimination claims. *Rayyan v. Virginia Dep't of Transportation*, 719 F. App'x 198, 205 (4th Cir. 2018); *also Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 516-17 (4th Cir. 2006).

Furthermore, Zeng provides no evidence to support his contention that Asian faculty members were held to a higher standard than Caucasian faculty at MUSM. Defendants submit evidence that numerous faculty members of Asian descent have received tenure at MUSM. Zeng carves out two of the most highly esteemed Asian faculty members and argues that their excellence is proof of a higher standard for Asians. Such a bald, conclusory, and factually uncorroborated assertion does not create a genuine issue of material fact necessary to withstand summary judgment. As the ALJ aptly noted, "[j]ust because those two members of the faculty were particularly distinguished even among tenured faculty does not mean they had to be more distinguished than other tenured faculty in order to receive tenure." (ECF No. 343-13 at 30). The overwhelming weight of the evidence establishes that all MUSM faculty members applying for promotion or tenure were judged in the same manner—by comparing the applicant's performance to the expectations set forth in the applicant's original appointment letter and to the standards for promotion to Associate Professor. From the perspective of the tenure committees, Zeng just did not satisfy these expectations or standards.

Zeng argues that evidence of other Asian faculty members being hired, promoted, and tenured is not relevant to his case, stating: "If an employer discriminates against one employee based on race, the employer cannot purge the discrimination by hiring an employee of the same race later." (ECF No. 366 at 7). Zeng misconstrues the purpose of the evidence submitted by the defendants. Because Zeng has no direct evidence of

discrimination, he must rely on circumstantial evidence to establish a prima facie case. Zeng claims, without support, that Asians are required to meet a higher standard at MUSM. MUSM effectively refutes that contention by demonstrating two facts. First, numerous Asians have been hired, promoted, and tenured at MUSM, with Zeng being one of the few who did not advance. Second, of the group of faculty members who did not advance, most of them were Caucasian. This evidence raises the opposite inference than that indorsed by Zeng. It suggests that promotion and tenure at MUSM are not awarded based on race and national origin and that the process does not hinge, in any way, on those characteristics.

Moreover, Zeng claims that Primerano interfered with a fair tenure process by sending an email communication to the DP&TC advising them that he did not intend to support Zeng's application. However, three of the four committee members have confirmed that they were unaware of Primerano's position prior to considering Zeng's application. Additionally, the same four members of the DP&TC conducted Zeng's Pre-Tenure Review and Mid-Tenure Review and, as early as 2012—well before Primerano sent the challenged email—the DP&TC found Zeng lacking in credentials for tenure.

Even giving Zeng the benefit of the doubt and assuming that he has demonstrated a prima facie case of discrimination, his claims still must fail. When the burden shifts to the defendants to show a legitimate, non-discriminatory reason for denying Zeng tenure, the defendants have fully satisfied that burden. Zeng received multiple warnings over a period of three years that he was not performing to the level necessary for an award of tenure. He submitted his tenure application, nonetheless, without having significantly increased his publications and presentations, and without having followed some of the recommendations made to him over the years. The twenty individuals who reviewed

Zeng's tenure packet reached the same conclusion—Zeng's contributions were not sufficient to qualify him for tenure. Nineteen of those individuals held academic positions at MUSM; in essence, they were his professional peers. Yet, none of them believed that Zeng had demonstrated superior worth to the University, which was the fundamental criterium for tenure.

Having provided a non-discriminatory reason for the denial of tenure, the burden shifts back to Zeng to show that this reason is pretextual. Zeng cannot satisfy this burden. As stated, Zeng's charts comparing his performance to that of Dr. Koc and Dr. Denvir were not available to the tenure committees and, thus, did not figure into their analysis. In any event, the witnesses all testified that tenure was not a competition, but was an evaluation of how well an individual applicant fulfilled the responsibilities outlined in the initial letter of appointment and met the standards specified in the tenure polices and regulations. The witnesses further confirmed that this process of evaluation was standardly accepted by similar universities. *See Rosado v. Virginia Commonwealth Univ.*, 927 F. Supp. 917, 930 (E.D. Va. 1996) (noting that "[a] teacher's competence and qualifications for tenure or promotion are by their very nature matters calling for highly subjective determinations, determinations which do not lend themselves to precise qualifications and are not susceptible to mechanical measurement or the use of standardized tests.") (quoting *Clark v. Whiting,* 607 F.2d 634, 639 (4th Cir. 1989)). Zeng does not offer any facts to dispute this testimony. While it may be true that the tenure committees should not have held Zeng to the requirement of obtaining external research funding when Drs. Koc and Denvir were not similarly judged on that criterium, the mere fact that Zeng is of a different race and national origin than Drs. Koc and Denvir is not enough to show pretext. *McCleary-Evans v. Maryland Dep't of Transp., State Highway*

*Admin.*, 780 F.3d 582, 586 (4th Cir. 2015).

The record is clear that Zeng had other fundamental shortcomings in the eyes of the professionals who evaluated his performance. The documents substantiate that Zeng was given every opportunity to submit a successful tenure application; indeed, he was granted the exception of an additional year to build his curriculum vitae before submitting his request for tenure. Zeng had been warned multiple times over a lengthy period that he needed to make substantial improvement in order to achieve tenure. According to the committee members' perceptions, Zeng did not do so. Zeng's personal opinion about his qualifications versus the qualifications of other tenure applicants does not establish pretext. *See Hawkins v. PepsiCo. Inc,* 203 F.3d 274, 280 (4th Cir. 2000). Similarly, Zeng's "own assertions of discrimination ... in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action." *Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011). "Moreover, courts are cautioned not to 'substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure.'" *Rowe v. N. Carolina Agr. & Tech. State Univ.*, 630 F. Supp. 2d 601, 608 (M.D.N.C. 2009) (quoting *Jiminez,* 57 F.3d at 377).

