IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

WEI-PING ZENG,

               Plaintiff,

v.                                   CIVIL ACTION NO. 3:17-3008

MARSHALL UNIVERSITY,
DR. JERMONE A. GILBERT,
DR. JOSEPH SHAPIRO,
DR. W. ELAINE HARDMAN,
DR. DONALD A. PRIMERANO,
DR. RICHARD EGLETON,

               Defendants.

**MEMORANDUM OPINION AND ORDER**

Presently pending before the Court are seven motions for summary judgment and one motion for leave to file a third amended complaint. *See Mot. for Leave to Amend*, ECF No. 288; *Zeng Mot. for Summ. J.*, ECF No. 332; *Egleton Mot. for Summ. J.*, ECF No. 337; *Gilbert Mot. for Summ. J.*, ECF No. 339; *Hardman Mot. for Summ. J.*, ECF No. 341; *Marshall Mot. for Summ. J.*, ECF No. 345; *Primerano Mot. for Summ. J.*, ECF No. 345; *Shapiro Mot. for Summ. J.*, ECF No. 347. By standing order, the motions were referred to Magistrate Judge Cheryl A. Eifert for her preliminary findings of fact and recommendations for disposition. *Standing Order*, ECF No. 3. On January 28, 2020, Magistrate Judge Eifert issued two sets of Proposed Findings and Recommendations ("PF&Rs"): one addressing Plaintiff's motion for leave to file another amended complaint, and a second addressing the parties' cross-motions for summary judgment. *Leave to Amend PF&R*, ECF No. 411; *Summ. J. PF&R*, ECF No. 412. Plaintiff has submitted corresponding objections to each PF&R. *Summ. J. Objections*, ECF No. 418; *Leave to Amend Objections*, ECF

No. 419. The issues have been fully briefed and are ripe for resolution. For the reasons set forth below, the Court **DENIES** Plaintiff's objections and—consistent with this Memorandum Opinion and Order—**ADOPTS AND INCORPORATES HEREIN** the PF&Rs. The Court accordingly **GRANTS** Defendants' motions and **DENIES** Plaintiff's motions, and **ORDERS** this action removed from its docket.

# I. BACKGROUND

## A. Factual Setting

The roots of this case extend as far back as August 2009, when Plaintiff Wei-Ping Zeng received an offer of employment as an Associate Professor in the Department of Biochemistry and Microbiology at the Joan C. Edwards School of Medicine at Marshall University. *Letter from Charles McKown, MD to Wei-Ping Zeng, PhD*, ECF No. 332-4, at 11.[1] The offer was for a "tenure-track (probationary) appointment pursuant to the provisions of the West Virginia Higher Education Policy Commission Title 133, Procedural Rule Series 9" that would be "renewable at the beginning of each fiscal year." *Id.* The letter set Plaintiff's base salary at $75,000, and provided that he would "be eligible to apply for tenure as early as [his] third year at [MUSM] and no later than [his] sixth year of continuous full-time employment." *Id.* His responsibilities would include "[e]stablishment of an independent and externally[-]funded research program in cellular immunology," "[t]eaching in Medical Immunology or Medical Microbiology on an annual basis," "[d]irecting and teaching in one biomedical science graduate course," serving on various committees, and participating in a seminar program. *Id.* at 12.

---

[1] All page numbers are drawn from the placement of a given citation in a given docket entry, rather than its placement in any particular document.

On August 22, 2009, Plaintiff accepted his offer of employment and signed a Notice of Appointment to this effect. *2009-2010 Notice of Appointment*, ECF No. 343-2, at 1. The Notice of Appointment provided that he would begin his employment on September 1, 2009, and that he would participate "in scientific research or other scholarly activity which is consistent with [his] educational background, training, and/or experience and which is consistent with the mission and goals of Marshall University."[2] *Id.*

Pursuant to the terms of the Notice of Appointment, Plaintiff began his employment with MUSM on September 1, 2009. *Id.* However, delays in preparing his laboratory apparently prompted a discussion with Richard Niles—Chair of the Department of Biochemistry and Microbiology—about when his appointment would actually begin. Niles emailed Plaintiff on January 11, 2010, confirming that "[y]es, as we discussed earlier, the clock on this position does not start until you have set up your laboratory." *Richard Niles to Wei-Ping Zeng*, ECF No. 333-18, at 4. Plaintiff began using his laboratory the next month. *Wei-ping Zeng's Comments on Mid-Tenure Review*, ECF No. 333-9, at 4.

On July 15, 2010, Plaintiff signed another Notice of Appointment providing for his continued employment from July 1, 2010 until June 30, 2011. *2010-2011 Notice of Appointment*, ECF No. 343-3, at 1. In September 2010, Dr. Niles and Dr. Donald A. Primerano—a defendant in this case—completed Plaintiff's first evaluation. *2009-2010 Faculty Activities Evaluation*, ECF No. 332-2, at 13. As he did not teach a course in the 2009-2010 academic year, Plaintiff's reviewers did not grade his teaching abilities; nevertheless, they rated him "excellent" in research and

---

[2] Unlike his offer letter, the Notice of Appointment does not specifically list obtaining external research funding as a duty of his employment. *Compare Letter from Charles McKown, MD to Wei-Ping Zeng, PhD*, at 12, *with Notice of Appointment*, at 1–2.

service.[3] To improve his performance, Niles and Primerano suggested, *inter alia*, that Plaintiff decrease his grant applications and increase his publications and presentations, "[a]pply for a joint appointment in Internal Medicine," request a student to complete a rotation in his laboratory, and join a scientific society. *Id.*

On July 26, 2011, Plaintiff signed a third Notice of Appointment providing for another year of employment at MUSM. *2011-2012 Notice of Appointment*, ECF No. 343-3, at 3–4. Niles and Primerano once again completed his faculty evaluation, rating him as "excellent" in research and service and "good" in teaching for the Microbiology course he taught that year. *2010-2011 Faculty Activities Evaluation*, ECF No. 332-2, at 14. Plaintiff's student evaluations ranged between "average" and "good" over the same period, rated on a scale from very poor, poor, average, good, and very good. *2010-2011 Student Evaluation Results*, ECF No. 332-2, at 20–21. For example, students in his Medical Immunology course thought he was average at communicating information, ideas, and concepts in an understandable manner, *id.* at 21, but good at demonstrating knowledge of established and evolving sciences, *id.* at 20. The overall mean of his results was a score of 3.53, near the middle of the average range. *Id.* at 21.

At some point during the 2011-2012 academic year, things went somewhat awry in Plaintiff's teaching. After signing a fourth Notice of Appointment on July 20, 2012, Niles and Primerano once again undertook an evaluation of Plaintiff's performance and noted "low student evaluations on his Medical Immunology teaching." *2011-2012 Faculty Activities Evaluation*, ECF No. 332-2, at 15. They explained that

> [w]hile his presentations may have been adequate, the students were primarily concerned about the level of professionalism in his interactions with faculty and

---

[3] The reviewing form provides space for faculty members to be rated as outstanding, excellent, good, satisfactory, marginal, and unsatisfactory, in descending order of performance.

students. We advised [Plaintiff] that it would be wise to accept the advice of senior faculty in the classroom and discuss concerns or issues in the office.

*Id.* Though they rated his performance in research and service as "good," they considered his teaching only "satisfactory." *Id.* To remedy the issue, Niles and Primerano "strongly recommend[ed] [Plaintiff] attend Dr. Susan Jackman's lectures and team-based learning sessions in immunology and that he participate in workshops on teaching skills and active learning offer[ed] through the Office of Faculty Development."[4] *Id.* Students noticed a shift as well; Plaintiff's overall rating from students in his Medical Immunology course dropped nearly a full point from 3.53—well within the "average" range—to 2.56—well within the "poor" range.[5] *Compare 2010-2011 Student Evaluation Results*, at 21, *with 2011-2012 Student Evaluation Results*, ECF No. 332-2, at 25.

Plaintiff would not wait long before receiving another evaluation, this time from the Department of Biochemistry and Microbiology Mid-Tenure Review Committee on October 12, 2012. *Mid-Tenure Review*, ECF No. 333-9, at 1. The Committee was comprised of four of Plaintiff's colleagues, including Defendant Dr. W. Elaine Hardman, and "evaluated [Plaintiff's] performance in the areas of Teaching, Research, and Service, the three critical components for tenure and promotion." *Id.* In the review, the Committee offered a set of recommendations in each

---

[4] The PF&R notes that "[t]he overall assessment of [Plaintiff's] performance in the eyes of Dr. Niles and Primerano was that [he] needed to improve both his teaching and research skills." *Summ. J. PF&R*, at 13. This is technically incorrect; the assessment cited in the PF&R was not provided until 2013. *Compare* ECF No. 332-2, at 16, *with* ECF No. 333-3, at 19. Moreover, it is not clear that Primerano had any involvement in preparing the 2013 evaluation.