Zeng likewise fails to establish discrimination in course assignments, salary, or other privileges of employment. Zeng alleges discrimination in salary, because Drs. Denvir and Koc were hired two years after Zeng, but received higher salaries than him. Zeng claims that Drs. Koc and Denvir are "comparators" despite their different backgrounds, training, and fields of expertise, because they were all required to teach, research, and provide service to MUSM. In *Spencer v. Virginia State Univ.*, the Fourth Circuit pointed out the fallacy of such a comparison in the academic setting, stating,

"where the work is an exercise in intellectual creativity that can be judged only according to intricate, field-specific, and often subjective criteria," a plaintiff "may not rely on broad generalizations at a high level of abstraction" to claim that another faculty member is a comparator. *Spencer,* 919 F.3d 199, 204 (4th Cir.), *as amended* (Mar. 26, 2019), *cert. denied,* 140 S. Ct. 381 (2019).

    In response to Zeng's pay disparity claim, rather than quibble over Zeng's choice of comparators, MUSM submits print-outs from www.wvcheckbook.gov, a publicly-accessible website that reports the salaries of state employees. (ECF Nos. 363 at 3, 363-1 through 363-7). The print-outs show that Zeng's salary of approximately $76,000 was equivalent to other members of his academic department, who earned between $68,000 and $94,973. (ECF Nos. 363 at 3, 363-1 through 363-7). Some faculty members made more money than Zeng, and some made less, but no pattern emerges showing that the salaries corresponded in any way to race or national origin. The exhibits reflect that the salaries of some Caucasian faculty members were less than Zeng's salary, while the highest salary in the department was paid to Dr. Wei Li, a faculty member of Asian descent. (*Id.*). Even length of employment does not appear to determine the salaries at MUSM.

    MUSM argues that the variation in salary has nothing to do with race or national origin, but instead is related to market forces, university needs, and budgetary constraints. (ECF No. 363 at 4). The WVSC addressed the issue of pay disparity based upon market forces and confirmed that "[a] university does not engage in ... discrimination when it pays new faculty, regardless of age, based upon the fair market value generally prevailing for entry level faculty in their respective disciplines." *West Virginia Univ. Bd. of Regents v. Decker,* 447 S.E.2d 259, Syl. Pt. 5 (W. Va. 1994). Faculty

members are not guaranteed pay equity, as market forces, specialization, budgetary fluctuations, and the current needs of the institution drive the amount paid to faculty members. *See Spencer,* 919 F.3d at 204 ("Professors are not interchangeable like widgets. Various considerations influence the hiring, promotion, and compensation of different professorial jobs. As a result, faculty salary decisions require a complex balancing of factors."). The exhibits and the explanation offered by MUSM provide a non-discriminatory reason for the alleged salary differences between Zeng and other members of his department; thus, shifting the burden back to Zeng to establish that MUSM's explanation is pretextual. Once again, Zeng offers no evidence to meet this burden.

Finally, as for teaching assignments and other alleged privileges (like meeting visiting scholars), Zeng fails to show that his introduction to scholars, or the subject matter of the courses he taught, had any material impact on his employment conditions—such as salary, title, work hours, laboratory environment—or on his application for tenure. The tenure committees advised Zeng that his course load was low, but he was not penalized for teaching classes in subjects other than Immunology. Zeng claims that he was hired to replace Dr. Jackman and, thus, was entitled to teach her courses. However, unexpectedly, Dr. Jackman did not retire until years after Zeng began employment. At the point when Dr. Jackman retired, Zeng's teaching skills were evaluated as needing improvement. Accordingly, MUSM and the department chair had a legitimate, if not compelling, non-discriminatory reason to assign Dr. Jackman's courses to other faculty members. As to Zeng's lack of exposure to scholars and researchers—a claim that he has not factually supported—the evidence indicates that Primerano and Dr. Niles arranged for Zeng to work with outside researchers and

encouraged him to participate in national and international scientific conferences. In any event, Zeng fails to demonstrate any legal entitlement to teach Dr. Jackman's courses, or to meet visiting scholars at MUSM, and he fails to establish that the right to teach those courses, or meet other researchers and academicians, constituted an "employment privilege."

Therefore, based upon the evidence, the undersigned **FINDS** that there are no material factual issues in dispute; Zeng fails to establish discrimination by the defendants on the basis of race or national origin; and the defendants are entitled to summary judgment in their favor on Counts 1, 2, 3, 4, 8, and 9.

### B.    Conspiracy Claim—Count 5

Zeng asserts a cause of action against Defendants Primerano and Shapiro under 42 U.S.C. § 1985(3), which provides as follows:

(3) Depriving persons of rights or privileges

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C.A. § 1985(3). To state a claim under § 1985(3), a plaintiff must allege the following elements:

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*Sines v. Kessler*, 324 F. Supp. 3d 765, 780 (W.D. Va. 2018) (citing *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011)); *also Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995). In addition, the plaintiff "must show an agreement or a 'meeting of the minds' by defendants to violate the claimant's constitutional rights." *Id.* at 1377. "[A]lthough an express agreement is not necessary, the participants in the conspiracy must share the general conspiratorial objective .... [I]t simply must be shown that there was a single plan, the essential nature and general scope of which was known to each person who is to be held responsible for its consequences." *Id.* at 1378.

The Fourth Circuit applies a "relatively stringent standard for establishing section 1985 conspiracies," specifically rejecting claims "whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts." *Id.* As the Fourth Circuit explained, under the standards governing claims of conspiracy to discriminate in employment, the Court "has rarely, if ever, found that a plaintiff has set forth sufficient facts to establish a section 1985 conspiracy, such that the claim can withstand a summary judgment motion." *Id.* "[T]he mere fact that a plaintiff is a member of a protected class is insufficient to support an inference of discriminatory motivation in a section 1985 claim." *Johnson v. City of Fayetteville*, 91 F. Supp. 3d 775, 796 (E.D.N.C. 2015) (citing *Gooden v. Howard,* 954 F.2d 960, 970 (4th Cir. 1992)).

The WVHRA also makes it illegal for persons and employers to "conspire with

others to commit acts or activities of any nature, the purpose of which is to harass, degrade, embarrass or cause physical harm or economic loss or to aid, abet, incite, compel or coerce any person to engage in any unlawful discriminatory practices," including to discriminate in the compensation, hire, tenure, terms, conditions or privileges of employment. West Virginia Code §§ 5-11-9(1) and (7)(A). "A cause of action may be maintained by a plaintiff employee as against another employee under the West Virginia Human Rights Act. Further, the cause of action may properly be based upon an allegation that the defendant employee aided or abetted an employer engaging in unlawful discriminatory practices." *Brown v. City of Montgomery*, 755 S.E.2d 653, 660 (W. Va. 2014) (citing *Holstein v. Norandex, Inc.,* 461 S.E.2d 473, Syl. pt. 4 (W. Va. 1995)).