[5] For his part, Plaintiff attached a set of comments to his 2011-2012 Faculty Activities Evaluation and conceded that his "teaching evaluation suffered from a poor student evaluation." *Comments to 2011-2012 Faculty Activities Evaluation*, ECF No. 332-4, at 22. He professed that "it was truly a shock that [he] received such [a] low student evaluation," and that it perhaps stemmed from the fact that he "did not finish one of the lectures 10 min[utes] before the hour." *Id.* Nevertheless, he stressed that he did "not believe that the students' evaluation reflected fairly [his] effort and the quality of [his] teaching." *Id.*

area for Plaintiff to improve his performance. Among other suggestions, they advised Plaintiff to "attend selected lectures from successful teachers," to "improve professionalism with colleagues," and to "be sure that you are an active participant on . . . committees." *Id.* at 1–2. The Committee also devoted a significant portion of its review to Plaintiff's research performance. They noted that "[p]ublications to support [Plaintiff's] hypotheses are critical," and that he had not published sufficiently with reference to the $300,000 start-up grant he had received upon his arrival at MUSM. *Id.* at 2. After making several other recommendations, they reiterated that "it is mandatory for you to get external independent funding as stated in your contract." *Id.*

On May 28, 2013, Plaintiff signed his fifth Notice of Appointment with MUSM to cover the upcoming 2013-2014 academic year. On June 21, 2013, Dr. Niles completed Plaintiff's 2012-2013 Faculty Activities Evaluation.[6] *See 2012-2013 Faculty Activities Evaluation*, ECF No. 333-19, at 10–19. Niles noted that Plaintiff's "overall [teaching] score in Med[ical] Immuno[logy] improved from 2.56 in 2011-2012 to 3.61 in 2012-2013," again placing him in the "average" range. *Id.* at 13. "While these improvements are significant," Niles continued, "his scores must improve into the good to very good range in order to be considered for tenure." *Id.* Niles accordingly marked that Plaintiff "Needs Improvement" with his teaching, and recommended several steps to improve his performance. Niles also registered a degree of disappointment with Plaintiff's research work, which he also felt needed improvement. *Id.* at 15. In particular, he noted that "[i]n order to be considered for tenure, [Plaintiff] must increase publications/year and obtain external funding." *Id.* Niles marked that Plaintiff's "Professionalism" and "Professional Development" were

---

[6] The form used to evaluate faculty members appears to have changed between 2012 and 2013, and replaced the prior "outstanding, excellent, good, satisfactory, marginal, and unsatisfactory" scale with an "exemplary, professional, needs improvement, and unacceptable" scale.

"Professional," but that his "Teaching & Mentoring" and "Research & Scholarly Activities" needed improvement. *Id.* at 19.

The fact that Plaintiff had earned a rating of "Needs Improvement" required Niles to "address" the score halfway through the calendar year. *Id.* In light of this requirement, Niles and Primerano sent Plaintiff a letter on March 10, 2014 that memorialized their mid-year review. *2014 Mid-Year Review*, ECF No. 333-19, at 20–21. The reviewers provided Plaintiff with several recommendations addressing potential future research opportunities. *Id.* at 20. They also noted that, while improved, they felt that Plaintiff's "teaching still needs to improve to be in the acceptable range." *Id.* They closed their letter with a warning about Plaintiff's approaching tenure deadline, writing

> Lastly, given that you arrived at Marshall in September 2009 and since tenure must be granted no later than the end of your sixth year (2014-15), your application for tenure must be submitted in October 2014. We think it is reasonable for you to ask the departmental promotion and tenure committee for a preliminary evaluation of your tenure application. We recognize that you may wish to request a re-set of the tenure clock so that 2009-2010 is not counted. If this becomes material, then we would need to get a ruling from the Promotion and Tenure Committee or the Dean. Please contact us if you have questions or concerns.

*Id.* at 20–21.

Plaintiff heeded the reviewers' advice and contacted the Departmental Promotion and Tenure Committee ("DP&TC") on March 14, 2014 for a preliminary review of his tenure application. *Wei-Ping Zeng to DP&TC*, ECF No. 343-4, at 1. The DP&TC responded within the month, and compared Plaintiff's performance with tenure requirements. They reached several key negative conclusions: that Plaintiff had "not met the requirement of excellence in either teaching or research,"[7] that he had "not met the minimum requirement of 4 years satisfactory teaching,"

---

[7] On the other hand, the Committee concluded that Plaintiff had met the requirement of obtaining satisfactory ratings for service. *Preliminary Review*, ECF No. 343-5, at 2.

that he had "not met a requirement for either effective performance or excellence in teaching," that he had "not received a grant since arriving at Marshall [and thus had] not established a research program," and that he had "not met a requirement for effective performance of excellence in research." *Preliminary Review*, ECF No. 343-5, at 1–2. The DP&TC also registered its opinion that "[t]wo original research papers in 4.5 years does not indicate an active research program," as well as confusion that Plaintiff did not attend "*any* presentations since arriving at Marshall, not even the local research meetings that would have cost no money to attend." *Id.* (emphasis in original). Nevertheless, Plaintiff's shortcomings with respect to teaching and service led the DP&TC to conclude that it did "not think [Plaintiff] would be recommended for tenure at this time." *Id.* at 2.

With this negative assessment in hand, Plaintiff contacted Defendant Dr. Joseph Shapiro on August 1, 2014 and requested an extension of time to apply for tenure due to circumstances outside his control. *Letter from Wei-Ping Zeng to Joseph Shapiro*, ECF No. 343-6. Shapiro granted the request for a one-year extension, and Plaintiff signed a sixth Notice of Appointment on August 19, 2014.[8] *Donald Primerano to Wei-Ping Zeng*, ECF No. 333-35, at 2; *2014-2015 Notice of Appointment*, ECF No. 343-3, at 10–11. Though he acceded to Plaintiff's request, Shapiro and Primerano sent a letter to Plaintiff on March 24, 2015 making clear their expectation that "apply[ing] for tenure in the Fall [of] 2015" would be his "last opportunity . . . to apply for tenure." *Letter from Joseph Shapiro and Donald Primerano to Wei-Ping Zeng*, ECF No. 343-7, at 1. "In the event that tenure is not approved," they noted, "your contract would expire on June 30, 2016." *Id.*

---

[8] At some point before this exchange, Primerano replaced Niles as Acting Chair of the Department of Biochemistry and Microbiology.

Plaintiff's student evaluations continued to hover near or slightly below departmental averages as the deadline for applying for tenure grew closer. *See*, *e.g.*, *2014 Student Evaluation Results*, ECF No. 332-3, at 5–6; *2015 Student Evaluation Results*, ECF No. 332-3, at 7–9. On May 7, 2015, Plaintiff expressed concern "about 2 dates that are mentioned in the letter from you and the [D]ean." *Wei-Ping Zeng to Donald Primerano*, ECF No. 339-8, at 1. First, he asked to postpone the October 1, 2015 application deadline to November because "October is a busy month for grant application[s]." *Id.* Second, he took issue with their belief that his contract would expire on June 30, 2016. *Id.* In view of the "serious delay in having a lab space," Plaintiff thought "the end date should be Aug[ust] 30, 2016." *Id.* Plaintiff was granted a limited extension and permitted to submit his application on October 19, 2015, but the termination date for his employment remained the same. *W. Va. Pub. Employees Grievance Bd. Hr'g Tr.*, ECF No. 333-6, at 145. With this unmodified June 30, 2016 date in mind, Zeng signed his seventh Notice of Appointment with MUSM on July 13, 2015. *2015-2016 Notice of Appointment*, ECF No. 339-9, at 1–2. This final employment agreement stated that Plaintiff's appointment had begun on July 1, 2015 and would expire on July 1, 2016. *Id.*

On October 7, 2015, Primerano sent an email to Plaintiff, Hardman, and Dr. Bonnie Beaver. In the email, Primerano—apparently unprompted—advised Plaintiff that he would "need to modify Appendix C [of the tenure application] indicating that I am not recommending you for tenure." *Donald Primerano to Wei-Ping Zeng and Bonnie Beaver*, ECF No. 333-18, at 2. This email was unusual, as Plaintiff had not yet submitted an application for tenure. Nevertheless, he did so in the coming days and the DP&TC issued a recommendation to deny Plaintiff's application on October 26, 2015. *Application for Tenure*, ECF No. 322-1; *Tenure Review for Dr. Wei-Ping Zeng*, ECF No. 343-9. The DP&TC made several important findings. First, with respect to

Plaintiff's teaching performance, they found that he "demonstrate[d] adequate teaching but [did] not think that [he] demonstrate[d] *excellence* in teaching."[9] *Tenure Review for Dr. Wei-Ping Zeng*, at 2 (emphasis in original). Second, they concluded that Plaintiff did not "demonstrate[] *excellence* in research." *Id.* (emphasis in original). These findings were of particular importance in light of the requirement that "[p]romotion to Associate Professor requires overall evidence of *superior worth* to the University as demonstrated by effective performance in all major areas of responsibility and *excellence* in either teaching or research/scholarly activities." *Id.* at 1 (internal quotations omitted) (emphasis in original). The DP&TC closed its recommendation by explaining that

> The number one reason that Dr. Zeng was hired was to establish a research program. Dr. Zeng was provided funding, time and laboratory space to establish this program. Based on the evidence we were presented, it is clear that Dr. Zeng has not fulfilled the expectations of the department and to which he agreed at the time he was hired.

*Id.* at 3.

The next day, Primerano advised Plaintiff that the DP&TC had not recommended him for tenure. *Donald Primerano to Wei-Ping Zeng*, ECF No. 333-13, at 1. Primerano—naturally enough, given his earlier email—agreed with the DP&TC's unanimous vote, and informed Shapiro that Plaintiff "did not demonstrate excellence in teaching or research." *Donald Primerano to Joseph Shapiro*, ECF No. 333-21, at 2. He specifically noted that Plaintiff had failed to secure the "establishment of an independent and externally[-]funded research program." *Id.*

The MUSM Personnel Advisory Committee was next to consider Plaintiff's application for tenure.[10] On January 25, 2016, the Committee unanimously voted against recommending

---

[9] In making this determination, they acknowledged that "Dr. Zeng's student evaluations have improved to an acceptable level." *Tenure Review for Dr. Wei-Ping Zeng*, at 2.