In contrast, "[w]here several combine and agree to do a lawful act, violative of no duty to another due from them, it is not an unlawful conspiracy subjecting them to an action by him, though the act injure him, and was so intended." *West Virginia Transp. Co. v. Standard Oil Co.,* 40 S.E. 591, Syl. pt. 3  (W. Va. 1901). Stated simply, "[t]here can be no conspiracy to do that which is lawful in a lawful manner." *Porter v. Mack,* 40 S.E. 459, Syl. pt. 2 (W. Va. 1901).

"Under West Virginia law, a civil conspiracy is defined as 'a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means.'" *Clay v. Consol Pennsylvania Coal Co., LLC*, 955 F. Supp. 2d 588, 599–600 (N.D.W. Va. 2013) (quoting *Dixon v. American Indus. Leasing Co.,* 253 S.E.2d 150, 152 (W. Va. 1979)). Because a conspiracy requires at least two participants, and a corporation can act only through its agents and employees, "[a]gents and employees of a corporation cannot conspire with

their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage." *Cook v. Heck's Inc.*, 342 S.E.2d 453, 460 (W. Va. 1986) (quoting *Wise v. Southern Pacific Co.,* 223 Cal.App.2d 50, 72, 35 Cal. Rptr. 652, 665 (1963)). The intracorporate conspiracy doctrine has two exceptions, however. *Facey v. Dae Sung Corp.*, 992 F. Supp. 2d 536, 542 (D. Md. 2014). "First, the doctrine is generally inapplicable where a coconspirator possesses a personal stake independent of his relationship to the corporation. Second, a plaintiff may state a conspiracy claim where the agent's acts were not authorized by the corporation." *Id.* (quoting *Painter's Mill Grille, LLC v. Brown,* 716 F.3d 342, 353 (4th Cir. 2013)) (internal citations and markings omitted).

Zeng alleges that Primerano and Shapiro conspired to retaliate against Zeng by prematurely terminating his employment. According to Zeng, he was entitled to a "terminal contract" giving him one final year of employment after the denial of his tenure application. Instead, he received a letter from Primerano on June 29, 2016 telling Zeng that his last day of employment was the following day. Zeng argues that this "early termination" was due to his EEOC complaint and WVPEGB filing in which he alleged discrimination in the denial of his tenure application.

The record, as developed by the parties, simply does not factually support a conspiracy claim. There is no dispute that Primerano, alone, wrote the June 29, 2016 letter. As such, Zeng must show Shapiro's involvement in the alleged conspiracy, and Zeng must show that the goal of the conspiracy was to retaliate against Zeng for challenging the constitutionality of an adverse employment decision.

Zeng attempts to demonstrate a conspiracy by referencing the March 24, 2015 letter, co-signed by Primerano and Shapiro, notifying Zeng that his employment would

end in June 2016 if he did not receive tenure. However, that letter is not evidence of a conspiracy to retaliate against Zeng for exercising his right to challenge discrimination, because the letter was written more than one year before Zeng filed his EEOC complaint and grievance. Zeng's suggestion that this letter was all part of a long-term scheme to retaliate against him is nothing more than speculation and is, quite frankly, implausible. Zeng describes this letter as a "threat" of early termination, but there is no evidence that Shapiro or Primerano considered June 30, 2016 to constitute an early termination of Zeng's contract. To the contrary, the evidence is uncontroverted that Zeng's seventh annual contract with MUSM ended on June 30, 2016 and MUSM's Tenure Regulations limited non-tenured probationary faculty to a maximum of seven years' employment. The evidence is also uncontroverted that MUSM's faculty contracts ran from July 1 to the following June 30, because those dates corresponded with MUSM's fiscal and academic year. Consequently, even when a faculty member started employment after July 1, his or her contract of employment would always end the following June 30. Moreover, both the Tenure Regulations and the witness testimony indicate that when a faculty member spent more than half of the fiscal year in continuous, fulltime employment, that portion of the fiscal year counted as one full year of employment. Zeng provides no evidence to demonstrate that Primerano and Shapiro believed otherwise. As such, the letter was simply confirming what Primerano and Shapiro believed was the termination date of Zeng's employment with MUSM, assuming he did not obtain tenure.

Zeng also refers to a meeting that he had with Shapiro on February 22, 2016, followed by a meeting Zeng had with Primerano on March 16, 2016. Zeng states that Shapiro agreed in February 2016 to allow Zeng to stay on the faculty until as late as June 2017 if he did not make a "fuss" about the tenure decision, but if Zeng decided to

challenge the decision, then his employment would end on June 30, 2016. Primerano reiterated this position in March, and University counsel confirmed the offer by email on March 18, 2016. Zeng proceeded to file the grievance and EEOC complaint, and he was terminated.

Once again, none of these events establishes that Primerano and Shapiro conspired to retaliate against Zeng. Primerano and Shapiro communicated to Zeng that his  termination date was June 30, 2016 ***well before*** the dispute over tenure arose. After the dispute arose, Shapiro offered to extend Zeng's employment beyond the contract termination date in an effort to appease him. However, when Zeng rejected that offer, the default termination date remained in place.

As the unrefuted evidence shows that Primerano and Shapiro believed June 30, 2016 was Zeng's employment termination date, and they communicated that belief to Zeng more than one year before the tenure decision, the tenure dispute, the EEOC complaint, and the grievance, the undersigned **FINDS** that there are no genuine issues of material fact in dispute; Zeng cannot logically support a claim of conspiracy to retaliate; and the defendants are entitled to summary judgment in their favor on Count 5.