[10] Defendant Dr. Richard Egleton was one of three faculty members appointed to review

Plaintiff for tenure despite acknowledging that all candidates under consideration at the time "met the basic considerations" for tenure. *Recommendations of the Personnel Advisory Committee*, ECF. No. 333-40, at 3–4. On January 29, 2016, Shapiro notified newly-appointed Marshall University President (and Defendant) Jerome Gilbert of the Committee's recommendation not to award tenure to Plaintiff. *Shapiro Dep.*, ECF No. 333-52, at 46. On February 8, 2016, Dr. Beaver mailed a letter to Plaintiff informing him that the Committee had voted against his application for tenure. *Bonnie Beaver to Wei-Ping Zeng*, ECF No. 333-22, at 1. She noted that "the primary reason the Committee voted against a recommendation regarding your tenure related to a lack of funded research productivity." *Id.*

On March 17, 2016, Plaintiff sent a letter to President Gilbert arguing for an award of tenure. *Letter from Wei-Ping Zeng to Jerome Gilbert*, ECF No. 382-3, at 23–27. The letter raised four principal points: that he added valuable technical expertise to the MUSM faculty, that he was better qualified for tenure than two recently-appointed colleagues, that his seventh year of employment should not end until February 2017, and that the DP&TC did not act independently in making their decision. *Id.* at 25–27. With respect to the last point, he argued that "there is clear evidence that the committee received instruction from an authoritative administrator"—presumably Primerano—"and voted in [sic] the will of such person." *Id.* at 27. Though it is unclear what the exact content of Gilbert's response was, Plaintiff characterized it as "not . . . positive." *W. Va. Pub. Employees Grievance Bd. Hr'g Tr.*, ECF No. 333-8, at 46. On April 30, 2016, Gilbert formally advised Plaintiff that his tenure application was denied. *Letter from Jerome Gilbert to Wei-Ping Zeng*, ECF No. 333-24, at 1. Plaintiff's employment with Marshall concluded with the

---

Plaintiff's application in detail.

expiration of his contract on June 30, 2016. *See Letter from Donald Primerano to Wei-Ping Zeng*, ECF No. 334-13, at 1.

**B. Procedural History**

Even before his application was formally denied, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that the tenure review process was tainted with discrimination. *W. Va. Pub. Employees Grievance Bd. Hr'g Tr.*, ECF No. 333-8, at 47. On May 5, 2016, Marshall University's Associate General Counsel emailed Plaintiff and indicated that MUSM would be amenable to continuing his employment until February 2017 if he agreed to withdraw his EEOC complaint, waive his rights to file a grievance, and refrain from bringing "any further claims against the University, including the School of Medicine." *Jendonnae Houdyschell to Wei-Ping Zeng*, ECF No. 333-19, at 2. Obviously enough, Plaintiff did not agree to the offer.

On May 17, 2016, Plaintiff filed a formal grievance with the West Virginia Public Employees Grievance Board ("WVPEGB"). *W. Va. Pub. Employees Grievance Board Form*, ECF No. 333-19, at 1. Plaintiff claimed that he had been denied tenure due to discrimination based on race and had suffered early termination due to opposing that discrimination. *Id.* He sought reversal of President Gilbert's tenure decision and "[r]emoval of [the] threat of early termination of employment." *Id.* In West Virginia, state grievance proceedings have three levels of review that are followed by judicial review in the Circuit Court of Kanawha County. W. Va. Code § 6c-2-4. Plaintiff's Level I hearing was held on June 20, 2016 in Huntington, with President Gilbert selecting Steve Hensley—a former Marshall employee—to act as the Grievance Examiner. *Level I W. Va. Pub. Employees Grievance Board Hr'g Tr.*, at 5. Aside from Hensley, Plaintiff, and Primerano, only Candace Kraus—Deputy General Counsel for the West Virginia Higher

Education Policy Commission—and Ms. Debra Hart—Director of Equity Programs—were present. *Id.* at 2. The thrust of Plaintiff's argument was that he was denied tenure based on his race and national origin, and that he had always understood his end date to be February 2017. *Id.* at 83–87. Marshall, on the other hand, pointed out that Plaintiff was warned for years that he was not performing at the level necessary to receive tenure and the school's decision was based on nothing other than his performance. *Id.* at 87–90. Hensley agreed with Marshall and resolved the matter in the university's favor. *ALJ Decision*, ECF No. 343-13, at 1.

Two more rounds of grievance proceedings followed: first an unsuccessful mediation, and then a hearing and a decision by Chief Administrative Law Judge ("ALJ") Billie Thacker Catlett of the WVPEGB. *Id.* at 1, 69. Over the course of five days, Plaintiff and Marshall essentially advanced the same arguments as at the Level I hearing (albeit in more detail). *Id.* at 2. Drs. Primerano, Shapiro, Hardman, Yu, and Beaver all testified, essentially repeating the well-worn assertion that Plaintiff did not obtain tenure because he had not demonstrated excellence in teaching or research and had not obtained an external grant to fund a research program. *See W. Va. Pub. Employees Grievance Bd. Hr'g Tr.*, ECF Nos. 333-3–8. Plaintiff also testified, arguing extensively that two other Caucasian employees—Drs. Koc and Denvir—were similarly situated employees with inferior records who had nevertheless obtained tenure. *Id.* The ALJ rendered her decision on August 18, 2017, finding that Marshall had improperly considered Plaintiff's failure to obtain external grant funding in making its tenure decision. *Id.* at 67. Nevertheless, she concluded that this consideration was "cured by analyzing whether the tenure decision was sound without" taking grant funding into account, and that the decision was therefore "not contrary to law or school policy or regulation or arbitrary and capricious." *Id.* Plaintiff appealed the ALJ's decision to the Circuit Court of Kanawha County, West Virginia on September 20, 2017. On

November 1, 2018, the Circuit Court entered an order affirming the ALJ's decision. *Zeng v. Marshall University*, Civ. A. No. 17-AA-72 (Cir. Ct. Kan. Cnty. Nov. 1, 2018). On November 30, 2018, Plaintiff appealed the Circuit Court's order to the Supreme Court of Appeals of West Virginia. This appeal remains pending. *Zeng v. Marshall University*, No. 18-1035 (W. Va. Nov. 30, 2018).

Even before the ALJ issued her final decision, however, Plaintiff filed the instant action in this Court on May 23, 2017. *See Compl.*, ECF No. 2, at 1. As Plaintiff was—and still is—proceeding *pro se*, the case was referred to Magistrate Judge Cheryl A. Eifert for findings of fact and recommendations for disposition. *Standing Order*, at 2. This action has since spawned hundreds of docket entries and two amended complaints, as well as dozens of orders from this Court and Magistrate Judge Eifert. The active Second Amended Complaint is split into eleven counts and is often quite difficult to parse. *See Second Am. Compl.*, ECF No. 55, at 1–49. At a broad level of generality, however, Plaintiff raises discrimination claims under the West Virginia Human Rights Act, Title VII of the Civil Rights Act of 1964, and the United States and West Virginia Constitutions in Counts One, Two, Three, Four, Eight, and Nine of the Second Amended Complaint. *Id.* He also raises a conspiracy claim in Count Five, a retaliation claim in Count Six, a negligent failure to prevent retaliation claim in Count Ten, a due process claim in Count Eleven, and a breach of contract claim in Count Seven.

Over a year was set aside for discovery, and dispositive motions were ordered due by September 16, 2019. *Order*, ECF No. 329. Magistrate Judge Eifert issued PF&Rs with respect to those dispositive motions—as well as to Plaintiff's pending motion to file a third amended complaint—on January 28, 2020, recommending that the Court deny Plaintiff's motions and grant Defendants' motions. *See Summ. J. PF&R*; *Leave to Amend. PF&R.* Plaintiff timely filed

objections to both PF&Rs, albeit exceeding the page limits established by this Court in its January 30, 2020 Order.[11] *See Order*, ECF No. 415, at 2. Before turning to these objections, however, the Court will undertake a brief review of the legal standards governing its analysis.

## II. STANDARD OF REVIEW

As an initial matter, the Court notes that Plaintiff is proceeding *pro se* and is entitled to a liberal construction of his filings. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Of course, a liberal construction is not a limitless construction and the Court will "not construct the plaintiff's legal arguments for him." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

Where a plaintiff files objections to a PF&R, district courts must afford *de novo* review to "those portions of the . . . proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). The reverse is true as well, and courts are not required to review those portions of a PF&R to which no objection is made. *Thomas v. Arn,* 474 U.S. 140, 150 (1985). The Court will similarly decline to afford *de novo* review to "general and conclusory" objections, and will address only those objections that raise specific errors in the PF&R. *McPherson v. Astrue*, 605 F. Supp. 2d 744, 749 (S.D.W. Va. 2009). The same is true of objections that only reiterate earlier factual or legal assertions. *Reynolds v. Saad*, No. 1:17-124, 2018 WL 3374155, at *2 (N.D.W. Va. July 11, 2018). Any other approach—particularly in light of the scope of the parties' filings and

---

[11] Plaintiff also filed four motions after filing his objections to Magistrate Judge Eifert's PF&Rs: two "Motions for Supplemental Discovery," a "Motion to Amend [Second] Motion for Supplemental Discovery," and a "Motion to File Response Exceeding Page Limit." *See Mot. for Supplemental Discovery*, ECF No. 420; *Second Mot. for Supplemental Discovery*, ECF No. 420; *Mot. to File Resp. Exceeding Page Limit*, ECF No. 425; *Mot. to Amend Mot. for Supplemental Discovery*, ECF No. 431. Defendants also filed a "Motion to Strike Portion of Plaintiff's Objections." *Mot. to Strike*, ECF No. 426. The Court denied all these motions, reasoning that nearly seven months had passed since the close of discovery and that Plaintiff had already filed objections that exceeded the allotted page limits. *Order*, ECF No. 433 at 1–2. Nevertheless, the Court clarified that it would consider the entirety of Plaintiff's overlength objections in light of his *pro se* status. *Id.*

exhibits in this case—would "render[] the initial referral to the magistrate judge useless." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982). Nevertheless, the Court retains the wide discretion to "accept, reject, or modify, in whole or in part, the findings or recommendations" of the Magistrate Judge. 28 U.S.C. § 636(b)(1)(C). It is with this legal framework in mind that the Court turns to the pending objections.

## III. DISCUSSION

As has already been noted, two sets of Plaintiff's objections to Magistrate Judge Eifert's PF&Rs are currently pending: one related to Plaintiff's Motion for Leave to Submit Third Amended Complaint, and another related to the parties' cross-motions for summary judgment. The Court will consider both sets of objections separately.