### C.    Retaliation Claim—Count 6

With respect to retaliation, Title VII provides, in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e−3(a). To succeed on a claim of retaliation, "a plaintiff must show: (1) that he engaged in protected activity, (2) that the employer took a materially adverse

action against him and (3) there is a causal connection between the protected activity and the adverse action." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 213–14 (4th Cir. 2019) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61–68 (2006). Protected activities fall within two broad categories: participation and opposition. *Id.* "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take [an] adverse employment action against an employee for opposing discrimination practices in the workplace." *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). "Actions that constitute 'participation' include '(1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII.'" *Brief-McGurrin v. Cisco Sys., Inc.*, No. 1:18CV131, 2019 WL 1332357, at *6 (M.D.N.C. Mar. 25, 2019) (quoting *Laughlin*, 149 F.3d at 255).

Similarly, the WVHRA prohibits an employer from engaging "in any form of reprisal or otherwise discriminate against any person because he or she has opposed any practices or acts forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article." W. Va. Code §55-11-9(7)(C). To state a claim of illegal retaliation under the WVHRA, a plaintiff must establish:

> (1) she was engaging in protected activity; (2) her employer was aware of the protected activity; (3) her employer took adverse action against her; and (4) the adverse action was retaliatory or, in the absence of such evidence, was sufficiently temporally related to the protected activity to allow an inference of retaliatory motive on the part of the employer.

*Porter v. M.W. Logistics Servs., LLC*, No. 1:18CV122, 2019 WL 4007351, at *7 (N.D.W. Va. Aug. 23, 2019) (citing *Hanlon v. Chambers*, 464 S.E.2d 741, 753 (W. Va. 1995)). The WVHRA defines protected activity as "that which challenges any practices or acts forbidden under" the WVHRA. *Id. (*quoting *Hanlon,* 464 S.E.2d at 753). As explained in

*Hanlon*, protected activity has two components; one objective and one subjective. *Hanlon,* 464 S.E.2d at 754. The objective component requires that "[t]he employee's opposition must be reasonable in the sense that it must be based on a set of facts and a legal theory that are plausible." *Id*. The subjective component is met when "the view [is] honestly held and [is] more than a cover for troublemaking." *Id*.

Retaliation may be established under Title VII and the WVHRA by either producing direct evidence or through the *McDonnell Douglas* burden-shifting framework. *Strothers v. City of Laurel, Maryland,* 895 F.3d 317, 327 (4th Cir. 2018). A retaliation claim under §§ 1981, 1985 shares the same elements as a Title VII claim for retaliation. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015). In all retaliation cases, the employee must show that "but for" his or her protected activity, the employer would not have taken the adverse employment action. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) ("[T]he Court now concludes as follows: Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."); *also Perkins,* 936 F.3d at 214 ("[T]o establish the necessary causation for a retaliation claim, the employer must have taken the adverse employment action *because* the plaintiff engaged in a protected activity.") (citation and internal markings omitted).

For the same reasons discussed above, Zeng cannot demonstrate retaliation. To begin, Zeng has no direct evidence of retaliation. Even if Zeng had such proof, to obtain summary judgment in his favor on this count, Zeng must prove by a preponderance of the evidence that his grievance or EEOC complaint was the "but for" cause of his

termination on June 30, 2016. This he cannot do.

The material facts underlying this claim are not in dispute. Zeng received a letter in March 2015 from Primerano and Shapiro advising him that if he did not obtain tenure that Fall, his term of employment with MUSM would end the following summer on June 30, 2016. Zeng was concerned about this notice and discussed it with Primerano. Zeng felt that his employment should not end until August 30, 2016, because he did not start working at MUSM until September 1, 2009. Ultimately, Zeng received an extension of the time in which to submit his application for tenure, but the termination date of his employment was not amended. Witness testimony confirms that faculty appointments run from July 1 to June 30 regardless of when employment actually commences and, typically, even a portion of the academic year will count as a whole year when calculating the tenure clock. This testimony is substantiated by Zeng's faculty appointment contracts themselves and by Zeng's own statement to Shapiro when he sought an extension of the application deadline. In a letter dated August 1, 2014, Zeng stated: "since I arrived in 2009, the Faculty Promotion and Tenure Regulations would require that I apply for tenure in my sixth year (the fall of 2014), I am requesting that I be allowed to apply for tenure in the Fall of 2015." (ECF No. 343-6). Accordingly, Zeng's termination date of June 30, 2016 was set in both the appointment contract and the March 2015 letter, and Zeng acknowledged that his sixth year ran from July 1, 2014 through June 30, 2015 in his August 2014 letter, making 2015-16 his seventh year. Zeng's recent statements in his affidavit that he was not required to apply for tenure in 2014 and did not need the Dean's permission to file in 2015 are not **facts**; instead, they represent Zeng's current interpretation of the policies and regulations governing tenure—an interpretation that contradicts his August 2014 letter. Zeng's alternative

interpretation of the policies and regulations, however, does not preclude summary judgment. *Allman,* 898 F.2d 144, 1990 WL 27215, at 4.

Based on the facts, Zeng cannot demonstrate that his pre-set termination date of June 30, 2016 was retaliatory under the relevant laws. Zeng again attempts to circumvent this timing problem by indicating that he warned Primerano before March 2014 that he "would not tolerate" a denial of his tenure application. However, such a statement does not constitute "protected activity." Zeng did not submit his tenure application until October 2015, well after the termination date was already in place. The application had to go through multiple levels of review, with neither Primerano nor Shapiro having the last word on whether the application would be approved or rejected. Neither Primerano nor Shapiro could have definitely known the outcome of the application. Zeng did not challenge the constitutionality of the tenure decision until his application was denied by Gilbert. The pre-set termination date of June 30, 2016 was enforced when the parties could not reach an amicable agreement resolving their differences related to Zeng's tenure application. Given these facts, Zeng fails to show that his EEOC complaint or the lodging of a grievance was the "but for" cause of his termination. Clearly, despite his efforts, Zeng cannot rely on temporal proximity to establish retaliation, because he was notified of his June 30, 2016 termination date more than a year before he filed an EEOC complaint or a grievance with the WVPEGB. *Danial,* 2019 WL 6064900, at *8 (collecting cases).

Therefore, the undersigned **FINDS** that there are no material factual issues in dispute; Zeng has failed to demonstrate retaliation in his termination; and the defendants are entitled to summary judgment in their favor on Count 6.