### A. Objections to PF&R Addressing Leave to File Third Amended Complaint

Plaintiff's objections to Magistrate Judge Eifert's PF&R addressing the pending Motion for Leave to Submit Third Amended Complaint are as brief as they are futile. With respect to his first objection—that three new counts of action and nineteen new defendants should be incorporated into this case—he merely "maintains his arguments set forth in his previous pleadings." *Leave to Amend Objections*, at 1. This is not a cognizable objection, insofar as the Court will not afford *de novo* review to objections that are merely "reiterations" of arguments raised before a magistrate judge. *Reynolds*, 2018 WL 3374155, at *3 (N.D.W. Va. July 11, 2018). Plaintiff's second argument—an objection to "the magistrate judge's recommendation to dismiss the entire complaint"—is somewhat mystifying, because nowhere in the PF&R does Magistrate Judge Eifert recommend dismissing the presently-operative Second Amended Complaint. *Leave to Amend Objections*, at 1. Plaintiff's final objection is not really an objection at all, and is styled a "Motion to Withdraw New Count of Action 12." *Id.* at 2. This is apparently in reference to the

defamation and tortious interference claims this Court already addressed in its August 22, 2019 Memorandum Opinion and Order. *See Mem. Op. & Order*, ECF No. 325. Given that Plaintiff's objection appears to concur with the PF&R's conclusion that Count 12 was previously refused by this Court, *Leave to Amend PF&R*, at 8, the Court obviously need not consider its merits. It follows that Plaintiff's objections with respect to Magistrate Judge Eifert's first PF&R must be denied.

### B. Objections to PF&R Addressing Summary Judgment

Plaintiff has submitted thirty-three numbered objections with respect to Magistrate Judge Eifert's treatment of the parties' cross-motions for summary judgment. Though many raise similar issues, the Court will consider each objection in turn for the sake of analytical clarity. While certain objections are well-taken and the Court adjusts its legal analysis accordingly, none alter the outcome of this case.

#### 1. Application of *McDonnell Douglas* and Mixed-Motive Approaches

Plaintiff's first specific objection contains two distinct arguments: (1) that application of the burden-shifting framework established by *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), was unnecessary and that the Court's analysis should focus on discrimination *vel non*, and (2) that Magistrate Judge Eifert should also have analyzed his claims under the "mixed-motive" approach to reviewing Title VII claims. Resolution of the first half of this dispute is straightforward enough, for it appears Plaintiff has misapprehended the relationship between the *McDonnell Douglas* framework and discrimination *vel non*. The two are not separate inquiries; rather, the *McDonnell Douglas* scheme "exists solely to facilitate determination of 'the ultimate question of discrimination *vel non*.'" *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 295 (4th Cir. 2010) (quoting *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991)). It is true that, on appeal, "the issue boils down to whether the plaintiff has presented a triable question of intentional

discrimination, and 'the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 (1993)). Yet for the purposes of summary judgment, application of the *McDonnell Douglas* scheme to evaluate a plaintiff's claims is a perfectly appropriate means of reaching the ultimate question of whether a plaintiff was a victim of intentional discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000). To the extent Plaintiff's objection is construed as an argument that *McDonnell Douglas* was erroneously applied, then, his objection is denied.

The second half of Plaintiff's objection requires more discussion. "A plaintiff has two potential avenues to avoid summary judgment in a Title VII discrimination claim." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 206 n.4 (4th Cir. 2019). First, under a "mixed-motive" framework, a plaintiff may "present direct or circumstantial evidence that creates a genuine issue of material fact as to whether an impermissible factor such as race solely or partially motivated the employer's adverse employment decision." *Id.* Alternatively, a plaintiff "may proceed under the *McDonnell Douglas* pretext framework." *Id.* Magistrate Judge Eifert based her analysis solely on the *McDonnell Douglas* scheme, concluding that Plaintiff "offers no direct or circumstantial evidence that any of the defendants discriminated against him on the basis of race or national origin." *Summ. J. PF&R*, at 85. Plaintiff objects, arguing that he "presented 42 pages of undisputed material facts in support of discrimination" in his Motion for Summary Judgment. *Summ. J. Objections*, at 3. The Court must therefore consider whether Plaintiff has presented direct or circumstantial evidence of racial animus.

Direct evidence is "evidence which, if believed, would prove the existence of a fact in issue without inference or presumption." *O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542 (4th Cir. 1995), *rev'd on other grounds*, 517 U.S. 308 (1996). For example, direct evidence could

include statements or conduct "by decisionmakers clearly showing that race was a motivating factor in the employment decision." *McCormack v. Roanoke Reg'l Airport Com'n*, No. 7:00-CV000926, 2002 WL 32598873, at *2 (W.D. Va. Oct. 16, 2002). Plaintiff has presented no such evidence here.

Circumstantial evidence can likewise create a genuine issue of material fact in a Title VII case on its own, *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100–102 (2003), but "[t]he usual method to establish discriminatory intent with circumstantial evidence is by proving a 'prima facie case,' often called the '*McDonnell Douglas*' test,"[12] *Robinson v. Volvo Group of North America, LLC*, 65 F. Supp. 3d 458, 462 (M.D.N.C. 2014). Nevertheless, in some situations—such as where "an employer's false explanation about the circumstances of the plaintiff's termination, accompanied by evidence that the employer acted with an illicit motive," circumstantial evidence may prove discriminatory intent. *Arthur v. Pet Dairy*, 593 F. App'x 211, 219 (4th Cir. 2015). Yet to survive summary judgment under a mixed-motive theory, Plaintiff's circumstantial evidence must at least create a genuine issue of material fact as to whether his race or national origin was a motivating factor in MUSM's decision to decline him tenure. *See Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005). Simply put, the circumstantial evidence Plaintiff has presented here is not sufficient to make such a determination. Even taking the evidence in the light most favorable to Plaintiff, nothing he has placed before the Court combines to suggest that his race or

---

[12] This is because the Fourth Circuit Court of Appeals has frequently "suggested that circumstantial evidence is at the heart of the *McDonnell Douglas* approach." *Id.* at 461 n.2 (citing, *inter alia*, *Laing v. Fed. Express Corp.*, 703 F.3d 713, 718–19 (4th Cir. 2013) ("Without the benefit of direct evidence to support her claim, [Plaintiff] next seeks to rely on circumstantial evidence under the *McDonnell Douglas* burden-shifting framework.")). At a point, however, this discussion into different schemes of proof becomes more academic than useful; after all, a "plaintiff always bears the ultimate burden of proving that [an] employer intentionally discriminated against her." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996)).

national origin had anything to do with his termination. The Court is not impermissibly "weighing" the evidence in making this determination at the summary judgment stage, as Plaintiff suggests; rather, it is concluding that Plaintiff's has not presented evidence to suggest the existence of impermissible motives on Defendants' part. As such, even under the mixed-motive framework— which, given the facts of Plaintiff's case, is likely more demanding than the *McDonnell Douglas* scheme—his objection must still be denied.

### 2. "Legitimate" Expectations

Plaintiff's next objection is that Magistrate Judge Eifert erred in considering MUSM's expectations for his job performance rather than its *legitimate* expectations for his job performance. *Summ. J. Objections*, at 4. Plaintiff points to page seventy-eight of the PF&R, which defines the third element of the *McDonnell Douglas* test as an inquiry into whether "at the time of the adverse employment action, he was performing up to his employer's expectations." *PF&R*, at 78. Plaintiff is correct; though Magistrate Judge Eifert cites to *Holland v. Wash Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007), for her definition of the *McDonnell Douglas* test, the quoted portion she reproduces in the PF&R is not actually drawn from *Holland*.[13] As Plaintiff notes, the third element of the *McDonnell Douglas* test is a determination of whether "he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment actions." *Holland*, 487 F.3d at 214.

Nevertheless, this is once again a legal distinction without much difference for the actual case *sub judice*. Plaintiff has simply failed to demonstrate that he was performing up to MUSM's legitimate expectations of a faculty member deserving of tenure. *See Hawkins v. Pepsico, Inc.*, 203

---

[13] This language does appear in *Supinger v. Virginia*, 167 F. Supp. 3d 795, 807 (W.D. Va. 2016), but is obviously not binding on this Court and does not alter the Fourth Circuit's consistent references to "legitimate" expectations.

F.3d 274, 281 (4th Cir. 2000) ("[Plaintiff attempts to frame [Defendant]'s behavior in racial terms by charging that [Defendant] did not subject any of [Plaintiff]'[s] white peers to similarly poor treatment. But [Plaintiff] presents no facts that tend to show this allegedly disparate treatment was due to race rather than [Defendant]'s admittedly low regard for [Plaintiff]'[s] individual performance."). The basic requirement for promotion to Associate Professor—and therefore to receive tenure—is to demonstrate "evidence of superior worth to the University" through "effective performance in all major areas of responsibility and excellence in either teaching or research/scholarly activities." *See Faculty Promotion and Tenure Regulations*, ECF No. 333-1, at 4. This requirement is legitimate, and as his annual evaluations, Mid-Tenure Review, and Pre-Tenure Review make abundantly clear, Plaintiff's colleagues simply determined that he was not performing at levels necessary to justify an award of tenure. *See Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989) (finding that "a plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action"). Plaintiff's objection, while meritorious, is therefore inconsequential given the facts before the Court.

### 3. Reliance on *Jiminez v. Washington College*

Plaintiff's next objection is somewhat difficult to decipher, but appears to center on Magistrate Judge Eifert's reliance on *Jiminez v. Washington College*, 57 F.3d 369, 376 (4th Cir. 1995), and specifically its command that courts "be ever vigilant in observing that [they] do not sit as a super personnel council to review tenure decisions." Essentially, Plaintiff appears to believe that Magistrate Judge Eifert did not consider "whether the reviewers evaluate job performances in discriminatory manners" because she had afforded undue attention to the "irrelevant issue of the

requirement for the court to give deference to the decision maker's opinion." *Summ. J. Objections*, at 5.

As a preliminary matter, the issue of deference to a university's tenure decision is far from "irrelevant"—indeed, it is precisely this principle that frames a court's approach to Title VII claims raised in relation to tenure denials. Moreover, Magistrate Judge Eifert devoted considerable energy to considering whether Plaintiff had demonstrated the existence of discrimination in Marshall's decision to deny him tenure; she simply reached a conclusion that Plaintiff disagrees with. *See Summ. J. PF&R*, at 85–97. The fact that she considered binding precedent from the Fourth Circuit Court of Appeals alongside her analysis is not only appropriate, but necessary. Plaintiff's objection is thus meritless and must be denied.