### D.    Negligent Failure to Prevent Retaliation—Count 10

Zeng accuses Gilbert of negligently failing to prevent the retaliatory acts of Shapiro and Primerano in prematurely terminating Zeng's employment. Title 42 U.S.C. § 1986 provides:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented ....

42 U.S.C. § 1986 (2012). In order to succeed on a claim under § 1986, the plaintiff must first show that he has a cause of action under § 1985. *See Trerice v. Summons*, 755 F.2d 1081, 1085 (4th Cir. 1985) ("A cause of action based upon § 1986 is dependent upon the existence of a claim under § 1985."); *also Burnett v. Sharma,* 511 F. Supp.2d 136, 145 (D.D.C. 2007) ("Because the complaint fails to state a claim under § 1985, plaintiff cannot maintain a claim under § 1986."); *Womack v. Owens*, 736 F. App'x 356, 358 (4th Cir. 2018) ("Because the complaint does not adequately allege a § 1985 conspiracy, it cannot bring a claim under § 1986."); *Dunfee v. Glob. Contact Servs., LLC*, No. CIV.A. 2:11-00306, 2011 WL 5530270, at *4 (S.D.W. Va. Nov. 14, 2011) ("To effectuate a cause of action under § 1986, plaintiff must state a cause of action under 42 U.S.C. § 1985 ... Because plaintiff has failed to allege a claim pursuant to § 1985, his § 1986 claim must correspondingly fail and is therefore dismissed.). The plaintiff must then demonstrate that the defendant had knowledge that the wrongs conspired to be done under § 1985 were about to be committed, and the defendant had the ability to prevent the wrongs, but neglected to do so. *Ogunsula v. Holder*, No. GJH-15-1297, 2015 WL 3892126, at *3 (D. Md. June 22, 2015), *aff'd,* 641 F. App'x 260 (4th Cir. 2016).

For the reasons explained above, there is no evidence of retaliation. Accordingly, the undersigned **FINDS** that there are no material factual issues in dispute; Zeng cannot succeed on his claim of negligent failure to prevent retaliation; and the defendant is entitled to summary in his favor on Count 10.

### E.    Violation of Due Process Right—Count 11

Zeng claims violations of his right to due process when (1) Defendants Primerano, Shapiro, and MUSM "prematurely terminated the plaintiff's employment and without offering a 1-year terminal contract, which abridged plaintiff's right to the full process of grievance," (2) Defendant Gilbert appointed "a former Marshall University executive, instead of an impartial attorney, as the level I hearing examiner," and (3) MUSM and Gilbert "failed to provide the plaintiff timely notice of faculty non-retention." (ECF No. 55 at 45-46). The Fourteenth Amendment's due process protections apply only to recognized property and liberty interests, *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 82 (1978). Without a protected interest, there is no right to due process of law. *Board of Regents v. Roth,* 408 U.S. 564, 569 (1976). In order to possess a property interest, the individual "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. "To have a property interest subject to procedural [or substantive] due process protection, an individual must be entitled to a benefit created and defined by a source independent of the Constitution, such as state law." *Huang v. Board of Governors of University of North Carolina*, 902 F.2d 1134, 1141 (4th Cir. 1990) (citing *Roth*, 408 U.S. at 577).

In *Siu v. Johnson,* 748 F.2d 238, 243 (4th Cir. 1984), the Fourth Circuit addressed the question of whether a faculty member's contractual employment status "as a classic

probationary academic employee 'on the tenure track' but untenured," gave rise to a property interest for which any procedural protection was constitutionally due. The Court noted that some courts had treated such a position as no more than employment at will, which did not give rise to a protectible property interest beyond its stated terms. *Id.* The Court found this view to have merit, indicating that the probationary nature of the position "might well be viewed as creating in its holder no more than a unilateral expectation that in regular course the relationship might ripen, following expiration of the probationary term, into permanent employment, terminable thereafter only for cause." *Id.* However, the Court also recognized that other courts had intimated that this "expectancy" might be "elevated to constitutionally protectible property interest status by contractually binding provisions which, in some form or another, require a regularized decisional process for declining to award tenure." *Id.* Ultimately, the Fourth Circuit reiterated the rule set forth in *Roth*; "where a property interest—including one involving academic employment—is claimed to be derived from state law sources, it is obviously necessary to look to those sources to determine the general nature of the interest, for the process constitutionally due is dependent on that." *Siu,* 748 F.2d at 244 (citations omitted).

Forty years ago, in *State ex rel. McLendon v. Morton,* 249 S.E.2d 919, 925 (W. Va. 1978), the WVSC resolved the question of whether the State's higher education procedures provided a tenure-track faculty member at a state college or university with a protected property interest in an award of tenure. The WVSC held that a faculty member at a state college or university who satisfied the college or university's objective eligibility requirements for tenure and submitted a tenure application had a "sufficient entitlement so that she could not be denied tenure on the issue of her competency

without some procedural due process." *Id.* The degree of protection afforded to the individual depended upon an analysis of three distinct factors: (1) the private interests affected by the official action; (2) the risk of an erroneous deprivation through the procedures used, and the probable value of any additional or substitute procedures; and (3) the government's interest, including the function involved and any extra burdens caused by using additional or substitute procedures. *Id.* at 925-26 (quoting *Waite v. Civil Service Commission*, 241 S.E.2d 164, syl. pt. 5 (W. Va. 1977)). The WVSC concluded that minimal due process in this circumstance required "a notice of the reasons why tenure is not extended and a hearing with an opportunity to submit evidence relevant to the issues raised in the notice. The hearing tribunal should be unbiased. If the teacher demonstrates that the reasons are wholly inadequate or without a factual basis, the administration would be required to show the contrary." *Id.* at 926 (citing *Board of Regents v. Roth*, 408 U.S. at 585-86).

In view of the decision in *State ex rel. McLendon,* the undersigned **FINDS** that Zeng had a protectable property interest in the prospect of receiving tenure, and thus maintaining employment with MUSM, which required that he receive due process. The inquiry, then, turns to what process was due Zeng and whether he received it. *See Davis v. Rao*, 982 F. Supp. 2d 683, 689 (E.D. Va. 2013), *aff'd,* 583 F. App'x 113 (4th Cir. 2014). While state law sources determine the general nature of the property interest, "they do not define in detail the process constitutionally due for protection of the interest, except to the extent that they may coincide with elements of that process as independently defined by federal law." *Sui,* 748 F.2d at 244.