### 4. Consideration of Similarly Situated Employees

Plaintiff next argues that Magistrate Judge Eifert erred in determining that Drs. Koc and Denvir were not comparators for the purposes of assessing his claims of disparate pay. *Summ. J. Objections*, at 6. He specifically attacks her reliance on *Spencer v. Virginia State University*, 919 F.3d 199, 204 (4th Cir. 2019), for the proposition that "professors cannot be similarly situated with each other." *Id.* Plaintiff contends *Spencer* is inapposite because the comparators worked in different departments, were former administrators, taught different levels of students, and had salaries based on their status as former administrators. *Id.* This is a very weak argument; no two cases will share exactly the same set of facts, and Magistrate Judge Eifert's reliance on *Spencer* is entirely justified given that Plaintiff and his proposed comparators also differed in several key respects.[14] In any event, she does not cite *Spencer* for the proposition that professors can *never* be

---

[14] In particular, Plaintiff is an immunologist, Dr. Koc was an expert in proteomic and mass spectrometry, and Dr. Denvir is a mathematician specializing in bioinformatics. *Summ. J. PF&R*, at 63, 67.

similarly situated with each other; rather, she repeated its reasoning that "[p]rofessors are not interchangeable like widgets," and that professors' salaries may be based on "various considerations" including market forces and specialized skills. *Spencer*, 919 F.3d at 204. Within this framework, Magistrate Judge Eifert pointed to Koc and Denvir's "different backgrounds, training, and fields of expertise" as evidence of the fallacy of comparing their salaries with Plaintiff's. *Summ. J. PF&R*, at 94. Nothing about this analysis warrants objection.

Plaintiff also contends that Magistrate Judge Eifert "erroneously suggested that instead of Koc and Denvir, the plaintiff should be compared with the highly acclaimed professors Yu and Jackman." *Summ. J. Objections*, at 6. She did no such thing; the portion of the PF&R to which Plaintiff cites is merely a summary of the Defendants' responses to Plaintiff's Motion for Summary Judgment. *Summ. J. PF&R*, at 72. It follows that this objection must be denied.

## 5. Specific Evidence of Disparate Treatment

This objection is so general as to border on the unreviewable, but essentially makes out an argument that Magistrate Judge Eifert should have lavished more attention on his comparisons between his reviews and the reviews of Drs. Koc and Denvir. *Summ. J. Objections*, at 7. At the same time, he advances the confusing argument that "this case is not about the reviewers' opinion of the plaintiff." *Id.* To the contrary, this case is plainly about the reviewers' opinion of the plaintiff—specifically, whether their decision to deny him tenure was motivated by racial or national animus. This is particularly true given the fact that the tenure committees did not compare applicants against each other, but rather against the responsibilities outlined in their letters of appointment and internal tenure regulations. In any event—and as Magistrate Judge Eifert points out—the tenure committees did not have access to all of the comparison data that Plaintiff has submitted to the Court. *Summ. J. PF&R*, at 88. Plaintiff's objection is therefore denied.

### 6. MUSM Policies

Plaintiff next argues that Magistrate Judge Eifert mistakenly construed his comparative record of publications as merely his own opinion rather than an accurate reflection of official MUSM policies. *Summ. J. Objections*, at 8. Plaintiff is apparently referencing portions of the PF&R that characterize his comparisons to Drs. Koc and Denvir as essentially subjective. *See Summ. J. PF&R*, at 86–88. Simply put, the Court agrees with this assessment of his comparisons. Contrary to Plaintiff's oft-repeated assertion that he has presented "undeniable evidence" that he published "more . . . articles of greater significance than" either Dr. Koc or Dr. Denvir, the evidence actually shows that Dr. Koc published two original research papers in two years and that Dr. Denvir published thirteen papers in three years. *See ALJ Decision*, at 45. Plaintiff, on the other hand, published only three original research papers in his six years of employment with MUSM. *Id.* Plaintiff responds by arguing that his papers were of greater importance than his colleagues' papers, and points to the "impact factor" assigned to each paper as evidence of this fact. *Summ. J. Objections*, at 8. Without citation, he claims that "[t]he generally accepted measure of importance of publications is the impact factor." *Id.* at 9. He further argues that "the school of medicine officially acknowledged that impact factor is *a* criterion for research productivity." *Id.* (emphasis added). This may well be the case, but no MUSM regulation dictates that the impact factor of an article is the *only*—or even the primary—factor to be considered in evaluating publications. Indeed, they explicitly provide that the "number, quality, and importance of publications" are to be considered. *Marshall Univ. Bd. of Governors Faculty Promotion Policy*, ECF No. 334-12, at 2. Nothing about this language suggests that the impact factor of Plaintiff's papers alone dictated a particular outcome during the tenure review process.[15] As such, his objection is denied.

---

[15] In fact, nothing about this language actually requires a committee to consider the

### 7. Evidence of Teaching and Publications Before the Tenure Reviewers

Plaintiff's next several objections challenge Magistrate Judge Eifert's conclusion that "much of the information now submitted by Zeng to prove his superiority to Drs. Koc and Denvir was not contained in the tenure packet supplied by Zeng." *Summ. J. PF&R*, at 88. His seventh objection in particular makes clear that the tenure committees had access to his teaching reviews, a list of his publications, and information about their importance. *Summ. J. Objections*, at 10. Plaintiff misapprehends the PF&R, however, which makes no claim that *all* of the information he presents in support of his comparisons to Drs. Koc and Denvir was not included in his tenure review packet. Neither Magistrate Judge Eifert nor this Court deny that certain pieces of evidence pertaining to Plaintiff's teaching performance and publications were put before the tenure committees as part of Plaintiff's review. To the extent Plaintiff has objected to a conclusion Magistrate Judge Eifert never reached, his objection is denied.

### 8. Comparative Data Available to Tenure Reviewers

As above, Plaintiff objects that he included certain comparative information about publications by Drs. Koc and Denvir in his tenure application and that Magistrate Judge Eifert erred in reasoning that it had not been included. *Id.* at 10. Once again, Magistrate Judge Eifert did not find that Plaintiff failed to include *all* information about his colleagues' publications with his tenure review packet; she merely concluded that "*much* of the information now submitted by Zeng to prove his superiority to Drs. Koc and Denvir was not included in the tenure application packet." *Summ. J. PF&R*, at 88 (emphasis added). As such, Plaintiff's objection is denied.

---

"impact factor" of an article at all. The regulation only speaks to the "importance of publications."

### 9.  Use of Public Information by Tenure Reviewers

Plaintiff's final objection related to information contained in his tenure review packet actually stems from information that was never contained in his tenure review packet. He argues that "the reviewers were not limited exclusively to the information in the application," and that they should have relied on information in the public domain. *Summ. J. Objections*, at 11. He further contends that the reviewers actually did rely on some information accessible only in electronic databases, and that this reliance should allow him to present further evidence from outside the context of his tenure application to this Court. This reasoning is deeply flawed. At core, Plaintiff's burden is to demonstrate that race was an impermissible factor in his denial of tenure under either a mixed-motive or pretextual framework. Presenting additional information to the Court that played no role in the reviewers' tenure decision does nothing to advance this goal. As Magistrate Judge Eifert notes, the "witnesses universally testified that the tenure committees at MUSM judged Drs. Koc, Denvir, and Zeng—like every other tenure applicant—on the materials that each applicant submitted with his or her tenure application," and that they "did not compare applicants to each other." *Summ. J. PF&R*, at 88. The mere possibility that reviewers could have accessed favorable information about how Plaintiff stacked up against his Drs. Koc and Denvir is therefore irrelevant in meeting his burden on his discrimination claims. The objection is accordingly denied.

### 10. Tabular and Numerical Presentation of Evidence

Plaintiff next takes issue with Magistrate Judge Eifert's "accusation" that he "frequently manipulate[ed] data in his own calculations." *Id.* at 86. Whether or not "manipulation" is the appropriate way to refer to Plaintiff's presentation of data is largely semantic, however, and is independent of Magistrate Judge Eifert's actual conclusion that Plaintiff's "data compilations do not reflect the information actually considered by the tenure committees when performing their

deliberations and do not measure the information in the same manner as used by the committees['] members." *Summ. J. PF&R*, at 88. Indeed, even taking Plaintiff's data sets at face value, "those compilations shed little light on the key issue of whether there was an improper discriminatory motive in the decision not to award Zeng tenure." *Id.* (citing *Hawkins*, 203 F.3d at 280). Plaintiff's *ex post facto* arguments that the tenure committees could theoretically have accessed the information he presents through internal Marshall records and public databases say nothing about the tenure committees' actual motivations in denying recommendations for tenure. It follows that Plaintiff's objection must be denied, even when liberally construed as an objection to Magistrate Judge Eifert's conclusion rather than the labels she has attached to it.

### 11. Meeting Marshall's Legitimate Expectations

Not so much an objection as a recitation of legal standards, Plaintiff contends that the Court should analyze whether he was performing at a level substantially equivalent to the lowest level of those who received tenure in determining if he met his employer's legitimate expectations. *Summ. J. Objections*, at 16. He claims that "[i]n *Duke v. Uniroyal Inc.*, 928 F.3d 1413 (4th Cir. 1991), the [Fourth] Circuit [Court of Appeals] defined [an] employer's legitimate expectation as 'performing at a level substantially equivalent to the lowest level of those retained in the group or territory.'" *Id.* This is an incorrect reading of *Duke*, which concerned allegations of age discrimination in circumstances where an employer's reduction in force was motivated by business reasons and employee performance was "irrelevant." *See Duke*, 928 F.2d at 1418. In this case, MUSM's legitimate expectations for Plaintiff—as well as his ability to meet them—are directly relevant; indeed, they form the very basis for his termination. Plaintiff's amended legal standard is inapplicable to this case, and his objection is denied.