To succeed on a procedural due process claim, Zeng must show: (1) "that he had a constitutionally cognizable life, liberty, or property interest"; (2) "that the deprivation

of that interest was caused by 'some form of state action'"; and (3) "that the procedures employed were constitutionally inadequate." *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013) (quoting *Iota Xi Chapter Of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 145 (4th Cir. 2009)). Of these three elements, the most controversial in this case is the latter.

For his first allegation, Zeng relies, in part, on the fact that he was not given a terminal contract for the year after his tenure application was denied. According to Zeng, this prevented him from exhausting his grievance with the WVPEGB before being terminated. In *Sui*, the Fourth Circuit described the due process to which a tenure applicant is entitled as follows:

> The procedures prescribed for making the tenure decision—including the decision not to award tenure, thereby "terminating" whatever interest may have existed—plainly contemplate a subjective, evaluative decisional process by academic professionals rather than an objective fact-finding process by tribunals adapted to that quite different purpose. This in turn indicates that any process constitutionally due the subject of that decision is not in essence an adversarial fact-finding procedure for which fairly stringent judicial review to insure adequacy is both necessary and possible, but is one much more subjective and less susceptible, therefore, to fine-tuned judicial review. Indeed, the process due one subject to this highly subjective evaluative decision can only be the exercise of professional judgment by those empowered to make the final decision in a way not so manifestly arbitrary and capricious that a reviewing court could confidently say of it that it did not in the end involve the exercise of professional judgment. This in turn means that insuring the adequacy of the process as followed in a particular case does not require or permit a court to inquire into the ultimate wisdom, or prudence, or informed nature of the decision finally made. The judicial inquiry is properly only whether the decision was made, wisely or not, by a specific exercise of professional judgment and on the basis of factors clearly bearing upon the appropriateness of conferring academic tenure.

*Siu*, 748 F.2d at 244–45 (internal citations omitted). Zeng does not allege a due process violation in the tenure review process, and he plainly received due process under *Sui*.

Once the decision to deny tenure was made, Zeng arguably had no further

property interest in his employment with MUSM. Nonetheless, assuming that such an interest remained, Zeng was entitled to notice of the reasons for his termination and a chance to respond. However, "the Fourteenth Amendment does not require that an employee necessarily receive the full panoply of due process rights at a pretermination hearing where the available post-termination procedures protect those rights." *Abatena v. Norfolk State Univ.*, No. 2:13CV699, 2014 WL 1819665, at *12 (E.D. Va. May 7, 2014). A public employee is "entitled to a very limited hearing prior to his termination, *to be followed by a more comprehensive post-termination hearing*." *Gilbert v. Homar*, 520 U.S. 924, 929, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997) (emphasis added); *Copenny v. City of Hopewell*, 7 F.Supp.3d 635, 638 (E.D. Va. 2014). *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985) "and its progeny have upheld pre-termination process … *only when a plaintiff was later afforded a full post-termination hearing*." *Garraghty, Com. of Va., Dep't of Corr.*, 52 F.3d 1274, 1283 (4th Cir. 1995) (citing *Holland* and two other Fourth Circuit cases).

In this case, Zeng was given notice years in advance of his termination that he was not performing to the level needed to receive tenure, and at each evaluation, he received detailed reasons for the assessment and an opportunity to respond. Zeng was also well aware, years in advance, that if he failed to receive tenure, his employment would terminate at the end of his seventh year. After his Mid-Tenure Review and Pre-Tenure Review had occurred, Zeng knew that he needed to make specific changes in his approach to teaching and research, and the failure to do so would be detrimental to his chances for continued employment. As early as March 2015, Zeng was told that his employment at MUSM would end on June 30, 2016, unless received tenure that academic year. When his tenure application was progressing through the review levels,

Zeng was kept informed of the results. He was also given an opportunity to discuss the matter with Dr. Beaver, Primerano, and Shapiro.

Given that Zeng delayed his application for tenure until his seventh year of employment, Primerano and Shapiro could not offer Zeng tenure, or definitively offer him a "terminal contract" in his sixth year, as was the process anticipated by the Tenure Regulations. However, in March 2015, he did receive a hybrid notice tailored to his unique circumstances, which included the anticipated date of, and reason for, termination of employment (i.e. not receiving tenure). While Zeng sent an email communication in May 2015 questioning the June 30, 2016 termination date, he did not request a hearing on the matter or explicitly seek a modification of his employment contract. He clearly did not request an extra "terminal" year. After his tenure application was denied and before his termination, Zeng filed a grievance and had a Level I hearing. At the hearing, Zeng received details regarding his denial of tenure, the reason for his upcoming termination, and was given an opportunity to be heard. As such, Zeng received the pretermination due process owed to him under the Fourteenth Amendment. Undoubtedly, the continuation of the grievance process and his court cases provided him with adequate post-termination due process.

Zeng's second complaint deals with the selection of Mr. Hensley as the hearing examiner. MUSM followed the procedure set out by the WVPEGB, which allowed the involved state agency to select the Level I hearing examiner; presumably, to allow the agency first crack at resolving the dispute. Zeng fails to show any bias in the manner or method by which the Level I hearing was held, and he was permitted to appeal the Level I hearing decision to an ALJ, and then to the Circuit Court of Kanawha County, and finally to the WVSC. Zeng's right to an impartial decision-maker at the first step of the

process is not determinative of the due process inquiry. As Zeng received due process in the grievance procedure as a whole, there is no merit to this claim.