**12. Exceeding Marshall's Expectation of Excellence in Teaching**

Plaintiff's next contention is that Magistrate Judge Eifert erred in determining that he had not demonstrated the requisite excellence in teaching to obtain tenure. *Summ. J. Objections*, at 17. He relies on a comparison table that lists seven factors for consideration in tenure decisions: teaching load, development of new courses, development of syllabus material, student sponsorship, resident training, courses taken to improve teaching effectiveness, and student evaluations. *Id.* At the outset, the whole exercise of Plaintiff's side-by-side comparison is once again unavailing; as witnesses unanimously testified, the tenure committees reviewed applications on their own merit rather than in comparison with other candidates for tenure. *See Summ. J. PF&R*, at 8.

The question before the Court is therefore whether Plaintiff has presented evidence sufficient to demonstrate that he was performing up to MUSM's legitimate expectations. The answer is plainly that he was not. The entire course of Plaintiff's employment at MUSM is replete with exhortations to improve his teaching skills and warning signs of what lay ahead if he did not. As early as his second annual evaluation, evaluators rated his teaching as merely "good." One year later, they aimed even lower and rated his teaching "satisfactory." Reviewers consistently suggested that Plaintiff attend classes with other professors and consult with other university resources to improve his teaching. The committee that issued Plaintiff's Mid-Tenure Review believed that he was not performing adequately in teaching, and suggested various remedial steps to improve his chances of attaining tenure. Evaluations in the following years similarly suggested various steps for improving his teaching abilities. Even allowing for some improvement in Plaintiff's teaching near the end of his time at MUSM, "Zeng simply did not follow through on all of the committees' recommendations" and did not demonstrate the sort of excellence in teaching

necessary to deserve an award of tenure. *Id.* at 91; *see also Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 516—17 (4th Cir. 2006) (upholding grant of summary judgment where a "long string of performance problems" led to employee's firing). This failure to meet MUSM's legitimate expectations is fatal to his claim,[16] and his objection is denied.

### 13. Exceeding Marshall's Expectation of Excellence in Research

Plaintiff similarly objects to Magistrate Judge Eifert's conclusion that he did not show the requisite excellence in research to justify tenure. *Summ. J. Objections*, at 17–18. Again, Plaintiff employs a comparison chart to demonstrate his purported superiority to Drs. Koc and Denvir. Again, the Court finds little relevance in Plaintiff's comparisons given the tenure committees' practice of reviewing each application separately and without reference to the performance of other candidates for tenure.

The Court therefore narrows its inquiry to a single question: whether Plaintiff has presented sufficient evidence for a reasonable jury to conclude he had demonstrated excellence in research, therefore meeting Marshall's legitimate expectations. As with teaching, the answer is that he has not met this burden. For years ahead of his final tenure decision, reviewing faculty members advised Plaintiff that he should increase the frequency of publications, participate in conferences and meetings, and work with other faculty members to develop grant proposals and collaborative projects. Reviewers were likewise unimpressed by the return on his initial $300,000 research grant. Indeed, as Plaintiff's own evidence shows, he earned two "satisfactory" rankings and one "poor" ranking for his research. *Id.* at 18. The implications of this lengthy record of constructive criticism and apparent unresponsiveness are clear enough: Plaintiff simply did not demonstrate the

---

[16] Plaintiff has presented no evidence or argument suggesting that MUSM's expectations of excellence in teaching were somehow illegitimate or a "sham designed to hide the employer's discriminatory purpose." *Brummett v. Lee Enter., Inc.*, 284 F.3d 742, 745 (7th Cir. 2002).

excellence in research that was legitimately expected of applicants for tenure. Plaintiff's objection that Magistrate Judge Eifert erred in making this determination is therefore denied.

### 14. Marshall's Discriminatory Animus

Plaintiff also objects to Magistrate Judge Eifert's determination that he had not shown that Asian faculty members were held to a higher standard than Caucasian faculty members at MUSM, thereby failing the fourth prong of the *McDonnell Douglas* analysis. *Id.* at 19. For support, he "respectfully refers the court to his motion for summary judgment" and references several particular portions of it. *Id.* As the Court will not afford *de novo* review to mere reiterations of earlier arguments raised before a magistrate judge, it will not do so here. *Reynolds*, 2018 WL 3374155, at *2. Reviewing Magistrate Judge Eifert's conclusion that Plaintiff had demonstrated no discriminatory animus for clear error—and finding none—the Court denies Plaintiff's objection.

### 15. Improperly Affording Deference to the ALJ's Decision

Plaintiff's next objection is somewhat unclear, variously referencing "full faith and credit," "*res judicata*," and "claim and issue [pre]clusion," but seems to suggest that Magistrate Judge Eifert afforded undue (or even absolute) deference to the West Virginia Public Employee Grievance Board's final decision. *Summ. J. Objections*, at 20. To the contrary, even a glancing review of the PF&R reveals over seventy pages of a careful and searching review of the evidence underlying this case and the arguments contained in each party's motion.[17] *See Summ. J. PF&R*, at 1–72. Magistrate Judge Eifert's references to the ALJ's decision do not reflect deference, but rather careful review and discussion. *See*, *e.g.*, *id.* at 86 n.1 (noting "consideration" of the ALJ's

---

[17] Indeed, the PF&R contains an entire section discounting much of Defendants' full faith and credit argument. *Summ. J. PF&R*, at 118–19.

conclusions). As this Memorandum Opinion and Order makes clear, merely referencing another adjudicator's findings does not inherently involve the application of any deference to those findings. The objection is therefore denied.

### 16. Improperly Discrediting Plaintiff's Evidence

Plaintiff next contends that Magistrate Judge Eifert "fully adopted the grievance board's erroneous finding that the plaintiff manipulated evidence," thereby exceeding her authority at the summary judgment stage. *Summ. J. Objections*, at 20. In particular, the PF&R quotes the ALJ's opinion that Plaintiff "appears to frequently manipulate data in his own calculations to detract from the performance of compared faculty members and enhance his own." *Summ. J. PF&R*, at 86. This statement—as well as Magistrate Judge Eifert's subsequent substantiation of it—does not reflect a desire to "discredit" Plaintiff's evidence, but rather a hope to engage with underlying facts behind that evidence. What this review uncovered was a series of discrepancies in the data Plaintiff presented, such as his decision not to include co-authored articles or his omission of references to relevant timeframes. None of this "discredits" Plaintiff's actual evidence; rather, it examines the facts underlying his chosen packaging of it. To reason otherwise would confine courts to taking evidence like Plaintiff has presented here—primarily composed of tables and other numerical data—at face value, entirely unable to determine if such data is grounded in reality. The Court therefore denies Plaintiff's objection.

### 17. Deference to Defendants' Opinions of Job Performance

Plaintiff argues that Magistrate Judge Eifert "misconstrued the case law[] to think that so long as the employer has different opinions on the employee's job performance there is no case for the employee." *Summ. J. Objections*, at 21. To the contrary, the PF&R accurately quotes precedent from the Fourth Circuit Court of Appeals and other district courts within the Fourth

Circuit to make the point that a "plaintiff's disagreement with an employer's criticisms is not relevant because the inquiry is not whether an employer's assessments of a plaintiff were accurate." *Ostrem v. Arlington Cnty. Sch. Bd.*, No. 1:18-CV-746, 2019 WL 6188278, at *4 (E.D. Va. Nov. 19, 2019). This principle does not suggest that a plaintiff may not bring an anti-discrimination lawsuit where an employer has an unfavorable opinion of his or her performance, but it does suggest that "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff" when determining if he or she is meeting an employer's legitimate expectations. *Warch*, 435 F.3d at 518. Inasmuch as Magistrate Judge Eifert appropriately discounted Plaintiff's opinions of his own performance, his objection is denied.

## 18. Failure to Recognize Arbitrariness of Decisions

Plaintiff's next objection is that Magistrate Judge Eifert erred in treating "the chair's comments in faculty reports and tenure reviewers' . . . evaluations as independent factors for determining excellence in teaching or research." *Summ. J. Objections*, at 21. In particular, he argues that "the chair and other reviewers did not have a license to say whatever they wanted" and that the blatant inaccuracy of their reviews essentially render them meaningless. *Id.* Plaintiff is fundamentally incorrect. A "teacher's competence and qualifications for tenure or promotion are by their very nature matters calling for highly subjective determinations, determinations which do not lend themselves to precise qualifications and are not susceptible to mechanical measurement or the use of standardized tests." *Clark v. Whiting*, 607 F.2d 634, 639 (4th Cir. 1989). The inherent subjectivity of tenure decisions renders any opinions of an applicant's performance vital in determining whether that applicant is meeting his employer's legitimate expectations. To ignore the opinions of those who reviewed Plaintiff's performance simply because he disagrees with them

and believes they are arbitrary would turn this Court into precisely the type of super personnel council that it may never become. *See Jiminez*, 57 F.3d at 376. The objection is accordingly denied.

### 19. Requirement of Proving Discrimination Against Asian Faculty Members

Plaintiff's next objection contains two sub-parts: first, that Magistrate Judge Eifert improperly held that he would need to demonstrate a pattern of discrimination against all Asian faculty to make his case, and second, that she erred in concluding that he had not demonstrated such a pattern. *Summ. J. Objections*, at 22. With respect to the first part of Plaintiff's objection, it is not clear that Magistrate Judge Eifert ever concluded that he was required to demonstrate a pattern of discrimination against all Asian faculty members to make out a successful anti-discrimination claim; she merely suggests that he singled out just two successful Asian faculty members to make the case that all Asian faculty members are held to a higher standard than their Caucasian coworkers. *Summ. J. PF&R*, at 91.

The second half of Plaintiff's objection is similarly unavailing, as it is essentially a bald disagreement with Magistrate Judge Eifert's conclusion that he had not demonstrated that MUSM held Asian faculty members to a higher standard than their Caucasian counterparts. Indeed, he leaves entirely unaddressed Magistrate Judge Eifert's determination that (1) Plaintiff was one of few Asians who was not offered tenure by MUSM and (2) that "of the group of faculty members who did not advance, most of them were Caucasian." *Id.* at 92. This evidence weighs overwhelmingly against Plaintiff's position, and he has not provided countervailing evidence that could create a genuine issue of material fact. The Court therefore denies the objection.