Finally, Zeng asserts that he was denied due process when Shapiro and Gilbert failed to give him timely notice of non-retention. As discussed thoroughly above, Zeng was advised years before his termination that he would not receive tenure unless his performance improved significantly. He was provided with detailed recommendations on how to make those improvements. He knew from the time of his initial appointment that his last contract would run from July 1, 2015 through June 30, 2016, unless he obtained tenure. In March 2015, he received a letter to that effect. Because of his unusual circumstances—which were the result of *his* request for a delay—Zeng did not have the typical terminal year. Nevertheless, he received a terminal year. And he knew it was a terminal year. While the notice of non-retention did not, and could not, adhere precisely to the Tenure Regulations, "the mere fact that a state agency violates its own procedures does not *ipso facto* mean that it has contravened federal due process requirements." *Garraghty,* 52 F.3d 1285. The evidence confirms that Zeng received due process throughout.

Therefore, the undersigned **FINDS** that Zeng fails to show a genuine issue of material fact related to his Fourteenth Amendment due process claim; Zeng received adequate due process in the decision to deny him tenure and subsequently terminate his employment at MUSM; and the defendants are entitled to summary judgment in their favor on Count 11.

## F.    Breach of Contract—Count 7

Given that Zeng fails to establish any cause of action triggering federal jurisdiction, this Court may decline to exercise supplemental jurisdiction over a matter

purely of state law and concern. 28 U.S.C. § 1367 (providing that district courts may decline to exercise supplemental jurisdiction over a claim if the court has dismissed all claims over which it has original jurisdiction); *see also York v. City of Turlington*, 225 F. Supp. 3d 341, 351 (M.D.N.C. 2016) ("Because this court will dismiss all of Plaintiffs' federal claims and there is no other identified basis of subject matter jurisdiction, the court declines to exercise supplemental jurisdiction over their State law claims."). However, should this Court choose to exercise supplemental jurisdiction, the undersigned **FINDS** that Zeng provides no factual basis for a breach of contract claim.

As the defendants point out, the only written contracts that Zeng had with any of the defendants were the faculty appointment letters between Zeng and MUSM, setting forth the terms of Zeng's employment at MUSM and incorporating the various regulations and rules of MUSM, MU, and the West Virginia Higher Education Policy Commission. At the time of his termination, the employment contract in place expired on June 30, 2016. (ECF No. 339-9). Zeng alleges that his contract was breached by an early termination. However, Zeng's appointment terminated on June 30, 2016, and that was the day he was asked to leave MUSM. Therefore, on the face of the contract, there was no breach.

Nevertheless, the contract was made subject to the terms and conditions of the Tenure Regulations, Series 9, and Policy AA-28. (ECF No. 339-9). Policy AA-28 provided that the maximum period of probation at MU could not exceed seven years. (ECF No. 333-2 at 2). This seven-year limit was also found in Series 9. (ECF No. 334-11 at 9). Series 9 made clear, however, that the seven-year maximum probationary period was not a *guarantee* of seven-years' employment. Indeed, paragraph 10.4 of Series 9 stated that the hiring institution had the right to terminate the appointment of a faculty

member at the end of any contract year "for any reason that is not arbitrary, capricious, or without factual basis." (*Id.*).

If a probationary faculty member was not earlier terminated, both Series 9 and Policy AA-28 required the institution to notify the faculty member during the sixth year of employment that he or she had received tenure, or if tenure were not awarded, that his or her employment would end at the end of the seventh year. (ECF No. 334-11 at 9; ECF No. 333-2 at 2). Here, Zeng's contract included an exception to the sixth-year notice related to tenure, because Zeng had asked for and received an extension of his application deadline. For that reason, Primerano and Shapiro could not advise Zeng of the result of his tenure request in March 2015, but could, and did, notify him more than a year in advance that his final year of faculty appointment at MUSM would end on June 30, 2016 in the event he did not received tenure.

Zeng attempts to argue that the agreed-upon extension of the deadline for his tenure application automatically extended his employment for an additional year. Zeng has supplied no proof to support that argument. Certainly, the evidence establishes that the parties did not have a meeting of the minds on this point. The extension granted pertained only to the tenure application. The March 2015 letter from Primerano and Shapiro corroborated their belief that an extension of the tenure application date did not operate to extend the employment termination date. For that reason, they notified Zeng of the June 30, 2016 termination date in March 2015. The evidence further demonstrates that Zeng had no clear understanding of the effect that his delayed tenure application had on his employment termination date. In response to the March 2015 letter, Zeng suggested that his employment should be extended to ***August 31, 2016***, because he did not start working at MUSM until September 1, 2009. (ECF No. 339-8).

In March 2016, Zeng suggested that his termination date was actually ***February 2017***, because his lab was not available until February 2010. (ECF No. 382-3 at 23-27). And, in his grievance, he suggested that he was entitled to employment until ***June 30, 2017***, because that would constitute the end of his "terminal" year. If Zeng had no concrete position regarding when his employment contract expired, then he and MUSM certainly could not have agreed to a contract modification. Moreover, throughout this litigation, Zeng has treated the denial of his tenure application as an event separate from his termination. Consequently, it is disingenuous for him to conjoin those events for purposes of this one claim.

Therefore, the undersigned **FINDS** that there are no material facts in dispute; Zeng fails to demonstrate a breach of contract; and the defendants are entitled to summary judgment in their favor on Count 7.

### G. Full Faith and Credit

Defendants have raised the defenses of full faith and credit of the ALJ's decision, adopted by the Circuit Court, and qualified immunity. In view of the undersigned's conclusion that Zeng has not successfully established any of his claims, these defenses are only briefly addressed.

The Federal Full Faith and Credit Act ("FF&C Act"),  28 U.S.C. § 1738, provides in relevant part that:

> The records and judicial proceedings of any court of any such State, Territory or Possession, or copies thereof, shall be proved or admitted in other courts within the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form. Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they

117

have by law or usage in the courts of such State, Territory or Possession from which they are taken.

The FF&C Act requires federal courts to apply the state's *res judicata* law when determining the preclusive effect of a state court judgment. *Migra v. Warren City Sch. Dist. Bd. Of Educ.,* 465 U.S. 75, 85 (1984). Under the doctrine of *res judicata*, "'a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action.'" *Porter v. McPherson,* 479 S.E.2d 668, 676 (W. Va. 1996) (quoting *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326 n. 5 (1979)). In other words, *res judicata* is "claim preclusion." *Sattler v. Bailey,* 400 S.E.2d 220, 225 (W. Va. 1980).