### 20. Failure to Recognize Dr. Primerano's Interference

Plaintiff contends that Magistrate Judge Eifert overlooked two pieces of evidence related to Dr. Primerano: that he told the departmental tenure committee "years before" October 2015 that

he did not plan on recommending Plaintiff for tenure, and that he blocked his access to the same committee's review of his tenure application. *Summ. J. Objections*, at 23. This objection is simple enough to resolve, because there is simply no evidence that either omission would alter a Court's consideration of whether unlawful discrimination influenced MUSM's tenure decision. Primerano's premature decision to advise his colleagues that he would not recommend Plaintiff for tenure was neither prudent nor considerate, but it has no clear relationship to Plaintiff's race or national origin. The same is true of Primerano's alleged decision to "block" Plaintiff from requesting revisions in the departmental committee's report on his application for tenure, which reflects a failure of effective management more than anything else. Plaintiff's objection must therefore be denied.

### 21. Failure to Recognize the Defendants' Warnings were Disparate Treatments

Plaintiff next objects to Magistrate Judge Eifert's finding that he "could not prove pretext because the defendants gave multiple warnings." *Id.* at 23. While he considers this logic "baffling," it is actually quite straightforward. To prove that an employer's stated reasons for an adverse employment decision are pretextual, a "plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). Yet even before reaching this point, an employer must produce "sufficient evidence to support a nondiscriminatory explanation for its decision." *Id.* Plaintiff's multiple warnings that he was not performing sufficiently well to obtain tenure are strong evidence that he was denied tenure for the exact reason MUSM has proffered here: his lacking performance.

Of course, Plaintiff also argues that these warnings constituted "unfavorable disparate treatments." *Summ. J. Objections*, at 23. He claims that similarly situated employees performed

substantially the same and did not receive similar warnings. *Id.* at 24. As has been noted frequently already, the key question in resolving Plaintiff's discrimination claims is quite narrow: whether the committees' decision to deny Plaintiff a tenure recommendation was the result of impermissible discrimination. Given the fact that each application is reviewed on its own rather than weighted against others, comparing the relative commentary for each tenure applicant is a largely irrelevant exercise. This objection is accordingly denied.

### 22. Pay Discrimination

Plaintiff also claims that Magistrate Judge Eifert erred in concluding that he was not the subject of discrimination in salary. First, he once again argues that *Spencer v. Virginia State University*, 919 F.3d at 204, is inapposite to this case because the comparators in *Spencer* taught different types of students and had their salaries determined by their former status as administrators. *Summ. J. Objections*, at 24. As discussed *supra*, *Spencer* is not inapposite here. The differences between Plaintiff and Drs. Koc and Denvir are manifold, ranging from their different backgrounds, training, and fields of experience. To succeed on a claim for discrimination in salary, Plaintiff must demonstrate that he and his proposed comparators "had *equal* jobs, not just that they all performed vaguely related tasks using nominally comparable skills." *Spencer*, 919 F.3d at 205 (emphasis in original).

Of course, Plaintiff's claim fails for an even clearer reason: that his salary of about $76,000 per year fell comfortably in the middle of other salaries in his department. *See State Employees Total Compensation*, ECF Nos. 363-1–7. Some Caucasian faculty members earned less than Plaintiff, while some Asian faculty members earned more. *See Marshall Resp. in Opp'n*, ECF No. 363, at 3–5. There is simply no pattern of discrimination apparent in this publicly-available data; rather, it suggests that MUSM pays employees based on market forces, specialization,

budgetary considerations, and current institutional needs. Plaintiff offers no persuasive evidence in his Objections or original Motion for Summary Judgment to demonstrate that this non-discriminatory explanation is pretextual. Instead, he fixates on largely meaningless statistical measures—the fact that two immunologists at West Virginia University were paid between $94,000 and $99,000 in 2009, for example. *Summ. J. Objections*, at 26. At best, this information represents exactly the sort of "scintilla" of evidence that is insufficient to defeat summary judgment. Plaintiff's objection is denied.

### 23. Employment Privilege

Plaintiff's final objection with respect to his discrimination claims rests on his argument that MUSM discriminated against him by denying him the opportunity to teach Dr. Jackman's Medical Immunology course. *Id.* at 28. Specifically, he claims Magistrate Judge Eifert erred in concluding that he did not suffer an adverse employment consequence from the denial and that he did not demonstrate that MUSM's reasoning was pretextual. *Id.* The Court disagrees with Plaintiff on both counts. First, Plaintiff has presented no evidence that his application for tenure was affected in any way by MUSM's refusal to allow him to teach Dr. Jackman's course. Indeed, a core part of his argument is that his actual courseload was *not* factored into the tenure committees' decisions. *Id.* ("[T]he primary reason the tenure committees and reviewers did not give [an] excellent rating of the plaintiff's teaching was because they considered, *albeit falsely*, the plaintiff's teaching load to be low." (emphasis added)). Second, Plaintiff has failed to demonstrate that MUSM's stated reason for asking another professor to teach Dr. Jackman's course—Plaintiff's low teaching scores—was pretextual. Though Plaintiff's teaching scores had improved by 2015, this fact alone is insufficient to demonstrate that his prior low teaching scores were not the actual basis for MUSM's decision. Moreover, the fact that the professor who took over teaching Dr.

Jackman's course later earned low reviews does not indicate that MUSM's original decision was pretextual. As such, Plaintiff's objection must be denied.

### 24. Conspiracy for Breach of Contract and Retaliation

It is difficult to discern exactly what portions of Magistrate Judge Eifert's findings that Plaintiff particularly objects to with respect to his conspiracy claim; indeed, the majority of his objection appears to be a recitation of his earlier arguments concerning the existence of a years-long conspiracy to retaliate against him for an EEOC complaint he had not yet filed. *See id.* at 29–33. He takes issue with Magistrate Judge Eifert's "new theory"—which is really her proposed finding—that Drs. Primerano and Shapiro did not consider Plaintiff's termination on June 30, 2016 to be an early termination. *Id.* at 29. Of course, Plaintiff's termination on June 30, 2016 was *not* an early termination; in fact, "the evidence is uncontroverted that Zeng's seventh annual contract with MUSM ended on June 30, 2106 and MUSM's Tenure Regulations limited non-tenured probationary faculty to a maximum of seven years' employment." *Summ. J. PF&R*, at 101.

He also objects to Magistrate Judge Eifert's conclusion that "the defendants could treat employment time of less than 1 full year as a full probationary year." *Summ. J. Objections*, at 30. It is true that Marshall regulations provide that faculty "appointed at times other than the beginning of the academic year may choose to have those periods of appointment equal to or greater than half an academic year considered as a full year *for tenure purposes only.*" *See id.* (emphasis added). Yet why this language—which applies only to tenure decisions—should have any effect on the end date of Plaintiff's actual employment is entirely unclear, particularly given that a decision on Plaintiff's tenure status had already been rendered.

As a final matter, Plaintiff re-alleges his claim that Primerano and Shaprio's joint letter of March 24, 2015—filed over a year before Plaintiff filed his EEOC complaint and initiated

grievance procedures—marked the start of a conspiracy to retaliate against him for doing just that. *Id.* at 31. He claims Magistrate Judge Eifert erred in discrediting the letter as evidence of a conspiracy. *Id.* The Court disagrees, and finds Plaintiff's argument unavailing once again. This case neatly encapsulates the Fourth Circuit Court of Appeals' "relatively stringent standard for establishing section 1985 conspiracies." *Simmons v. Poe*, 47 F.3d 1370, 1378 (4th Cir. 2011). Under standards governing claims of conspiracy to discriminate in employment, courts in the Fourth Circuit have "rarely, if ever, found that a plaintiff has set forth sufficient facts to establish a section 1985 conspiracy, such that the claim can withstand a summary judgment motion." *Id.* Plaintiff's unsupported conclusions are simply not enough to avoid summary judgment, and his objection is denied.

### 25. Retaliation: No Alternative Interpretations of Policies

Plaintiff's next three objections all stem from his retaliation claim, which he outlines in Count Six of the Second Amended Complaint. This particular objection stems from Magistrate Judge Eifert's interpretation of Marshall policies requiring a terminal contract for certain employees, though the precise nature of Plaintiff's objection to her conclusion is unclear. *Summ. J. Objections*, at 33. He raises two legal arguments related to implied contracts in employee handbooks and property interests in tenure-track faculty positions, though these are more Plaintiff's spin on certain legal principles than cognizable objections to the PF&R.

Nevertheless, Plaintiff also raises several factual objections. Each of these is principally centered around his own changing interpretations of Marshall policy as it related to his termination date. He attempts to wriggle free from his prior admission that "the Faculty Promotion and Tenure regulations would require that I apply for tenure in my sixth year (the fall of 2014)" when

requesting an extension to the fall of 2015.[18] *Id.* at 35. He variously claims that he never mentioned the word "policy" in his letter, and that his use of the verb "would" instead of "will" somehow indicates uncertainty about the very tenure deadline he was requesting to extend. *Id.* at 35. That Plaintiff has changed his interpretation of the regulations now to require a terminal contract extending his employment is belied by his own prior statements and reflects nothing more than a desire to put forth a more favorable interpretation of applicable regulations.

As a final note, Plaintiff's focus on regulatory provisions governing terminal contracts is misplaced. The core of his retaliation claim is that he was discharged on June 30, 2016 in retaliation for filing his EEOC complaint and his grievance with the WVPEGB. As noted with respect to his conspiracy claim, Plaintiff was informed that his employment with Marshall would end on that date over a year before its arrival and well before filing any complaint or grievance. This fact alone renders Plaintiff's objections to Magistrate Judge Eifert's findings on his retaliation claim a somewhat academic exercise, though the Court of course affords them the *de novo* review required by law. In any event, the objection is denied.