A defense of *res judicata* "may operate to bar a subsequent proceeding even if the precise cause of action involved was not actually litigated in the former proceeding so long as the claim could have been raised and determined." *Blake v. Charleston Area Med. Ctr., Inc.*, 498 S.E.2d 41, 49 (W. Va. 1997)). In West Virginia, to establish a *res judicata* defense, a party must demonstrate the coexistence of three elements: "(1) a final adjudication on the merits in the first proceeding; (2) the same parties, or persons in privity with those same parties, as the first proceeding; and (3) a cause of action in the second proceeding that is identical to the cause of action determined in the first proceeding—or such that it could have been resolved, had it been presented, in the first proceeding." *Brozik v. Parmer*, No. 18-0565, 2019 WL 4165132, at *3 (W. Va. Sept. 3, 2019) (quoting *See* Syl. Pt. 4, *Blake*, 498 S.E.2d at 41)).

Here, the ALJ's administrative decision was appealed to the Circuit Court of Kanawha County, which affirmed and adopted the ALJ's findings and conclusions of law. Zeng then appealed the Circuit Court's decision to the WVSC, where the matter

remains pending. Although the law of West Virginia  is "unclear" as to whether a judgment pending appeal is or is not "a final judgment for res judicata purposes," *see Weirton Med. Ctr., Inc. v. Cmty. Health Sys., Inc.*, No. 5:15CV132, 2017 WL 6347173, at *6 (N.D.W. Va. Dec. 12, 2017), *aff'd sub nom. Weirton Med. Ctr., Inc. v. Quorum Health Res., LLC*, 734 F. App'x 896 (4th Cir. 2018), it matters not, because a *de novo* review of the evidence fully supports the ALJ's determination. In any event, giving the state court judgment full faith and credit would not provide a reason for dismissal of this action in its entirety, as this case includes many issues not addressed by the ALJ in the grievance proceeding.

Accordingly, the undersigned **FINDS** that this Court need not perform a *res judicata* analysis, because independent review of the matter demonstrates that Defendants are entitled to judgment in their favor on all of Zeng's claims and, regardless, the application of *res judicata* would not result in a dismissal of the entire case.

### H.    Qualified Immunity

Under the doctrine of qualified immunity, government officials performing discretionary functions may be protected from monetary damages when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity "is a judicially created doctrine that stems from the conclusion that few individuals will enter public service if such service entails the risk of personal liability for one's official decisions." *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir. 1994). This doctrine protects state agents in the exercise of their official duties from the risk of personal liability for making "bad guesses in gray areas," ensuring that they are only responsible for "transgressing bright lines." *Marciariello v. Sumner,* 973

F.2d 295, 298 (4th Cir. 1992). As the Supreme Court of the United States explained in

*Pearson v. Callahan:*

> Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

*Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Groh v. Ramirez,* 540 U.S. 551,

567 (2004)). Because qualified immunity is "an immunity from suit rather than a mere

defense to liability," it is "effectively lost if a case is erroneously permitted to go to trial."

*Id.* (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)). "Where the defendant seeks

qualified immunity, a ruling on that issue should be made early in the proceedings so

that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier*

*v. Katz,* 533 U.S. 194, 200 (2001).

 In determining the applicability of qualified immunity, the court must consider

two questions: (1) whether a constitutional or statutory right would have been violated

on the facts alleged by the plaintiff, and (2) whether the right asserted was clearly

established at the time of the alleged violation. *Pearson,* 555 U.S. at 232. These questions

may be answered in any order that "[would] best facilitate a fair and efficient disposition

of each case." *Id.* at 242. If a court finds that a claimed constitutional right was not

clearly established at the time of the alleged wrongdoing, the court may dispose of the

case without engaging in the pointless exercise of determining whether the facts alleged

actually establish a violation of that right. *Id.* Similarly, if a court determines that the

facts alleged by the plaintiff do not support a reasonable inference that a constitutional

right was violated, the analysis terminates, and the complaint is subject to dismissal for

failure to state a claim.

"[A] defendant can raise the qualified-immunity defense at both the motion to dismiss and summary judgment stage." *Raub v. Bowen*, 960 F. Supp. 2d 602, 608 n.8 (E.D. Va. 2013) (citing *Tobey v. Jones,* 706 F.3d 379, 393–94 (4th Cir. 2013)). "So long as qualified immunity does not turn on *disputed facts,* 'whether the officer's actions were reasonable is a question of pure law.'" *Id.* (citing *Henry v. Purnell,* 652 F.3d 524, 531 (4th Cir. 2011) (*en banc* )). However, in many cases, "immunity is peculiarly well-suited for resolution at the summary judgment stage." *Id.* (citing *Willingham v. Crooke,* 412 F.3d 553, 558–59 (4th Cir. 2005)). As qualified immunity is designed to shield officials "not only from liability but from the burdens of litigation, its establishment at the pleading or summary judgment stage has been specifically encouraged." *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992).

To be clearly established, a right must be sufficiently clear "that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. "Indeed, a rejection of qualified immunity requires that in the light of pre-existing law the unlawfulness [of a defendant's actions] must be apparent." *Williams v. Ozmint*, 716 F.3d 801, 808 (4th Cir. 2013) (internal citations and quotations omitted).

As stated above, based on the facts before the Court, the undersigned **FINDS** that Zeng fails to demonstrate that the defendants violated a constitutional or statutory right belonging to Zeng. As such, the analysis ends there, and the individual defendants are entitled to dismissal on the additional ground of qualified immunity.

## VI.   **Proposal and Recommendations**

For the reasons stated, the undersigned respectfully **PROPOSES** that the presiding District Judge and accept the foregoing findings and **RECOMMENDS** that the Motion for Summary Judgment filed by Plaintiff, (**ECF No. 332**), be **DENIED**; the Motions for Summary Judgment filed by the defendants, (**ECF Nos. 337, 339, 341, 343, 345, and 347**), be **GRANTED**; and this civil action be **DISMISSED** and **REMOVED** from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, Plaintiff shall have fourteen days (for the filing of objections) and three days (if this document was received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to Judge Chambers and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to Plaintiff, counsel of record, and any unrepresented party.

**FILED:** January 28, 2020

_____
Cheryl A. Eifert
United States Magistrate Judge