### 26. Retaliation: Premature Termination Apart from Terminal Contract

Plaintiff's next objection does not actually reference any part of Magistrate Judge Eifert's PF&R, and merely claims that "the defendants should [have] issue[d] the plaintiff a notice of faculty employment to cover 'part of' academic year 2016-17, from July 1, 2016 to Aug[ust] 30, 2016." *Id.* at 36. It is entirely unclear how this objection relates to a particular portion of the PF&R. In any event, the court denies the objection to the extent it is characterized as one.

---

[18] He also argues that there was no "meeting of the minds" at a discussion with Dr. Primerano about an extension of time to apply for tenure. *Summ. J. Objections*, at 35. The Court does not attach much significance to this meeting, other than to note it is further evidence of Plaintiff's awareness of MUSM's position regarding his termination date.

### 27. Retaliation: Plaintiff's Protected Activities

Plaintiff next argues that Magistrate Judge Eifert erred in identifying the wrong "protected activity" for which he was discharged. *Id.* at 36. He claims that his protected activities included filing a complaint with the EEOC and a grievance with the WVPEGB in April and mid-May 2016, and that Defendants retaliated against him by sending him a notice of termination on June 29, 2016. *Id.* As has been discussed already, this is a dramatically incomplete picture of what actually occurred. Plaintiff received notice of his contract's termination date on March 24, 2015 from both Drs. Primerano and Shapiro. He later discussed that termination date with Primerano in person, though it was not altered. It requires no weighing of the evidence to conclude that Plaintiff's contract termination date was established far before he even contemplated filing a complaint or grievance (and, for that matter, before he was even denied tenure). The fact that Shapiro later offered to extend Plaintiff's employment by several months to appease him does not alter this analysis. It belies basic logic to conclude that enforcement of a pre-set termination date is the product of retaliation for protected activity that has not already occurred. Plaintiff's objection is denied.

### 28. Neglect to Prevent Retaliation

Plaintiff next objects to Magistrate Judge Eifert's conclusion that summary judgment is warranted with respect to his 42 U.S.C. § 1986 claim because she erred in concluding that he had not demonstrated the existence of a conspiracy to retaliate under 42 U.S.C. § 1985. *Id.* at 37. As discussed above, Plaintiff's objections to Magistrate Judge Eifert's findings on his conspiracy claim are not meritorious. Plaintiff has failed to present sufficient evidence to succeed on a claim for conspiracy to retaliate or for actual retaliation, and thus cannot succeed on a claim for neglect

to prevent retaliation. As he presents no other argument against Magistrate Judge Eifert's conclusion, his objection is denied.

### 29. Substantive Due Process Violation

The first of Plaintiff's five objections related to his due process claims focuses on his "substantive due process right in the tenure process." *Id*. This is a difficult objection to parse; while he centers it on Magistrate Judge Eifert's purported error in concluding that "once tenure is denied the property interest in tenure ceases to exist," the rest of his objection seems to be that discrimination was simply so apparent in his tenure review process that it would "shock the conscience." *Id.* at 38. It is unclear how this alleged error and the substance of this objection relate, but the Court will address them nonetheless. As the United States Supreme Court has made clear, substantive due process may be used to override a decision in an academic setting only where the decision "is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Regents of the Univ. of Michigan v. Ewing*, 474 U.S. 214, 223 (1985). There is no evidence before the Court that rises to this high level. As Plaintiff's substantive due process rights were not violated by the tenure review process, his objection is denied.

### 30. Due Process: Property Interest

Plaintiff's next objection again references the requirement that professors who are denied tenure be offered a "terminal contract" for a final year of employment. *Summ. J. Objections*, at 38. He claims Magistrate Judge Eifert erred in determining that he did not request an extra "terminal" year after receiving Primerano and Shapiro's March 24, 2015 letter, which laid out in no uncertain terms that his final day of employment (barring an award of tenure, that is) would be June 30, 2016. Of course, the unique circumstances of Plaintiff's time at Marshall warranted this slightly

atypical approach. Three Marshall regulations make this point clearly. First, Marshall requires professors to apply for tenure before their sixth year of employment. *See Title 133, Series 9 Procedural Rule, West Virginia Higher Education Policy Comm'n*, ECF No. 334-11, at § 10.3. Second, the maximum period of tenure-track status is capped at seven years. *Id.* Third and finally, professors who are denied tenure are guaranteed a one-year written terminal contract of employment. *Id.*

In normal circumstances, Plaintiff would have applied for tenure by the fall of 2014. If he were denied, he presumably would have been offered a terminal contract for another year of employment. Of course, Plaintiff requested an additional *seventh* year in which to apply for tenure. Primerano and Shaprio granted this request, but noted that the fall of 2015 would be Plaintiff's "last opportunity . . . to apply for tenure." *Letter from Joseph Shapiro and Donald Primerano to Wei-Ping Zeng*, at 1. The letter also provided a plain warning that "[i]n the event that tenure is not approved, your contract would expire on June 30[,] 2016." *Id.* This arrangement made it impossible to afford Plaintiff a terminal contract and still comply with the seven-year cap on tenure-track appointments, but suited Plaintiff's desire for an extension in time to apply for tenure. To the extent Plaintiff's objection is narrowly construed as arguing he was under no obligation to request a terminal contract, he is correct. Yet his argument fails when placed in the broader context of an extension in his tenure application period that had already been granted. Plaintiff was under no obligation to request a terminal contract, but MUSM was under no obligation to offer one either; indeed, it had already effectively done so in acceding to Plaintiff's extended timeline. In any event, "the mere fact that a state agency violates its own procedures does not *ipso facto* mean that it has contravened federal due process requirements." *Morris v. City of Danville*, 744 F.2d 1031, 1048 n.9 (4th Cir. 1984). It follows that this objection is denied.

### 31. Due Process: Primerano's June 29, 2016 Letter

Plaintiff next objects to Magistrate Judge Eifert's conclusion that the March 24, 2015 letter he received from Primerano and Shapiro served as notice of his pending termination. *Summ. J. Objections*, at 39. Instead, he argues that the June 29, 2016 letter he received from Primerano was his notice of termination. *Id.* He claims that the 2015 letter was insufficient because it did not provide him with notice of a pending termination, the reason for such a termination, or an opportunity to challenge his termination.[19] *Id.* at 40. Of course, the Court need not consider the constitutional implications of these claims because none of them are true. The 2015 letter clearly stated that Plaintiff's contract would expire on June 30, 2016, thereby providing him notice of his pending termination absent an award of tenure. Plaintiff's argument that the letter did not provide him with the reason for his termination is equally specious; indeed, it expressly conditions the end of his employment upon his failure to obtain tenure. Finally, the letter was sent over a year before Plaintiff's contract was set to expire. He was afforded abundant time to challenge his dismissal—time he took advantage of by filing a complaint with the EEOC and a grievance with the WVPEGB. In fact, grievance proceedings moved efficiently enough that his Level I hearing was conducted before his termination. In short, Magistrate Jude Eifert did not err in concluding that Plaintiff received notice of his termination in 2015 and his objection is accordingly denied.

### 32. Due Process: Lack of Pre-Termination Hearing

Plaintiff's penultimate objection is that Magistrate Judge Eifert erred in determining that he was afforded adequate pre-termination due process. *Id.* at 40. This argument is predicated on

---

[19] He raises these arguments in light of the United States Supreme Court's holding that a "tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). Plaintiff, obviously enough, is not a tenured public employee.

Plaintiff's incorrect view that he was not provided with pre-termination notice until June 29, 2016. *Id.* at 41. As is discussed with respect to the prior objection, Plaintiff was provided with notice of his pending termination on March 24, 2015. Even before that date, Plaintiff had been told consistently that he would need to improve his performance in order to obtain tenure. After receipt of the 2015 letter, he engaged in discussions with Drs. Beaver, Primerano, and Shapiro about when his application would be due and what result it was likely to yield. After his application for tenure was denied, he filed an EEOC complaint and a grievance with the WVPEGB—a grievance that quickly yielded a Level I hearing on June 20, 2016. Plaintiff was thus afforded a significant period of time and several different avenues to share his version of events. This certainly meets (and, in fact, markedly exceeds) the due process threshold for pre-termination hearings, particularly given the length and scope of his post-termination proceedings. *See Gilbert v. Homar*, 520 U.S. 924, 929 (1997) (concluding that a public employee is "entitled to a very limited hearing prior to his termination, to be followed by a more comprehensive post-termination hearing"). Plaintiff's objection is accordingly denied.

### 33. Due Process Under State and Federal Constitutions

Plaintiff's final objection is actually structured as a "reminder" to the Court that he has raised claims under the West Virginia Constitution and the United States Constitution, and argues that an unbiased tribunal is a key element of due process under West Virginia law. *Summ. J. Objections*, at 41–42. He argues that Magistrate Judge Eifert erred in concluding that his Level I hearing comported with state due process requirements, and points to the appointment of Stephen Hensley—a former Marshall employee—as the Level I hearing examiner as proof. *Id.* As an initial matter, Plaintiff correctly identifies the right to an unbiased tribunal as a "fundamental element of due process" in West Virginia. *State ex rel. Skinner v. Dostert*, 278 S.E.2d 624, 634 (W. Va. 1981).

Yet he has presented no evidence that the Level I hearing was actually biased against him, and in any event was later afforded the opportunity to appeal Hensley's decision to a mediator, an ALJ at the WVPEGB, the Circuit Court of Kanawha County, and the Supreme Court of Appeals of West Virginia—all of which he has done. The notion that Plaintiff has been denied due process under the West Virginia Constitution after five rounds of review is meritless, and his objection is denied.

## IV. CONCLUSION

Pursuant to the foregoing analysis, the Court **DENIES** both sets of Plaintiff's objections, ECF Nos. 418, 419, and **ADOPTS AND INCORPORATES HEREIN** the PF&Rs, ECF Nos. 411, 412. The Court accordingly **GRANTS** Defendants' various motions for summary judgment, ECF Nos. 337, 339, 341, 343, 345, 347, and **DENIES** Plaintiff's corresponding cross-motion for the same, ECF No. 332. The Court likewise **DENIES** Plaintiff's motion for leave to file another amended complaint, ECF No. 288, and **ORDERS** this civil action removed from its docket.

The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented parties.

ENTER:    March 26, 2020

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE